

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW, Rm. 7327
Washington, DC 20530

MSR:ASDasgupta
DJ # 80-11E-66

Tel: 202-514-5428

VIA CM/ECF

November 22, 2013

Ms. Molly C. Dwyer
Clerk, United States Court of Appeals
for the Ninth Circuit
P.O. Box 193939
San Francisco, CA
94119-3939

RE:   *Enos v. Holder*, No. 12-15498 (9th Cir.)

Dear Ms. Dwyer:

Pursuant to Fed. R. App. P. 28(j), we write to provide notice of this Court's recent decision in *United States v. Chovan*, No. 11-50107 (9th Cir.) (Nov. 18, 2013), which upholds the constitutionality of 18 U.S.C. § 922(g)(9), the federal statute that is also being challenged in this case. A copy of the slip opinion is attached.

As relevant to this case, the *Chovan* decision holds that a domestic violence misdemeanant who never lost "the right to vote, the right to serve on a jury, or the right to hold public office * * * cannot qualify for the civil rights restored exception to § 922(g)(9)." Slip Op. 10; *see also id.* at 7-9 (rejecting argument that domestic violence misdemeanant's "civil rights were restored within the meaning of § 921(a)(33)(B)(ii) when his right to own firearms was restored under California law ten years after his 1996 conviction"). The *Chovan* decision further holds that § 922(g)(9)'s restriction on firearm possession satisfies intermediate scrutiny on its face, *id.* at 27, and as applied to a domestic violence misdemeanant "who has not committed domestic violence for fifteen years," *id.* at 29-30. *See also id.* at 22-23 (concluding that because "§ 922(g)(9) does not implicate the core Second Amendment right, * * * intermediate rather than strict scrutiny is the proper standard to apply").

We would be grateful if you would provide copies of this letter to the panel.

Sincerely,

**s/ Anisha S. Dasgupta**

Anisha S. Dasgupta
Attorney for Appellees

Encl.

cc:     all counsel (via CM/ECF)

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. DANIEL EDWARD CHOVAN, *Defendant-Appellant*. | No. 11-50107 D.C. No. 3:10-cr-01805-JAH-1 OPINION |

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted
February 15, 2012—Pasadena, California

Filed November 18, 2013

Before: Harry Pregerson, Michael Daly Hawkins,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Pregerson;
Concurrence by Judge Bea

## SUMMARY[*]

**Criminal Law/Second Amendment**

The panel affirmed the district court's denial of a motion to dismiss an indictment in a case in which the defendant contended that 18 U.S.C. § 922(g)(9), which prohibits persons convicted of domestic violence misdemeanors from possessing firearms for life, violates his Second Amendment right to bear arms and does not apply to him because his civil rights have been restored.

The panel held that the defendant's 1996 misdemeanor domestic violence conviction did not divest him of civil rights because it did not divest him of the right to vote, the right to serve on a jury, or the right to hold public office, and that he therefore cannot qualify for the "civil rights restored" exception to § 922(g)(9). The panel also rejected the defendant's argument that the civil rights restored exception violates the Equal Protection Clause.

The panel held that intermediate scrutiny applies to the Second Amendment claim, and that § 922(g)(9) is constitutional on its face and as applied to the defendant.

Concurring in the result, Judge Bea wrote separately to express his disagreement with the majority's default determination that persons convicted of domestic violence misdemeanors are thereby disqualified from the core right of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the Second Amendment to possess firearms for defense of the home.

---

## COUNSEL

Devin Burstein, Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant

Caroline P. Han, Assistant United States Attorney, San Diego, California, for Plaintiff-Appellee.

---

## OPINION

PREGERSON, Circuit Judge:

Following the entry of a conditional guilty plea, Daniel Chovan appeals the district court's denial of his motion to dismiss an indictment against him for violation of 18 U.S.C. § 922(g)(9). Section 922(g)(9) prohibits persons convicted of domestic violence misdemeanors from possessing firearms for life. Chovan contends that § 922(g)(9) is unconstitutional both on its face and as applied to him because it violates his Second Amendment right to bear arms. In the alternative, he argues that § 922(g)(9) does not apply to him because his civil rights have been restored within the meaning of 18 U.S.C. § 921(a)(33)(B)(ii). We have jurisdiction pursuant to 28 U.S.C. § 1291. We reject Chovan's "civil rights restored" argument, hold that intermediate scrutiny applies to his Second Amendment claim, and uphold § 922(g)(9) under intermediate scrutiny.

## FACTUAL & PROCEDURAL BACKGROUND

In 1996, Daniel Chovan was convicted in California state court of the misdemeanor of inflicting corporal injury on a spouse in violation of California Penal Code § 273.5(a). The victim, Cheryl Fix,[1] was living with Chovan at the time.[2] Chovan was sentenced to 120 days in jail and three years of supervised release.

Because of this conviction, Chovan was prohibited from possessing firearms under both state and federal law. Under California Penal Code § 12021(c)(1), which at the time applied to misdemeanants generally, Chovan was barred from owning, purchasing, receiving, or having in his possession or under his custody or control, any firearm for a ten-year period following his conviction. But under 18 U.S.C. § 922(g)(9), a federal statute that applies only to persons convicted of misdemeanor domestic violence crimes, Chovan was barred from possessing any firearm for life.

Section 922(g)(9) establishes two exceptions under which the statute will no longer apply: (1) "if the conviction has been expunged or set aside"; or (2) if the offender "has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense)." 18 U.S.C. § 921(a)(33)(B)(ii).

---

[1] Fix married Chovan in 1997 and changed her last name to "Chovan." We refer to her as Fix throughout this opinion for the sake of clarity. Fix and Chovan separated in 2009.

[2] California Penal Code § 273.5(a) does not require that the parties be married, but rather applies to any person who willfully inflicts corporal injury "upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child . . . ."

These exceptions are not met if "the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." *Id.*

In 2009, Chovan applied to purchase a firearm from a San Diego area gun dealer. He completed a required application form and answered "no" to the question whether he had ever been convicted of a misdemeanor crime of domestic violence. His purchase application was denied after a background check revealed his 1996 misdemeanor conviction of domestic violence. At the time of his application, Chovan could legally possess a firearm under California law because ten years had passed since his 1996 conviction, but § 922(g)(9) continued to bar him from possessing a firearm.

The FBI received information about Chovan's attempted purchase and began investigating Chovan. During their investigation, FBI agents found videos on the Internet depicting Chovan and others shooting rifles and conducting "border patrols" near the U.S.-Mexico border.

The FBI also learned that in March 2010, San Diego County Sheriff deputies responded to a domestic dispute at Chovan's residence. Fix, Chovan's then-estranged wife, told the officers that Chovan had become violent, hit her with a cell phone, and threatened to hunt her down and shoot her if she ever left him. Fix said that she believed Chovan's threats because he had weapons inside his house.

On April 15, 2010, FBI and Bureau of Alcohol, Tobacco, Firearms and Explosives agents executed a search warrant of Chovan's house. In the course of their search they found and confiscated four firearms, including a High Standard .22 caliber handgun that belonged to Chovan, and 532 rounds of

assorted ammunition. Federal agents arrested Chovan the day after the search. During his arrest, Chovan admitted that he had possessed and fired the firearms several times since his 1996 domestic violence conviction. A two-count indictment was brought against Chovan. Count One alleged that Chovan had knowingly possessed firearms in violation of § 922(g), and Count Two alleged that he had made a false statement in the acquisition of a firearm in violation of 18 U.S.C. § 924(a)(1)(A).

Chovan moved to dismiss Count One, contending that (1) § 922(g)(9) is an unconstitutional violation of the Second Amendment; (2) his civil rights were "restored" within the meaning of § 921(a)(33)(B)(ii), and therefore § 922(g)(9) did not apply to him; and (3) § 922(g)(9)'s application to him was a violation of equal protection. The district court denied Chovan's motion to dismiss, concluding that § 922(g)(9) "is a presumptively lawful prohibition and represents an exemption from the right to bear arms under the Second Amendment as articulated in [*District of Columbia v. Heller*, 554 U.S. 570 (2008)]."

Chovan pled guilty to Count One of the indictment, pursuant to a conditional plea agreement that preserved his right to appeal the denial of his motion to dismiss.[3] Chovan was sentenced to five years probation. Chovan timely appealed the denial of his motion to dismiss.

---

[3] Count Two was dismissed as a part of the plea agreement and is not at issue in this appeal.

## STANDARD OF REVIEW

We review de novo the constitutionality of a statute. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010). We also review de novo constitutional challenges to a district court's denial of a motion to dismiss. *Id.*

## DISCUSSION

Chovan argues on appeal that § 922(g)(9) violates the Second Amendment because it is an impermissible restriction on the individual and fundamental right to bear arms. He alternatively argues that § 922(g)(9) does not apply to him because his civil rights were restored when his ten-year ban on owning firearms under California state law expired, and thus that his conviction should be vacated. We disagree with both arguments.

## I. Civil Rights Restored

We start by addressing Chovan's non-constitutional argument that § 922(g)(9) does not apply to him because his civil rights have been restored.[4] Section 921(a)(33)(B)(ii) prevents the application of § 922(g)(9) in situations where a defendant's "civil rights" have been restored. Chovan contends that his civil rights were restored within the meaning of § 921(a)(33)(B)(ii) when his right to own

---

[4] *See Dep't of Commerce v. United States House of Representatives*, 525 U.S. 316, 343–44 (1999) (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.")).

8          UNITED STATES V. CHOVAN

firearms was restored under California law ten years after his 1996 conviction.

Section 921(a)(33)(B)(ii) does not define the term "civil rights." In *United States v. Brailey*, however, we addressed how to interpret the term. 408 F.3d 609, 611–13 (9th Cir. 2005). In 1997, James David Brailey was convicted in Utah of a misdemeanor crime of domestic violence. *Id.* at 610–11. As a result of this conviction, he was barred from possessing firearms under then-existing Utah state law. *Id.* at 611. In 2000, however, Utah amended its statutes such that Brailey and other misdemeanants were no longer prevented from possessing firearms. *Id.* at 610–11. Brailey was subsequently charged with firearm possession in violation of § 922(g)(9). *Id.* at 610. He appealed the § 922(g)(9) conviction, maintaining that his civil rights had been restored within the meaning of § 921(a)(33)(B)(ii) because his right to possess a gun had been restored under Utah law. *Id.*

We rejected Brailey's argument, concluding that his civil rights had never been "lost" because his misdemeanor conviction had not taken away his "core civil rights": the right to vote, to sit as a juror, or to hold public office. *Id.* at 613. Because Brailey's civil rights had never been lost, we reasoned that they could not have been restored. We noted that most other circuits had also concluded that, "where civil rights are not divested for misdemeanor convictions, a person convicted of a misdemeanor crime of domestic violence cannot benefit from the federal restoration exception." *Id.* at 612 (citing *United States v. Jennings*, 323 F.3d 263 (4th Cir. 2003); *United States v. Barnes*, 295 F.3d 1354 (D.C. Cir. 2002); *United States v. Smith*, 171 F.3d 617 (8th Cir. 1999)); *see also Logan v. United States*, 552 U.S. 23, 37 (2007) (holding that a different "civil rights restored" exception did

not apply to "an offender who lost no civil rights"). Thus, we concluded that Brailey failed to meet § 922(g)(9)'s civil rights restored exception.

Chovan argues that *Brailey*'s reading of the civil rights restored exception is too narrow and "create[s] an equal protection problem." According to Chovan it is unfair that under *Brailey*, individuals who lose the right to vote, serve on a jury, or hold public office because of their convictions but later have these rights restored can possess firearms, while individuals like Chovan who never lost these rights cannot.

Chovan's equal protection argument is foreclosed by our decision in *United States v. Hancock*, 231 F.3d 557 (9th Cir. 2000). In 1994 and 1995, Gary Hancock was convicted of four Arizona state misdemeanors involving violence or threats of violence against his wife. *Id.* at 560. In 1999, Hancock was convicted of possessing a firearm in violation of § 922(g)(9). *Id.* On appeal, Hancock argued that his indictment should have been dismissed on equal protection grounds. *Id.* at 565. He argued that in Arizona, domestic violence misdemeanants are treated more harshly under § 922(g)(9) than felons because Arizona misdemeanants, unlike felons, are not deprived of their civil rights and as a result can never have their civil rights restored. *Id.* at 566.

Applying rational basis review, we rejected Hancock's equal protection claim. *Id.* at 566–67. First, we explained that when Congress enacted § 922(g)(9), it "was aware of the discrepancies in state procedures for revoking and restoring civil rights . . . . [D]isparate treatment of some offenders was the inevitable result of Congress' decision to 'look to state law to define the restoration exception.'" *Id.* (citing *United States v. Smith*, 171 F.3d 617, 625 (8th Cir. 1999)). Second,

we noted that in addition to the civil rights restored exception, § 922(g)(9) provides "several adequate legal mechanisms" for which *both* misdemeanants and felons can qualify: "pardon, expungement, and setting aside of convictions." *Id.* at 567. Viewing the two exceptions together, we found that "Congress reasonably could conclude that felons who had been through a state's restoration process and had regained their civil rights . . . were more fit to own firearms than domestic-violence misdemeanants who had not had their convictions expunged or been pardoned." *Id.* We therefore upheld the civil rights restored exception under rational basis review as at least "minimally rational." *Id.*

Here, we apply *Brailey* and conclude that Chovan's 1996 misdemeanor domestic violence conviction did not divest him of civil rights because it did not divest him of the right to vote, the right to serve on a jury, or the right to hold public office. Because Chovan never lost these "core" civil rights, he cannot qualify for the civil rights restored exception to § 922(g)(9). Further, we reject Chovan's argument that the civil rights restored exception violates the Equal Protection Clause for the same reasons we articulated in *Hancock*. *Id.* at 566–67.

## II. Second Amendment Challenge

Having concluded that Chovan does not qualify for the "civil rights restored" exception, we turn to his Second Amendment challenge to § 922(g)(9). Chovan's Second Amendment argument is predicated on the Supreme Court's holding in *District of Columbia v. Heller* that the Second Amendment protects "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008).

In *Heller*, the Supreme Court struck down District of Columbia laws banning handgun possession in the home and requiring all firearms in homes to be unloaded and disassembled or "bound by a trigger lock or similar device." *Id.* at 630, 635.  While the *Heller* Court declined to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," it did establish that the individual right guaranteed by the amendment is "not unlimited." *Id.* at 626–27.

The *Heller* Court suggested that the core of the Second Amendment right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.  The Court indicated that determining the scope of the Second Amendment's protections requires a textual and historical analysis of the amendment.  *See id.* at 576–605.  Finally, the Court established that "weapons not typically possessed by law-abiding citizens for lawful purposes" are not protected by the Second Amendment, *id.* at 625, and that certain "longstanding prohibitions" are "presumptively lawful regulatory measures":

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27; *see also id.* at 627 n.26; *McDonald v. City of Chicago*, 561 U.S. __, 130 S. Ct. 3020, 3047 (2010).

The constitutionality of § 922(g)(9) is a question of first impression in this circuit, although a number of other circuits have upheld the statute using varying rationales. We briefly summarize the different approaches taken by these circuits.

## A. Approaches Taken By Other Circuits

### 1. Upheld as a "Presumptively Lawful Longstanding Prohibition": Eleventh Circuit

The Eleventh Circuit considered the constitutionality of § 922(g)(9) and upheld it as a "presumptively lawful longstanding prohibition[]." *United States v. White*, 593 F.3d 1199, 1205 (11th Cir. 2010). That court analogized § 922(g)(9) to the felon-in-possession ban the *Heller* Court listed as a presumptively lawful restriction, noting that "although passed relatively recently, § 922(g)(9) addresses the thorny problem of domestic violence, a problem Congress recognized as not remedied by 'longstanding' felon-in-possession laws." *Id.* at 1206. Concluding that "*Heller* does not cast doubt" on § 922(g)(9)'s constitutionality because § 922(g)(9) is a presumptively lawful prohibition, and without further constitutional analysis, the Eleventh Circuit upheld the statute. *Id.*

Two other circuits have criticized *White*'s approach. In *United States v. Chester*, the Fourth Circuit stated that "for all practical purposes" *White* treats "*Heller*'s listing of presumptively lawful measures" as a sort of "safe harbor for unlisted regulatory measures, such as 28 U.S.C. § 922(g)(9)" that are "analogous to those measures specifically listed in *Heller*." 628 F.3d 673, 679 (4th Cir. 2010). The *Chester* court criticized the approach as "approximat[ing] rational-basis review, which has been rejected by *Heller*." *Id.* In

*United States v. Skoien*, the Seventh Circuit sitting en banc declined to address whether § 922(g)(9) is presumptively lawful, stating, "We do not think it profitable to parse the[] passages of *Heller* [that list presumptively lawful measures] as if they contained an answer to the question whether § 922(g)(9) is valid." 614 F.3d 638, 640 (7th Cir. 2010) (en banc).

### 2. *Remanded to District Court to Apply Intermediate Scrutiny: Fourth Circuit*

In *Chester*, the Fourth Circuit considered William Samuel Chester's argument that his § 922(g)(9) conviction abridged his right to keep and bear arms under the Second Amendment. 628 F.3d at 674. The court held first that a two-part inquiry applies to Second Amendment claims:

> The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." . . . If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.

*Id.* at 680 (quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). After canvassing the historical evidence on the Second Amendment rights of domestic violence misdemeanants and finding it "inconclusive," the court stated, "We must assume, therefore, that Chester's Second Amendment rights are intact and that he is entitled to some

measure of Second Amendment protection to keep and possess firearms in his home for self-defense." *Id.* at 681–82.

In its discussion of the second step—whether the challenged regulation survives the appropriate level of scrutiny—the Fourth Circuit noted that the *Heller* Court left open the question of what level of scrutiny applies to a law burdening Second Amendment-protected conduct, although the Court made clear that rational basis review was not sufficient. *Id.* at 682. The *Chester* court went on to state:

> Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller*—the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense—by virtue of Chester's criminal history as a domestic violence misdemeanant. *Heller*, [554 U.S. at 635]. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.

*Id.* at 682–83. The *Chester* court found that the government had not "carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants," and it therefore remanded the case to afford the parties the opportunity to present evidence on this question in the first instance. *Id.* at 683.

### 3. Upheld After Application of Intermediate or Heightened Scrutiny: First, Fourth, and Seventh Circuits

In *United States v. Skoien*, the Seventh Circuit sitting en banc upheld § 922(g)(9) after assuming that intermediate scrutiny or its equivalent applied, and therefore that an "important governmental objective" and "substantially related" means were necessary to uphold the statute. 614 F.3d at 641–42. The Seventh Circuit examined a number of studies supporting the relationship between § 922(g)(9) and the important government interest of preventing gun violence. *Id.* at 642–44. The court noted, for example, that it is established that "firearms cause injury or death in domestic situations," and that "[d]omestic assaults with firearms are approximately twelve times more likely to end in the victim's death than are assaults by knives or fists." *Id.* at 643 (citing Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll, Mark L. Rosenberg & Philip H. Rhodes, *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. Am. Med. Ass'n 3043 (1992)). The court also noted that "[t]he presence of a gun in the home of a convicted domestic abuser is 'strongly and independently associated with an increased risk of homicide.'" *Id.* (quoting Arthur L. Kellermann, et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England J. Med. 1084, 1087 (1993)). In light of "[b]oth logic and data," the Seventh Circuit held that keeping guns from domestic violence misdemeanants is substantially related to the government interest of preventing gun violence. *Id.* at 642.

The *Skoien* court also held that § 922(g)(9) was constitutional as applied to Skoien. *Id.* at 645. Skoien contended that § 922(g)(9) was not substantially related to an

important government objective because it "perpetual[ly]" disqualifies all persons convicted of domestic violence, even people who had not been in legal trouble for many years. *Id.* at 644. The court rejected Skoien's argument, emphasizing the statute's exceptions under which domestic violence misdemeanants may regain their rights to possess firearms. The court also noted,

> Skoien is poorly situated to contend that the statute creates a lifetime ban for someone who does not pose any risk of further offenses [because] Skoien is himself a recidivist, having been convicted twice of domestic battery. . . . A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present.

*Id.* at 645 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

The First Circuit similarly upheld § 922(g)(9) after applying the equivalent of intermediate scrutiny. *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011). The *Booker* court found that while § 922(g)(9) "appears consistent with *Heller*'s reference to certain presumptively lawful regulatory measures," any "categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." *Id.* at 25. The court upheld § 922(g)(9) after concluding that social science research supported a finding of "a substantial relationship between § 922(g)(9)'s disqualification of domestic violence misdemeanants from gun ownership and

the governmental interest in preventing gun violence in the home." *Id.*

Finally, the Fourth Circuit in *United States v. Staten* considered the constitutionality of § 922(g)(9) on a full record after its decision in *Chester*. Unlike in *Chester*, where the court remanded the application of intermediate scrutiny to the district court because the record was incomplete, in *Staten* the court upheld § 922(g)(9) under intermediate scrutiny. 666 F.3d 154, 167 (4th Cir. 2011). The *Staten* court first held that the government had carried its burden of establishing that reducing domestic gun violence is a substantial government objective. *Id.* at 161. The court then examined the social science studies cited by the government and found that the government had established that:

> (1) domestic violence is a serious problem in the United States; (2) the rate of recidivism among domestic violence misdemeanants is substantial; (3) the use of firearms in connection with domestic violence is all too common; (4) the use of firearms in connection with domestic violence increases the risk of injury or homicide during a domestic violence incident; and (5) the use of firearms in connection with domestic violence often leads to injury or homicide.

*Id.* at 167. The court concluded that the government had therefore "carried its burden of establishing a reasonable fit between the substantial government objective of reducing domestic gun violence and keeping firearms out of the hands of [domestic violence misdemeanants]". *Id.*

## B. Chovan's Second Amendment Challenge

After considering the approaches taken by other circuits that considered the constitutionality of § 922(g)(9), we hold as follows. We adopt the two-step Second Amendment inquiry undertaken by the Third Circuit in *Marzzarella*, 614 F.3d at 89, and the Fourth Circuit in *Chester*, 628 F.3d at 680, among other circuits. Applying that inquiry, we hold that § 922(g)(9) burdens conduct falling within the scope of the Second Amendment's guarantee and that intermediate scrutiny applies to Chovan's Second Amendment challenge. Finally, like the First, Fourth, and Seventh Circuits, we apply intermediate scrutiny to § 922(g)(9) and hold that it is constitutional on its face and as applied to Chovan.

### 1. The Two-Step Inquiry

The two-step Second Amendment inquiry we adopt (1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny. *Chester*, 628 F.3d at 680; *see also Marzzarella*, 614 F.3d at 89.

We believe this two-step inquiry reflects the Supreme Court's holding in *Heller* that, while the Second Amendment protects an individual right to keep and bear arms, the scope of that right is not unlimited. 554 U.S. at 626–27. The two-step inquiry is also consistent with the approach taken by other circuits considering various firearms restrictions post-*Heller*. *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1251–58 (D.C. Cir. 2011) ("*Heller II*"); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800–05 (10th Cir. 2010). We join the Third, Fourth, Seventh, Tenth, and D.C. Circuits in holding

that the two-step framework outlined above applies to Second Amendment challenges.

### 2. Applying the Two-Step Inquiry: Section 922(g)(9) Affects Second Amendment Rights and Intermediate Scrutiny Applies

At the first step of the inquiry, we conclude that by prohibiting domestic violence misdemeanants from possessing firearms, § 922(g)(9) burdens rights protected by the Second Amendment.

Section 922(g)(9) is not mentioned in *Heller*. The government argues that § 922(g)(9) is a presumptively lawful regulatory measure and does not burden rights historically understood to be protected by the Second Amendment. According to the government, § 922(g)(9) is part of a "long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent."

We do not agree. First, it is not clear that such prohibitions are so longstanding. The first federal firearm restrictions regarding violent offenders were not passed until 1938, as part of the Federal Firearms Act. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698, 708 (2009) (noting that "one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I"). Second, and more importantly, the government has not proved that *domestic violence misdemeanants* in particular have historically been restricted from bearing arms. The Federal Firearms Act of 1938 only restricted firearm possession for those individuals convicted of a "crime of violence," defined as "murder, manslaughter, rape, mayhem,

kidnapping, burglary, housebreaking, and certain forms of aggravated assault—assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." *Id.* at 699 (internal quotation marks omitted). Domestic violence misdemeanants—like Chovan, who was convicted of simple misdemeanor assault under California Penal Code § 273.5(a)—would not be restricted from possessing firearms under the Federal Firearms Act. In fact, domestic violence misdemeanants were not restricted from possessing firearms until 1996, with the passage of the Lautenberg Amendment to the Gun Control Act of 1968. Pub. L. No. 104-208, § 658, 110 Stat. 3009, 3009-371 (1996).

Because of "the lack of historical evidence in the record before us, we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors. We must assume, therefore, that [Chovan]'s Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense." *Chester*, 628 F.3d at 681–82.

We now reach the second step of the Second Amendment inquiry. In *Heller*, the Supreme Court did not specify what level of scrutiny courts must apply to a statute challenged under the Second Amendment. The *Heller* Court did, however, indicate that rational basis review is not appropriate. *See Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Having concluded that § 922(g)(9) burdens Second Amendment rights, we reject rational basis review

and conclude that some sort of heightened scrutiny must apply.

In determining the appropriate level of scrutiny, other circuit courts have looked to the First Amendment as a guide. *See, e.g.*, *Chester*, 628 F.3d at 682; *Marzzarella*, 614 F.3d at 89 n.4, 96–97; *Ezell*, 651 F.3d at 703, 707. We agree with these courts' determination that, just as in the First Amendment context, the level of scrutiny in the Second Amendment context should depend on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *See Chester*, 628 F.3d at 682; *see also Marzzarella*, 614 F.3d at 96–97. More specifically, the level of scrutiny should depend on (1) "how close the law comes to the core of the Second Amendment right," and (2) "the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703.

*Heller* tells us that the core of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. Section 922(g)(9) does not implicate this core Second Amendment right because it regulates firearm possession for individuals with criminal convictions. "Although [Chovan] asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller*—the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense—by virtue of [Chovan]'s criminal history as a domestic violence misdemeanant." *Chester*, 628 F.3d at 682–83; *cf. Ezell*, 651 F.3d at 708 (finding that a challenged statute implicated the core Second Amendment right because "the plaintiffs *are* the 'law-abiding, responsible citizens' whose Second

Amendment rights are entitled to full solicitude under *Heller*").

The burden the statute places on domestic violence misdemeanants' rights, however, is quite substantial. Unlike the regulations in *Marzzarella* or *Heller II*, § 922(g)(9) does not merely regulate the *manner* in which persons may exercise their Second Amendment rights. *Cf. Marzzarella*, 614 F.3d at 97 (concluding that obliterated serial numbers regulation "does not severely limit the possession of firearms" because "[i]t leaves a person free to possess any otherwise lawful firearm he chooses"); *Heller II*, 670 F.3d at 1258 (reasoning that the District of Columbia's gun registration requirements were not a severe burden because they do not "prevent[] an individual from possessing a firearm in his home or elsewhere"). Instead, as Chovan argues, § 922(g)(9) amounts to a "total prohibition" on firearm possession for a class of individuals—in fact, a "lifetime ban." As such, the statute is a more "serious encroachment" on the Second Amendment right. *See Ezell*, 651 F.3d at 708. But Chovan goes too far when he argues that § 922(g)(9) is too broad because it "contains no provision limiting its applicability." As explained above, § 922(g)(9) exempts those with expunged, pardoned, or set-aside convictions, or those who have had their civil rights restored. Therefore, while we recognize that § 922(g)(9) substantially burdens Second Amendment rights, the burden is lightened by these exceptions.

In sum, § 922(g)(9) does not implicate the core Second Amendment right, but it does place a substantial burden on

the right.  Accordingly, we conclude that intermediate rather than strict scrutiny is the proper standard to apply.[5]

### 3. Applying Intermediate Scrutiny, We Uphold § 922(g)(9) and Its Application to Chovan

Although courts have used various terminology to describe the intermediate scrutiny standard, all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective. *Chester*, 628 F.3d at 683.  As we explain below, § 922(g)(9), both on its face and as applied to Chovan, survives intermediate scrutiny.

### a. Important Government Interest

Chovan concedes that § 922(g)(9) was motivated by the important government interest of "keeping firearms away from those most likely to misuse them" or "preventing gun violence."  We agree that § 922(g)(9) advances an important government objective, but define the objective slightly more narrowly, as preventing *domestic* gun violence.

---

[5] Most courts have also found that intermediate scrutiny or its equivalent is the proper standard to apply to Second Amendment challenges to § 922(g)(9) and similar statutes.  *See, e.g.*, *Booker*, 644 F.3d at 25; *Chester*, 628 F.3d at 682–83; *Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to Second Amendment challenge of 18 U.S.C. § 922(k), a ban on possession of firearms with obliterated serial numbers); *Reese*, 627 F.3d at 802 (applying intermediate scrutiny to Second Amendment challenge of 18 U.S.C. § 922(g)(8), which bans the possession of firearms by those subject to domestic protection orders); *Heller II*, 670 F.3d at 1257 (applying intermediate scrutiny to District of Columbia's firearm registration requirements).

That the government interest behind § 922(g)(9) was to prevent domestic gun violence is apparent from the face of the statute and its legislative history. As the government explains, the 1996 passage of § 922(g)(9) was motivated by the concern that guns were not being kept away from domestic abusers under felon-in-possession laws because "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies." *Skoien*, 614 F.3d at 643 (quoting 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg) (internal quotation marks omitted)); *see also United States v. Hayes*, 555 U.S. 415, 426 (2009); *United States v. White*, 593 F.3d 1199, 1205 (11th Cir. 2010). Through § 922(g)(9), Congress sought to "close this dangerous loophole" and "establish[] a policy of zero tolerance when it comes to guns and *domestic* violence." *Booker*, 644 F.3d at 16 (quoting 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg) (internal quotation marks omitted) (emphasis added)). Thus, the legislative history of § 922(g)(9) shows that Congress did not enact the statute for the purpose of "preventing gun violence," as Chovan argues. Instead, Congress passed § 922(g)(9) to prevent *domestic* gun violence.

We and other circuits have previously defined the government interest behind § 922(g)(9) in this way. In *United States v. Belless*, we noted that the purpose of § 922(g)(9) is "to keep firearms out of the hands of people whose past violence in domestic relationships makes them untrustworthy custodians of deadly force." 338 F.3d 1063, 1067 (9th Cir. 2003). In *Booker*, the First Circuit similarly defined the interest behind § 922(g)(9) as "keeping guns away from people who have been proven to engage in violence with those with whom they share a domestically intimate or familial relationship, or who live with them or the

like." 644 F.3d at 25. Finally, in *Staten*, the Fourth Circuit defined the interest behind § 922(g)(9) as "reducing *domestic* gun violence." 666 F.3d at 161 (emphasis added).

It is self-evident that the government interest of preventing domestic gun violence is important. *See Booker*, 644 F.3d at 25 ("[K]eeping guns away from people who have been proven to engage in [domestic] violence . . . is undeniably important." (citing *Carey v. Brown*, 447 U.S. 455, 471 (1980) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."))). We hold that the government has met its burden to show that reducing domestic gun violence is an important government objective.

### b. *Substantially Related to Government Interest*

Keeping guns from domestic violence misdemeanants is substantially related to the broader interest of preventing domestic gun violence for four related reasons. First, we agree with the government that the legislative history indicates that Congress enacted § 922(g)(9) because it sought to reach the people who had demonstrated violence, but were not kept from possessing firearms by § 922(g)(1) because domestic abusers are not often convicted of felonies. *See Hayes*, 129 S. Ct. at 1087.

Second, we agree with the government that "a high rate of domestic violence recidivism exists." The government relies on *Skoien*, in which the Seventh Circuit pointed to a number of studies estimating a rate of domestic violence recidivism between 35% and 80%. *See Skoien*, 614 F.3d at 643–44. Estimates of "[t]he full recidivism rate," which "includes violence that does not lead to an arrest," "range from 40% to

80% 'when victims are followed longitudinally and interviewed directly.'" 614 F.3d at 644 (citing Carla Smith Stover, *Domestic Violence Res*., 20 J. Interpersonal Violence 448, 450 (2005)). The *Skoien* court also cited two other studies that estimated the full recidivism rate to be 35% and 52%, respectively. *Id.* (citing Julia C. Babcock, et al., *Does Batterers' Treatment Work? A Meta-Analytic Review of Domestic Violence Treatment*, 23 Clinical Psychol. Rev. 1023, 1039 (2004) (estimating a 35% recidvism rate based on partners' reports); John H. Laub & Robert J. Sampson, *Understanding Desistance from Crime*, 28 Crime & Just. 1, 31 (2001) (estimating that only 48% of domestic abusers "suspended" their abusive conduct within three years of conviction)).

Third, we agree with the government that domestic abusers use guns. The government explains that "Congress acknowledged that the use of guns in incidents of domestic violence was a compelling concern," and cites to the Congressional Record in which Congress found that "annually, over 150,000 incidents of domestic violence involve a gun." *See United States v. Smith*, 742 F. Supp. 2d 855, 867 (S.D.W.Va. 2010) (citing Cong. Rec. 22,986)). The government further relies on the fact, articulated in *Booker*, that "nearly 52,000 individuals were murdered by a domestic intimate between 1976 and 1996, and the perpetrator used a firearm in roughly 65% of the murders." *Booker*, 644 F.3d at 26.

Finally, we agree with the government that the use of guns by domestic abusers is more likely to result in the victim's death. The government cites a medical study relied upon in *Skoien* for the proposition that incidents of domestic violence involving firearms are twelve times more likely to

end in the victim's death than incidents where a perpetrator is either unarmed or armed with a knife alone. *See Skoien*, 614 F.3d at 643 (citing Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll, Mark L. Rosenberg & Philip H. Rhodes, *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. Am. Medical Ass'n 3043 (1992)).

Putting these four conclusions together, the government has demonstrated that domestic violence misdemeanants are likely to commit acts of domestic violence again and that, if they do so with a gun, the risk of death to the victim is significantly increased. We hold that the government has thereby met its burden to show that § 922(g)(9)'s prohibition on gun possession by domestic violence misdemeanants is substantially related to the important government interest of preventing domestic gun violence. Because § 922(g)(9) is supported by an important government interest and substantially related to that interest, the statute passes constitutional muster under intermediate scrutiny.

### c. Chovan's As-Applied Challenge

Chovan argues that § 922(g)(9) is unconstitutional as applied to him because his 1996 domestic violence conviction occurred fifteen years before his § 922(g)(9) conviction, he is unlikely to recidivate, and he has in fact been law-abiding for those fifteen years.

Chovan cites several statistics in support of his argument that he is at low risk of recidivism. He cites the Sentencing Commission's *Measuring Recidivism* study, which establishes that those with stable employment are less likely to recidivate and that "'[r]ecidivism is comparatively low for

the lowest sentences (less than six months or probation).'" *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12, 14). He also cites a National Institute for Justice study for the proposition that people who remain offense free for as long as Mr. Chovan (and indeed for much shorter periods) pose a recidivism risk equal to that of the general population. *See* Blumstein & K. Nakamura, *'Redemption' in an Era of Widespread Criminal Background Checks*, NIJ Journal, June 2009, at 10).

But the Sentencing Commission statistics do not reveal the actual rate of recidivism for those with stable employment or short sentences; the statistics only establish that individuals in those two categories have *comparatively lower* recidivism rates than individuals in other categories. *Measuring Recidivism* at 14. Moreover, none of Chovan's statistics has to do with individuals convicted of domestic violence crimes specifically. The National Institute for Justice study mentions only burglary, robbery, and aggravated assault; it does not mention domestic violence, nor does it make conclusions about individuals convicted of crimes generally. *'Redemption'* at 12. Meanwhile, the government has referred to domestic violence studies mentioned by the *Skoien* court showing that the recidivism rates for individuals convicted of domestic violence is significant—between 35 and 80 percent. *See Skoien*, 614 F.3d at 643–44.

Chovan also argues that he has not been arrested for domestic violence since the 1996 conviction and has otherwise been law-abiding. He argues that a March 2010 domestic violence call made by his estranged wife and victim of the act of domestic violence underlying the 1996 conviction, Cheryl Fix, should not be held against him

because it did not result in a charge or even arrest and amounts to "unsubstantiated allegations." When San Diego County Sheriff deputies responded to the call, Fix told them that Chovan had become violent with her, struck her with a cell phone, and threatened to hunt her down and shoot her if she ever left him.

Although Chovan was not arrested for domestic violence, we nonetheless consider the March 2010 domestic abuse call and Fix's statements. The call is part of the record. And it should be considered, especially in light of one of the underlying rationales of § 922(g)(9): acts of domestic violence are under-reported and often do not lead to arrest or conviction. *See Skoien*, 614 F.3d at 643 (explaining that in enacting § 922(g)(9) Congress recognized that the felon-in-possession ban did not keep guns away from domestic abusers because many domestic abusers are never charged with or convicted of felonies (quoting 142 Cong. Rec. 22,985 (1996) (statement of Sen. Lautenberg))). The March 2010 domestic abuse call supports the conclusions that Chovan is at risk of recidivism for domestic violence and that Chovan might use a gun to commit future domestic violence. In light of the domestic abuse call, § 922(g)(9)'s application to Chovan is substantially related to the goal of reducing domestic gun violence.

But even if we were to set aside the March 2010 domestic abuse call and assume that Chovan has had no history of domestic violence since 1996, Chovan has not presented evidence to directly contradict the government's evidence that the rate of domestic violence recidivism is high. Nor has he directly proved that if a domestic abuser has not committed domestic violence for fifteen years, that abuser is highly unlikely to do so again. In the absence of such

evidence, we conclude that the application of § 922(g)(9) to Chovan is substantially related to the government's important interest of preventing domestic gun violence.

Finally, we note that if Chovan's as-applied challenge succeeds, a significant exception to § 922(g)(9) would emerge.  If Congress had wanted § 922(g)(9) to apply only to individuals with recent domestic violence convictions, it could have easily created a limited duration rather than lifetime ban.  Or it could have created a good behavior clause under which individuals without new domestic violence arrests or charges within a certain number of years of conviction would automatically regain their rights to possess firearms.  But Congress did not do so.  Congress permissibly created a broad statute that only excepts those individuals with expunged, pardoned, or set aside convictions and those individuals who have had their civil rights restored.  *See Skoien*, 614 F.3d at 641 ("[S]ome categorical disqualifications are permissible:  Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.").  The breadth of the statute and the narrowness of these exceptions reflect Congress's express intent to establish a "zero tolerance policy" towards guns and domestic violence.

Because the application of § 922(g)(9) to Chovan is substantially related to the government's important interest of preventing domestic gun violence, Chovan's as-applied challenge fails.

## CONCLUSION

For the foregoing reasons, we reject Chovan's "civil rights restored" claim, hold that intermediate scrutiny is the proper standard to apply to his Second Amendment claim, and uphold § 922(g)(9) and its application to Chovan under intermediate scrutiny.  **AFFIRMED.**

---

BEA, Circuit Judge, concurring:

I concur in the result of this case.  I write separately to express my disagreement with the majority's default determination that persons convicted of domestic violence misdemeanors are thereby disqualified from the core right of the Second Amendment to possess firearms for defense of the home.  First, however, let me detail the points on which the majority and I agree.

I.

Based on the weight of authority of our sister circuits, the majority opinion decides to apply to this Second Amendment case the familiar "scrutiny" tests that have become the method of analysis of challenged legislation under the First Amendment.  Because appellant does not argue this point but accepts it, *see* Blue Br. at 24 (arguing that strict scrutiny should apply), I will treat the point as waived and accept the application of the tiers of scrutiny analysis to the Second Amendment jurisprudence.  *But see Heller v. Dist. of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("Are gun bans and regulations to be analyzed based on the Second Amendment's text, history,

and tradition[,] . . . [o]r may judges re-calibrate the scope of the Second Amendment right based on judicial assessment of whether the law advances a sufficiently compelling or important government interest to override the individual right? . . . In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."); Eugene Volokh, *Implementing the Right To Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1443, 1461–73 (2009) ("[U]nitary tests such as 'strict scrutiny,' 'intermediate scrutiny,' 'undue burden,' and the like don't make sense here" in the Second Amendment context because the language of *Heller* seems to foreclose scrutiny analysis).

I agree with the majority that, if we are to apply the "tiers of scrutiny" to our Second Amendment jurisprudence, the correct way to do so is the two-step inquiry adopted by several other circuits, whereby we "(1) ask[] whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, . . . apply the appropriate level of scrutiny."  Maj. Op. at 18.

I also agree with the majority's application of step one. It correctly holds that there is insufficient evidence to conclude that the prohibition on misdemeanants owning firearms is "longstanding."  Therefore, Chovan's "Second Amendment rights are intact."  Maj. Op. at 20 (quoting *United States v. Chester*, 628 F.3d 673, 681–82 (4th Cir. 2010)).

I further agree with the majority opinion when, at step two, it "recognize[s] that 18 U.S.C. § 922(g)(9) substantially burdens Second Amendment rights."[1]  Maj. Op. at 22.

Finally, I agree with the majority that *if* one applies intermediate scrutiny, § 922(g)(9) would satisfy this level of scrutiny.  The governmental interest in preventing a possible recidivist from committing more serious violence through the use of a gun is a "substantial governmental interest," and § 922(g)(9) constitutes a "reasonable fit" between the legislation and its goal.  Maj. Op. at 23–27.

## II.

The sole basis of my disagreement with the majority opinion is the "default" effect of the misdemeanor conviction. I call it "default" because, without explanation,[2] the majority held Chovan's domestic violence misdemeanor conviction deprives him of his core right to gun possession for self-defense in the home, which, the Supreme Court held in *Heller*, the Second Amendment gives a "law-abiding,

---

[1] I do not, however, think the burden "is lightened" to some degree by the exceptions for those whose convictions have been pardoned, expunged, or set-aside, and for those who have had their civil rights restored.  Maj. Op. at 22.  If the convictions are no longer extant, there is no burden whatsoever.  If the conviction remains, the full burden obtains.  There is no "light" burden.

Removal of the convictions *is* relevant, however, to the narrow-tailoring requirement of the strict scrutiny test.  *See infra*, at 49–51.

[2] I would say *ipse dixit*, except some other courts *dixerunt'd* first.  *See, e.g.*, *Chester*, 628 F.3d at 682–83.  So, this is more of an argument from the non-binding authority of our sister circuits' opinions.

responsible citizen."[3]  The majority opinion in our case states that Chovan's constitutional "claim is not within the core right identified in *Heller*—the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense—by virtue of [his] criminal history as a domestic violence misdemeanant."  Maj. Op. at 14 (quoting *Chester*, 628 F.3d at 682–83).  Therefore, it concludes, because § 922(g)(9)'s burden, although "substantial[]," is not total, intermediate scrutiny is the correct standard.  *Id.* at 22.  "In sum," the majority opinion concludes, "§ 922(g)(9) does not implicate the core Second Amendment right . . . ."  *Id.* at 23.

Why?

a.

The majority opinion holds that Chovan forfeited his core Second Amendment right when he was convicted of a misdemeanor.  *Id.* at 22 (stating that Chovan can no longer be considered a "law-abiding, responsible citizen . . . by virtue of [his] criminal history as a domestic violence misdemeanant").  In this, the majority are not alone.  The Fourth Circuit has made a similar conclusion.  *See Chester*, 628 F.3d at 682–83.

This default disqualification of misdemeanants from the "core" right of the Second Amendment resembles the Supreme Court's "disqualification" language regarding felons in *Heller*.  The Court in *Heller* seemed to equate the status of

---

[3] It should be noted that the guns Chovan was found to possess were (1) at his home, and (2) of the kind traditionally used for defense of the home (a Winchester shotgun, a .22 caliber rifle, .22 caliber handgun, and a Baldwin & Company antique shotgun).

a felon or of one mentally ill with a presumptive disqualification from the Second Amendment right. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 631 (2008) (linking "disqualifi[cation]" with being a felon or insane); *id.* at 635 ("Assuming that Heller is not *disqualified* from the exercise of Second Amendment rights, the District *must* permit him to register his handgun and *must* issue him a license to carry it in the home.") (emphasis added).

Just as *Heller* found felons to be presumptively disqualified from the protection of the Second Amendment, so the majority have found a domestic violence misdemeanant, Chovan, to be presumptively disqualified from the "core" protection of the Second Amendment. This conclusion seems to stem from a perceived similarity between felons and domestic violence misdemeanants. This conclusion, however, is mistaken. Throughout history, felons have been subject to forfeiture and disqualification, but misdemeanants, in direct contrast to felons, have not.

At common law, there was a fundamental difference between felons and misdemeanants. In particular, felonies resulted in forfeiture of property and rights. 2 William Blackstone, *Commentaries* *96–97 (discussing forfeiture as the historical foundation of felony); *id.* at *377 (describing the possible punishments of serious crime as including "confiscation, by forfeiture of lands, or moveables, or both, or of the profits of lands for life: others induce a disability, of holding offices or employments, being heirs, executors, and the like"); *see* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 715 (2009) (recognizing that at common law a felony could result in attainder and "civil death," whereby the felon could no longer "perform[] legal functions, such as being a witness or suing").

Misdemeanors, on the other hand, did not; as the historian Theodore Plucknett put it, "most of the characteristics of criminal proceedings did not attach to misdemeanours. Thus, they were not subject to . . . forfeiture . . . ." Theodore Frank Thomas Plucknett, *A Concise History of the Common Law* 456 (1956). Even today, felons can suffer numerous restrictions on their constitutional rights. *See United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) ("[T]he application of § 922(g) to a violent felon . . . would appear appropriate under any Second Amendment reading. After all, felons lose out on fundamental rights such as voting and serving on juries, and face discrimination that need only survive rational basis review."). Indeed, as this court has held, "felons are categorically different from the individuals who have a fundamental right to bear arms." *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *see McLaughlin v. City of Canton, Miss.*, 947 F. Supp. 954, 975 (S.D. Miss. 1995) (finding that "The historical distinction between felonies and misdemeanors is more than semantic. Traditionally, dire sanctions have attached to felony convictions which have not attached to misdemeanor convictions. Many of these sanctions are in force today. Disenfranchisement was, and remains, one such sanction. Another such sanction is that which prohibits felons from owning or possessing firearms" and concluding that laws disenfranchising misdemeanants are subject to strict scrutiny).

Thus, although felon disqualification from the scope of the Second Amendment makes sense from an historical perspective, the same cannot be said for misdemeanants. Felon disqualification from the entire *scope* of the Second Amendment does not justify misdemeanant disqualification from the *core* of the Second Amendment. *See* Volokh, *supra*,

at 1498 ("If felon bans are upheld on the grounds that felons have historically been seen as outside the scope of various constitutional rights, then felon bans would offer a poor analogy for bans on possession by misdemeanants (even violent misdemeanants) . . . .").

b.

Not only does the status-based analogy of felons to misdemeanants not make sense; selecting intermediate scrutiny as the correct level at which to review a categorical, status-based disqualification from the core right of the Second Amendment also does not make sense.

Many circuits have chosen intermediate scrutiny to analyze statutes that undeniably burden Second Amendment rights. They have often done so based on an analogy between the right to free speech and the right to keep and bear arms. Indeed, as the Seventh Circuit has recognized, "[b]oth *Heller* and *McDonald* suggest that First Amendment analogues are . . . appropriate." *Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011). The Seventh Circuit went on to summarize the tiers of scrutiny at work in the realm of the First Amendment:

> In free-speech cases, . . . content-based regulations are presumptively invalid, and thus get strict scrutiny. On the other hand, time, place, and manner regulations on speech need only be reasonable and justified without reference to the content of the regulated speech. . . . [R]egulations in a traditional public or designated public forum get strict scrutiny, while regulations in a nonpublic

> forum must not discriminate on the basis of
> viewpoint and must be reasonable in light of
> the forum's purpose.

*Id.* at 708 (internal quotations marks and citations omitted). As the Tenth Circuit has stated, the right to keep and bear arms "is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.'" *United States v. Huitron-Guizar*, 678 F.3d 1164, 1165–66 (10th Cir. 2012). The "when" and "where" qualifications are known in free-speech jurisprudence as time, place, and manner restrictions. The "what" and "why" qualifications are content-based restrictions.

That leaves the "who," and it remains a sticking point. Categorical restrictions of constitutional rights based on an individual's class or status fit ill with free-speech jurisprudence. The Seventh Circuit has argued that categorical limits on the Second Amendment are analogous to the categorical limits in the free-speech context, such as obscenity or defamation. *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("Categorical limits on the possession of firearms would not be a constitutional anomaly. Think of the First Amendment, which has long had categorical limits: obscenity, defamation, incitement to crime, and others."). These categorical limits on free speech, however, are based on what is said, not who is saying it. *Cf. Skoien*, 614 F.3d at 649–51 (Sykes, J., dissenting) ("Adapting First Amendment doctrine to the Second Amendment context is sensible in some cases . . . . But this particular First Amendment analogy doesn't work here."). Our constitutional jurisprudence does not analyze status-based restrictions on free speech under intermediate scrutiny. A street-corner harangue on the beauties of revolution can perhaps be

prohibited on grounds that it presents a clear and present danger of violence; but it cannot be prohibited solely because the speaker has a misdemeanor record.

Judge Jones of the Fifth Circuit recognized this incompatability between intermediate scrutiny and status-based disqualifications in her recent dissent from a denial of rehearing en banc. *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). She disagreed with the opinion's conclusion that intermediate scrutiny was the correct standard to apply to §§ 922(b)(1) and (c)(1), which prohibit federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012). The majority in that case chose intermediate scrutiny because "the ban on handgun sales to minors under 21 is analogous to longstanding, presumptively lawful bans on possession by felons and the mentally ill." *Id.* at 206. Judge Jones argued that such categorical exclusions should not be analyzed under intermediate scrutiny.

> The panel's level of scrutiny is based on an analogy between young adults and felons and the mentally ill, as if any class-based limitation on the possession of firearms justifies any other, so long as the legislature finds the suspect "discrete" class to be "dangerous" or "irresponsible." On such reasoning, a low level of scrutiny could be applied if a legislature found that other groups—e.g. aliens, or military veterans with PTSD—were "dangerous" or "irresponsible."

*NRA*, 714 F.3d at 345 (Jones, J., dissenting).  Judge Jones is correct.  Categorical curtailment of constitutional rights based on an individual's status requires more rigorous analysis than intermediate scrutiny.

c.

Moreover, when the majority hold that Chovan's status as a misdemeanant excludes him from the core protection of the Second Amendment, it construes *Heller* as erecting not one but *two* barriers preventing persons from asserting their right to keep and bear arms.

The majority quote two passages from *Heller* as pertinent to ascertaining Chovan's Second Amendment rights.  The first *Heller* passage discusses presumptive disqualifications from the scope of the Second Amendment.

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27. In a footnote, the Court held that these restrictions were "presumptively lawful,"[4] and that the "list does not purport to be exhaustive." *Id.* at 627 n.26.

A second *Heller* passage, according to the majority, defines the "core" right protected by the Second Amendment: "And whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

---

[4] Although the court in *Heller* said laws that disqualify felons from possessing firearms were "presumptively lawful," it did not explain this phrase. *See United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) (stating that "the phrase 'presumptively lawful' could have different meanings . . . . [It] could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny," but preferring the first reading); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (stating that "'presumptively lawful' . . . by implication[] means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge"). *Heller* does not say whether this "presumption" was rebuttable or irrebuttable. If it is rebuttable, moreover, by what can it be rebutted? Again, the opinion is silent. Perhaps the best reading of this footnote is that the presumption is irrebuttable. Just as structural error "requires automatic reversal," *Washington v. Recuenco*, 548 U.S. 212, 218 (2006), so the status of being a felon automatically establishes that those individuals do not have the constitutional right to possess firearms. *See United States v. Vongxay*, 594 F.3d 1111, 1117 (9th Cir. 2010) (upholding § 922(g)(1)'s restriction on firearm possession for felons, and noting that "to date no court that has examined *Heller* has found 18 U.S.C. § 922(g) constitutionally suspect" (internal quotation marks omitted)). The language in *Heller* suggests that felons are, for now at least, conclusively outside the scope of the Second Amendment.

The majority construe the *Heller* Court in these two passages to be recognizing two different hurdles separating citizens from the core right of the Second Amendment. The first hurdle determines whether someone is a felon or mentally ill. If so, this person is presumptively disqualified from the Second Amendment's protection. I agree with this interpretation of the first passage.

The majority construe the second passage, however, as recognizing a further hurdle over which individuals must leap to assert their *core* right to keep and bear arms in defense of the home. Although individuals have access to a non-core Second Amendment right if they are not felons or mentally ill, the majority conclude, only those deemed "law-abiding" and "responsible" can lay claim to the "core" right of the Second Amendment to possess firearms for self-defense in the home. Without articulating a reason, the majority construe the terms "law-abiding" and "responsible" as recognizing a second standard, stricter than the "presumptively lawful" disqualification of felons and the mentally ill. That second standard, the majority conclude, again without explanation, excludes domestic violence misdemeanants. Maj. Op. at 14.

I construe the second passage differently. The terms of the second passage correspond precisely to the terms of the first passage. They are two sides of the same coin. "Law-abiding" in the second passage corresponds to "felon" in the first passage. "Responsible" in the second passage corresponds to "mentally ill" in the first passage. Thus, I read *Heller*'s second passage as restating the first passage. *Heller* does not cast doubt on "prohibitions on the possession of firearms by felons and the mentally ill," which is another way of saying that the Second Amendment establishes rights to

possess firearms for defense of the home in "law-abiding, responsible citizens."

If, as under the majority's reading, the terms "law-abiding" and "responsible" are not tied to "felons" and "mentally ill," how are the lower courts to recognize the limits of the "law-abiding, responsible citizen" standard? Why should we stop with domestic violence misdemeanors in defining categorical disqualifications from the core right of the Second Amendment? Why not all misdemeanors? Why not minor infractions? Could Congress find someone once cited for disorderly conduct to be "not law-abiding" and therefore to have forfeited his core Second Amendment right? Why should not legal determinations that were made without any trial at all disqualify individuals from the core Second Amendment right? Note, § 922(g) does *not* stop with convictions. Section 922(g)(8), for instance, even curtails Second Amendment rights based on restraining orders, with no trial at all, but rather with only a hearing of which the defendant received notice and the opportunity to participate.[5]

---

[5] The statute 18 U.S.C. § 922(g)(8) states:

> [It shall be unlawful for any person] who is subject to a court order that—**(A)** was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; **(B)** restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and **(C)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or **(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical

*Compare United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (finding intermediate scrutiny to be the correct level of scrutiny under which to analyze § 922(g)(8) because it targets a "narrow class[] of persons who, based on their past behavior, are more likely to engage in domestic violence," and upholding the law on that ground), *with United States v. Knight*, 574 F. Supp. 2d 224, 226 (D. Me. 2008) (finding that § 922(g)(8) satisfies *strict* scrutiny because "reducing domestic violence is a compelling government interest" and the prohibition is "temporary" and therefore "narrowly tailored"). Why should we not accept every congressional determination for who is or is not "law-abiding" and "responsible" for Second Amendment purposes?

Why not? Because *Heller* was a constitutional decision. It recognized the scope of a passage of the Constitution. The boundaries of this right are defined by the Constitution. They are not defined by Congress. *See NRA*, 714 F.3d at 345 (Jones, J., dissenting) ("In any event, it is circular reasoning to adopt a level of scrutiny based on the assumption that the legislature's classification fits that level.").

As we have seen, in the Founding period, felonies historically resulted in disqualification from certain rights, but misdemeanors did not, nor did infractions, nor restraining orders. I therefore conclude that domestic violence misdemeanants are not disqualified from the core protection of the Second Amendment, and that § 922(g)(9) accordingly should be analyzed, not under intermediate scrutiny, but

---

force against such intimate partner or child that would reasonably be expected to cause bodily injury, [to possess in or affecting commerce, any firearm or ammunition.]

under strict scrutiny. *See United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231 (D. Utah 2009) (finding that strict scrutiny is the correct rigor of analysis to apply to § 922(g)(9) because, first, *Heller* described the right to keep and bear arms as "fundamental," 554 U.S. at 593, and second, because *Heller* classified the Second Amendment right alongside the First and Fourth Amendments which are traditionally analyzed under strict scrutiny, but still upholding the statute under strict scrutiny analysis).

### III.

To be sure, strict scrutiny is a rigorous standard. The Supreme Court has called it "'strict' in theory but usually 'fatal' in fact." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) ("Only rarely are statutes sustained in the face of strict scrutiny.") (citing Gerald Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1972)). *But see Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995) ("[W]e wish to dispel the notion that strict scrutiny is strict in theory, but fatal in fact.") (internal quotation marks omitted).

Scholarly analysis shows that federal courts uphold around thirty percent of the laws they analyze under strict scrutiny. Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vand. L. Rev. 793, 862–63 (2006). Moreover, federal courts uphold Congressional statutes under strict scrutiny about half the time. *Id.* at 818.

There are several theories regarding what the purpose of strict scrutiny is, and what sorts of governmental acts can

satisfy its rigorous requirements. One theory defines strict scrutiny as upholding laws that undeniably burden constitutional rights only "when the government can demonstrate that infringements are necessary to avoid highly serious, even catastrophic harms." Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1302 (2007) (describing several competing theories of strict scrutiny analysis); *see City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring) (arguing that "At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb . . . can justify an exception to" constitutional rights under strict scrutiny analysis); *Lee v. Washington*, 390 U.S. 333, 334 (1968) (Black, J., concurring) (stating that the governmental goals of "maintaining security, discipline, and good order" in a prison can satisfy strict scrutiny analysis).

As Justice Thomas has argued, another way to say "compelling governmental interest" is "pressing public necessity." *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2423 n.1 (2013) (Thomas, J., concurring). This "pressing public necessity" consists "only [of] those measures the State must take to provide a bulwark against anarchy, or to prevent violence." *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (Thomas, J., concurring in part and dissenting in part).

I have already suggested that free speech doctrines should not be applied to Second Amendment restrictions that are based on the status of the individual. *See supra*, Part II.b. More analogous to status-based restrictions on the right to keep and bear arms would be restrictions on the freedom of association. Freedom of association cases often involve governmental action that restricts association based on the status or conduct of the individuals, just as § 922(g)(9)

restricts the right to keep and bear arms for particular persons based on their status and previous conduct. In both cases, moreover, this governmental action is often directed towards preventing violence and preserving public safety.

Federal courts apply strict scrutiny to freedom of association cases. *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Infringements on [the right to associate] may be justified by regulations adopted to serve compelling state interests . . . that cannot be achieved through means significantly less restrictive of associational freedoms."). Despite applying strict scrutiny, however, federal courts still often uphold statutes affecting freedom of association; in particular, federal courts uphold freedom of association regulations under a strict scrutiny analysis "when the asserted justification for the laws was public safety or effective law enforcement." Winkler, *supra*, at 868; *see, e.g.*, *Tabbaa v. Chertoff*, 509 F.3d 89, 92 (2d Cir. 2007) (finding under strict scrutiny analysis that customs officials did not violate plaintiffs' freedom of association rights by detaining and searching plaintiffs at the border when they returned from an Islamic conference in Canada because "given the intelligence [the officials] received, the inspection policy was narrowly tailored to achieve the compelling governmental interest in preventing potential terrorists from entering the United States"); *Grider v. Abramson*, 180 F.3d 739, 749, 752 (6th Cir. 1999) (finding under strict scrutiny analysis that municipal officials did not violate plaintiffs' freedom of association rights with their crowd control plan during a KKK rally because the plan "constituted a necessary constraint narrowly fashioned to further a compelling governmental interest in public safety and order" to prevent "disorderly conduct, breaches of the peace, and serious injuries to persons and property").

In our case, too, based on the data the majority discuss in detail, the government's interest in public safety and preventing gun violence is sufficiently compelling and narrowly tailored to satisfy those prongs of strict scrutiny analysis. *See* Maj. Op. at 23–27; *cf. United States v. Armstrong*, 706 F.3d 1, 8 (1st Cir. 2013) (finding that § 922(g)(9) satisfies constitutional scrutiny "under any standard").

Section 922(g)(9) frames the governmental interest: to prevent life-threatening harm to a predictable group of victims, i.e. those who have suffered domestic violence, from a predictably violent set of convicted criminals, i.e. those who have been convicted of a domestic violence misdemeanor. As the majority note, there is a sufficient body of penological knowledge regarding recidivism in domestic violence cases to satisfy the compelling interest element required in strict scrutiny analysis. Maj. Op. at 25–26; *see also Skoien*, 614 F.3d at 642–44 (discussing these studies in detail). Moreover, as the Supreme Court has stated, § 922(g)(9) targeted a particular deficiency in the felon-in-possession statute.

> Existing felon-in-possession laws, Congress recognized, were not keeping firearms out of the hands of domestic abusers, because "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies." 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg). By extending the federal firearm prohibition to persons convicted of "misdemeanor crime[s] of domestic violence," proponents of

§ 922(g)(9) sought to "close this dangerous loophole." *Id.*[] at 22986.

*United States v. Hayes*, 555 U.S. 415, 426 (2009).

As to "narrow tailoring," the second element of the strict scrutiny test, it is important to note that § 922(g)(9) applies only to those domestic violence convicts who remain convicted. Misdemeanants hold in their own hands the power to remove the taint of conviction and rejoin the protected class of those who may possess firearms. They can seek pardon, expungement, set-aside of their conviction, or restoration of civil rights. 18 U.S.C. § 921(a)(21)(B).[6] The frequency of such expungements, moreover, seem to have risen in many states since the enactment of § 922(g)(9). *See* Robert A. Mikos, *Enforcing State Law in Congress's Shadow*, 90 Cornell L. Rev. 1411, 1463–64 & nn. 187–88 (2005).

In answer to Chovan's as-applied challenge, California, where Chovan was convicted, makes expungement of misdemeanor convictions a right. Under § 1203.4a(a) of the California Penal Code, all misdemeanants can have their

---

[6] The statute 18 U.S.C. § 921(a)(21)(B) states:

> A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

convictions expunged after completion of their sentences if they have not been charged with or convicted of a further crime and have "lived an honest and upright life." Moreover, defendants must be informed of this right to expungement "either orally or in writing, at the time he or she is sentenced." *Id.* at § 1203.4a(c)(1). Prosecuting attorneys have fifteen days from the filing of the petition for dismissal with the court to object. *Id.* at § 1203.4a(f). This participation of the district attorneys in the process allows California to maintain some adversarial integrity in the expungement proceedings, as the district attorney can oppose the motion if the convict's rehabilitation is doubtful. This system places the evaluation of the convict's rehabilitation, *vel non*, in the state. Indeed, California courts have interpreted § 1203.4a(a) to *mandate* expungement when misdemeanants have complied with its terms. *See, e.g.*, *People v. Chandler*, 250 Cal. Rptr. 730, 734 (Cal. Ct. App. 1988) ("[A] defendant moving under Penal Code section 1203.4a is entitled as a matter of right to its benefits upon a showing that he has fulfilled the conditions of probation for the entire period of probation. It was apparently intended that when a defendant has satisfied the terms of probation, the trial court should have no discretion but to carry out its part of the bargain with the defendant.") (citations and quotation marks omitted).

Section 922 is in part a federalism-based statute. It looks to state law, passing restrictions on certain convicts based on decisions made by state legislatures and courts. Section 922 also ceases to apply if convicts have satisfied the state procedures for expungement. This helps the statute satisfy the narrow tailoring prong of strict scrutiny. It allows those who no longer pose a threat to society to demonstrate their rehabilitation and reclaim their Second Amendment rights.

It is not a blunt instrument. Rather, it targets only those whom the states continue to deem not rehabilitated. It is therefore narrowly tailored to the goal of preventing only those who pose the greatest risk to potential domestic violence victims from possessing guns.

With the aforementioned considerations in mind, I conclude that § 922(g)(9) advances a compelling governmental interest, and does so in a narrowly tailored manner. Therefore, the statute satisfies strict scrutiny analysis.

IV.

The *Heller* opinion did not provide lower courts with explicit guidance on how to analyze challenges to statutes under the Second Amendment. If we are to apply the familiar tiers of scrutiny analysis in Second Amendment cases, instead of a pure textual, historical, and structural analysis, however, history and precedent still dictate a more stringent examination of these issues than the majority allow. Strict scrutiny has become an integral aspect of much of our constitutional jurisprudence. *See* Fallon, *supra*, at 1268 (ranking strict scrutiny "among the most important doctrinal elements in constitutional law"). After applying strict scrutiny to § 922(g)(9), I come to the same conclusion as do the majority, and uphold the law. The close look afforded by strict scrutiny, however, ensures that the law truly is narrowly tailored to further a compelling governmental interest, and ensures that the Second Amendment's contours are drawn by the Constitution, and not by Congress.