# Law Offices of Donald Kilmer
A Professional Corporation

1645 Willow Street, Suite 150
San Jose, California 95125
E-Mail: Don@DKLawOffice.com
Phone: 408/264-8489
Fax: 408/264-8487

September 27, 2014

      Via:  E-File

Ms. Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
95 7th Street
San Francisco, California 94103-1526

    Re:    *Enos, et al., v. Holder, et al.*, Case No.: 12-15498

| | |
|---|---|
| Status: | Principal Briefing is Finished. Oral Argument is set for October 9, 2014. |
| Action: | Distribute this Fed. R. App. Proc. Rule 28(j) letter as appropriate given the current status of the case. |

Your Honors:

On June 2, 2014, the Supreme Court issued an opinion in *Bond v. United States*, __ U.S. __, 134 S.Ct. 2077 (2014). A copy is attached.

The Plaintiff/Appellants herein have also alleged a cause of action under the Tenth Amendment.

> Among the background principles of construction that our cases have recognized are those grounded in the relationship between the Federal Government and the States under our Constitution. [citations omitted]

> *Bond v. United States*, at 2088.

And:

> [T]hat "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides'" the "usual constitutional balance of federal and state powers." [citations omitted]
>
> *Bond v. United States,* at 2089

As noted in Appellants' briefs, it is clear from the language of the Lautenberg Amendment [18 U.S.C. § 921(a)(33)] that Congress intended ***some*** kind of state sponsored procedure for restoring the "right to keep and bear arms" after a person sustains a misdemeanor conviction for domestic violence.

This Court should conduct the federalism analysis in this case that is outlined in *Bonds* and reverse the decision of the trial court.

The Plaintiff/Appellants herein have been crime free for more than the ten years contemplated by state law. They have all availed themselves of adversarial procedures that restored them to the status of law-abiding citizens. This combination of California's statutory conditions should be honored by the United States Government and result in a restoration of Appellants Second Amendment rights.


Respectfully Submitted,
/s/
Donald Kilmer
Attorney for Appellants

## CERTIFICATE OF SERVICE

On this, September 27, 2014, I served the foregoing NOTICE OF SUPPLEMENTAL AUTHORITY (Bonds v. U.S.) by electronically filing it with the Court's ECF/CM system, which generated a Notice of Filing and effects service upon counsel for all parties in the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 27, 2014.

/s/ Donald Kilmer
Attorney of Record for Appellants



**CAROL ANNE BOND, PETITIONER v. UNITED STATES**

**No. 12-158.**

**SUPREME COURT OF THE UNITED STATES**

*134 S. Ct. 2077; 189 L. Ed. 2d 1; 2014 U.S. LEXIS 3988; 82 U.S.L.W. 4417; 24 Fla. L. Weekly Fed. S 803*

**November 5, 2013, Argued**
**June 2, 2014, Decided**

**NOTICE:**

The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:  [***1]**
   ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
*United States v. Bond, 681 F.3d 149, 2012 U.S. App. LEXIS 9057 (3d Cir. Pa., 2012)*

**DISPOSITION:**   *681 F.3d 149*, reversed and remanded.


**SYLLABUS**

   [**4]  To implement the international Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction, Congress enacted the Chemical Weapons Convention Implementation Act of 1998. The statute forbids, among other things, any person knowingly to "possess[ ] or use . . . any chemical weapon," *18 U. S. C. § 229(a)(1)*. A "chemical weapon" is "[a] toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter." *§ 229F(1)(A)*. A "toxic chemical" is "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. The term includes all such chemicals, regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere." *§ 229F(8)(A)*. "[P]urposes not prohibited by this chapter" is defined as "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity," and  [***2] other specific purposes. *§ 229F(7)*.

   Petitioner Bond sought revenge against Myrlinda Haynes -- with whom her husband had carried on an affair -- by spreading two toxic chemicals on Haynes's car, mailbox, and door knob in hopes that Haynes would develop an uncomfortable rash. On one occasion Haynes suffered a minor chemical burn that she treated by rinsing with water, but Bond's attempted assaults were otherwise entirely unsuccessful. Federal prosecutors charged Bond with violating, among other things, *section 229(a)*. Bond moved to dismiss the chemical weapons charges on the ground that the Act violates the *Tenth Amendment*. When the District Court denied her motion, she pleaded guilty but reserved the right to appeal. The Third Circuit initially held that Bond lacked standing to raise her *Tenth Amendment* challenge, but this Court reversed. On remand, the Third Circuit rejected her *Tenth Amendment* argument and her additional argument that *section 229* does not reach her conduct.

   *Held*: Section 229 does not reach Bond's simple assault. Pp. 8-21.

   (a) The parties debate whether *section 229* is a necessary and proper means of executing the Federal Government's power to make treaties, but "normally  [***3] [this] Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia County v. McMillan, 466 U.S. 48, 51, 104 S. Ct. 1577, 80 L. Ed.*

*2d 36* (*per curiam*). Thus, this Court starts with Bond's **[**5]** argument that *section 229* does not cover her conduct. Pp. 8-9.

(b) This Court has no need to interpret the scope of the international Chemical Weapons Convention in this case. The treaty specifies that a signatory nation should implement its obligations "in accordance with its constitutional processes." Art. VII(1), 1974 U. N. T. S. 331. Bond was prosecuted under a federal statute, which, unlike the treaty, must be read consistent with the principles of federalism inherent in our constitutional structure. Pp. 10-21.

(1) A fair reading of *section 229* must recognize the duty of "federal courts to be certain of Congress's intent before finding that federal law overrides" the "usual constitutional balance of federal and state powers," *Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S. Ct. 2395, 115 L. Ed. 2d 410*. This principle applies to federal laws that punish local criminal activity, which has traditionally been the responsibility of the States. This Court's precedents have referred to basic principles of federalism **[***4]** in the Constitution to resolve ambiguity in federal statutes. See, *e.g.*, *United States v. Bass, 404 U.S. 336, 92 S. Ct. 515, 30 L. Ed. 2d 488*; *Jones v. United States, 529 U.S. 848, 120 S. Ct. 1904, 146 L. Ed. 2d 902*. Here, the ambiguity in the statute derives from the improbably broad reach of the key statutory definition, given the term -- "chemical weapon" -- that is being defined, the deeply serious consequences of adopting such a boundless reading, and the lack of any apparent need to do so in light of the context from which the statute arose -- a treaty about chemical warfare and terrorism, not about local assaults. Thus, the Court can reasonably insist on a clear indication that Congress intended to reach purely local crimes before interpreting *section 229*'s expansive language in a way that intrudes on the States' police power. Pp. 10-14.

(2) No such clear indication is found in *section 229*. An ordinary speaker would not describe Bond's feud-driven act of spreading irritating chemicals as involving a "chemical weapon." And the chemicals at issue here bear little resemblance to those whose prohibition was the object of an international Convention. Where the breadth of a statutory definition creates ambiguity, it is appropriate to look to the ordinary **[***5]** meaning of the term being defined (here, "chemical weapon") in settling on a fair reading of the statute. See *Johnson v. United States, 559 U.S. 133, 130 S. Ct. 1265, 176 L. Ed. 2d 1*.

The Government's reading of *section 229* would transform a statute concerned with acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults. In light of the principle that Congress does not normally intrude upon the States' police power, this Court is reluctant to conclude that Congress meant to punish Bond's crime with a federal prosecution for a chemical weapons attack. In fact, only a handful of prosecutions have been brought under *section 229*, and most of those involved crimes not traditionally within the States' purview, *e.g.*, terrorist plots.

Pennsylvania's laws are sufficient to prosecute assaults like Bond's, and there is no indication in *section 229* that Congress intended to abandon its **[**6]** traditional "reluctan[ce] to define as a federal crime conduct readily denounced as criminal by the States," *Bass, supra, at 349, 92 S. Ct. 515, 30 L. Ed. 2d 488*. That principle goes to the very structure of the Constitution, and "protects the liberty of the individual from arbitrary power." *Bond v. United States, 564 U.S. ___, _____, 131 S. Ct. 2355, 2364, 180 L. Ed. 2d 269, 280*. **[***6]** The global need to prevent chemical warfare does not require the Federal Government to reach into the kitchen cupboard. Pp. 15-21.

*681 F.3d 149*, reversed and remanded.

**COUNSEL:** Paul D. Clement argued the cause for petitioner.

Donald B. Verrilli, Jr. argued the cause for respondent.

**JUDGES:** Roberts, C. J., delivered the opinion of the Court, in which Kennedy, Ginsburg, Breyer, Sotomayor, and Kagan, JJ., joined. Scalia, J., filed an opinion concurring in the judgment, in which Thomas, J., joined, and in which Alito, J., joined as to Part I. Thomas, J., filed an opinion concurring in the judgment, in which Scalia, J., joined, and in which Alito, J., joined as to Parts I, II, and III. Alito, J., filed an opinion concurring in the judgment.

**OPINION BY:** Roberts

**OPINION**

**[*2083]** Chief Justice Roberts delivered the opinion of the Court.

The horrors of chemical warfare were vividly captured by John Singer Sargent in his 1919 painting Gassed. The nearly life-sized work depicts two lines of soldiers, blinded by mustard gas, clinging single file to orderlies guiding them to an improvised aid station. There they would receive little treatment and no relief; many suffered for weeks only to have the gas claim their lives. The soldiers were shown staggering through piles of comrades too seriously burned to even join the procession.

The painting reflects **[***7]** the devastation that Sargent witnessed in the aftermath of the Second Battle of Arras during World War I. That battle and others like it led to an overwhelming consensus in the international community that toxic chemicals should never again be used as weapons against human beings. Today that objective is reflected in the international Convention on Chemical Weapons, which has been ratified or acceded to by 190 countries. The United States, pursuant to the Federal Government's constitutionally enumerated power to make treaties, ratified the treaty in 1997. To fulfill the United States' obligations under the Convention, Congress enacted the Chemical Weapons Convention Implementation Act of 1998. The Act makes it a federal crime for a person to use or possess any chemical weapon, and it punishes violators with severe penalties. It is a statute that, like the Convention it implements, deals with crimes of deadly seriousness.

The question presented by this case is whether the Implementation Act also reaches a purely local crime: an amateur attempt by a jilted wife to injure her husband's lover, which ended up causing only a minor thumb burn readily treated by rinsing with water. Because **[***8]** our constitutional structure leaves local criminal activity primarily to the States, we have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach. The Chemical Weapons Convention Implementation Act contains no such clear indication, and we accordingly **[**7]** conclude that it does not cover the unremarkable local offense at issue here.

I

A

In 1997, the President of the United States, upon the advice and consent of the Senate, ratified the Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction. S. Treaty Doc. No. 103-21, 1974 U. N. T. S. 317. The nations that ratified the Convention (State Parties) had bold aspirations for it: "general and complete disarmament under strict and effective international control, including the prohibition and elimination of all types of weapons of mass destruction." Convention Preamble, *ibid.* This purpose traces its origin to World War I, when "[o]ver a million casualties, up to 100,000 of them fatal, are estimated to have been caused by chemicals . . ., a large part following the introduction of **[***9]** mustard gas in 1917." Kenyon, Why We Need a Chemical Weapons Convention and an OPCW, in The Creation of the Organisation for the Prohibition of Chemical Weapons 1, 4 (I. Kenyon & D. Feakes eds. 2007) (Kenyon & Feakes). The atrocities of that war led the community of nations to adopt the 1925 Geneva Protocol, which prohibited the use of chemicals as a method of warfare. *Id.*, at 5.

Up to the 1990s, however, chemical weapons remained in use both in and out of wartime, with devastating consequences. **[*2084]** Iraq's use of nerve agents and mustard gas during its war with Iran in the 1980s contributed to international support for a renewed, more effective chemical weapons ban. *Id.*, at 6, 10-11. In 1994 and 1995, long-held fears of the use of chemical weapons by terrorists were realized when Japanese extremists carried out two attacks using sarin gas. *Id.*, at 6. The Convention was conceived as an effort to update the Geneva Protocol's protections and to expand the prohibition on chemical weapons beyond state actors in wartime. Convention Preamble, 1974 U. N. T. S. 318 (the State Parties are "[d]etermined for the sake of all mankind, to exclude completely the possibility of the use of chemical weapons, **[***10]** . . . thereby complementing the obligations assumed under the Geneva Protocol of 1925"). The Convention aimed to achieve that objective by prohibiting the development, stockpiling, or use of chemical weapons by any State Party or person within a State Party's jurisdiction. Arts. I, II, VII. It also established an elaborate reporting process requiring State Parties to destroy chemical weapons under their control and submit to inspection and monitoring by an international organization based in The Hague, Netherlands. Arts. VIII, IX.

The Convention provides:

"(1) Each State Party to this Convention undertakes never under any circumstances:

"(a)To develop, produce, otherwise acquire, stockpile or retain chemical weapons, or transfer, directly or indirectly, chemical weapons to anyone;

"(b) To use chemical weapons;

"(c) To engage in any military preparations to use chemical weapons;

"(d) To assist, encourage or induce, in any way, anyone to engage in any activity prohibited to a State Party under this Convention." Art. I, *id.*, at 319.

[**8] "Chemical Weapons" are defined in relevant part as "[t]oxic chemicals and their precursors, except where intended for purposes not prohibited under this Convention, [***11] as long as the types and quantities are consistent with such purposes." Art. II(1)(a), *ibid.* "Toxic Chemical," in turn, is defined as "Any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. This includes all such chemicals, regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere." Art. II(2), *id.*, at 320. "Purposes Not Prohibited Under this Convention" means "[i]ndustrial, agricultural, research, medical, pharmaceutical or other peaceful purposes," Art. II(9)(a), *id.*, at 322, and other specific purposes not at issue here, Arts. II(9)(b)-(d).

Although the Convention is a binding international agreement, it is "not self-executing." W. Krutzsch & R. Trapp, A Commentary on the Chemical Weapons Convention 109 (1994). That is, the Convention creates obligations only for State Parties and "does not by itself give rise to domestically enforceable federal law" absent "implementing legislation passed by Congress." *Medellin v. Texas, 552 U.S. 491, 505, n. 2, 128 S. Ct. 1346, 170 L. Ed. 2d 190 (2008).* It instead provides that "[e]ach State Party shall, [***12] in accordance with its constitutional processes, adopt the necessary measures to implement its obligations under this Convention." Art. VII(1), 1974 U. N. T. S. 331. "In particular," each State Party shall "[p]rohibit natural and legal persons anywhere . . . under its jurisdiction . . . from undertaking any activity prohibited to a State Party under this Convention, including enacting penal legislation with respect to such activity." Art. VII (1)(a), *id.*, at 331-332.

[*2085] Congress gave the Convention domestic effect in 1998 when it passed the Chemical Weapons Convention Implementation Act. See 112 Stat. 2681-856. The Act closely tracks the text of the treaty: It forbids any person knowingly "to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." *18 U. S. C. § 229(a)(1).* It defines "chemical weapon" in relevant part as "[a] toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose." *§ 229F(1)(A).* "Toxic chemical," in turn, is defined in general as "any chemical which through [***13] its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. The term includes all such chemicals, regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere." *§ 229F(8)(A).* Finally, "purposes not prohibited by this chapter" is defined as "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity," and other specific purposes. *§ 229F(7).* A person who violates *section 229* may be subject to severe punishment: imprisonment "for any term of years," or if a victim's death results, the death penalty or imprisonment "for life." *§ 229A(a).*

B

Petitioner Carol Anne Bond is a microbiologist from Lansdale, Pennsylvania. [**9] In 2006, Bond's closest friend, Myrlinda Haynes, announced that she was pregnant. When Bond discovered that her husband was the child's father, she sought revenge against Haynes. Bond stole a quantity of 10-chloro-10H-phenoxarsine (an arsenic-based compound) from her employer, a chemical manufacturer. She also ordered a vial of potassium dichromate (a chemical commonly used [***14] in printing photographs or cleaning laboratory equipment) on Amazon.com. Both chemicals are toxic to humans and, in high enough doses, potentially lethal. It is undisputed, however, that Bond did not intend to kill Haynes. She instead hoped that Haynes would touch the chemicals and develop an uncomfortable rash.

Between November 2006 and June 2007, Bond went to Haynes's home on at least 24 occasions and spread the chemicals on her car door, mailbox, and door knob. These attempted assaults were almost entirely unsuccessful. The chemicals that Bond used are easy to see, and Haynes was able to avoid them all but once. On that occasion, Haynes suffered a minor chemical burn on her thumb, which she treated by rinsing with water. Haynes repeatedly called the local police to report the suspicious substances, but they took no action. When Haynes found powder on her mailbox, she called the police again, who told her to call the post office. Haynes did so, and postal inspectors placed surveillance

cameras around her home. The cameras caught Bond opening Haynes's mailbox, stealing an envelope, and stuffing potassium dichromate inside the muffler of Haynes's car.

Federal prosecutors naturally charged [***15] Bond with two counts of mail theft, in violation of *18 U. S. C. § 1708*. More surprising, they also charged her with two counts of possessing and using a chemical weapon, in violation of *section 229(a)*. Bond moved to dismiss the chemical weapon counts on the ground that *section 229* exceeded Congress's enumerated powers and invaded powers reserved to the States by the *Tenth Amendment*. The District Court denied Bond's motion. She then entered a conditional guilty plea that reserved [*2086] her right to appeal. The District Court sentenced Bond to six years in federal prison plus five years of supervised release, and ordered her to pay a $2,000 fine and $9,902.79 in restitution.

Bond appealed, raising a *Tenth Amendment* challenge to her conviction. The Government contended that Bond lacked standing to bring such a challenge. The Court of Appeals for the Third Circuit agreed. We granted certiorari, the Government confessed error, and we reversed. We held that, in a proper case, an individual may "assert injury from governmental action taken in excess of the authority that federalism defines." *Bond v. United States, 564 U.S. ___, _____, 131 S. Ct. 2355, 2364, 180 L. Ed. 2d 269, 279 (2011) (Bond I)*. We "expresse[d] no view on the [***16] merits" of Bond's constitutional challenge. *Id., at ___, 131 S. Ct. 2355, 2366, 180 L. Ed. 2d 269, 283*.

On remand, Bond renewed her constitutional argument. She also argued that *section 229* does not reach her conduct because the statute's exception for the use of chemicals for "peaceful purposes" should be understood in contradistinction to the "warlike" activities that the Convention was primarily designed to prohibit. Bond argued that her conduct, though reprehensible, was not at all "warlike." The Court of Appeals rejected [**10] this argument. *681 F.3d 149 (CA3 2012)*. The court acknowledged that the Government's reading of *section 229* would render the statute "striking" in its "breadth" and turn every "kitchen cupboard and cleaning cabinet in America into a potential chemical weapons cache." *Id., at 154, n. 7*. But the court nevertheless held that Bond's use of "'highly toxic chemicals with the intent of harming Haynes' can hardly be characterized as 'peaceful' under that word's commonly understood meaning." *Id., at 154* (citation omitted).

The Third Circuit also rejected Bond's constitutional challenge to her conviction, holding that *section 229* was "necessary and proper to carry the Convention into effect." *Id., at 162*. [***17] The Court of Appeals relied on this Court's opinion in *Missouri v. Holland, 252 U.S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 18 Ohio L. Rep. 61 (1920)*, which stated that "[i]f the treaty is valid there can be no dispute about the validity of the statute" that implements it "as a necessary and proper means to execute the powers of the Government," *id., at 432, 40 S. Ct. 382, 64 L. Ed. 641*.

We again granted certiorari, *568 U.S. ___, 131 S. Ct. 455, 178 L. Ed. 2d 285 (2013)*.

II

In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder. The States have broad authority to enact legislation for the public good -- what we have often called a "police power." *United States v. Lopez, 514 U.S. 549, 567, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995)*. The Federal Government, by contrast, has no such authority and "can exercise only the powers granted to it," *McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 405, 4 L. Ed. 579 (1819)*, including the power to make "all Laws which shall be necessary and proper for carrying into Execution" the enumerated powers, *U. S. Const., Art. I, § 8, cl. 18*. For nearly two centuries it has been "clear" that, lacking a police power, "Congress cannot punish felonies generally." *Cohens v. Virginia, 19 U.S. 264, 6 Wheat. 264, 428, 5 L. Ed. 257 (1821)*. A criminal act committed wholly within a State "cannot be made [***18] an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States." *United States v. Fox, 95 U.S. 670, 672, 24 L. Ed. 538 (1878)*.

[*2087] The Government frequently defends federal criminal legislation on the ground that the legislation is authorized pursuant to Congress's power to regulate interstate commerce. In this case, however, the Court of Appeals held that the Government had explicitly disavowed that argument before the District Court. *681 F.3d, at 151, n. 1*. As a result, in this Court the parties have devoted significant effort to arguing whether *section 229*, as applied to Bond's offense, is a necessary and proper means of executing the National Government's power to make treaties. *U. S. Const., Art. II, § 2, cl. 2*. Bond argues that the lower court's reading of *Missouri v. Holland* would remove all limits on federal authority, so long as the Federal Government ratifies a treaty first. She insists that to effectively afford the Government a police power whenever it implements a treaty would be contrary to the Framers' careful decision to divide power between the States and the National Government [***19] as a means of preserving liberty. To the extent that [**11] *Holland* authorizes such usurpation of traditional state authority, Bond says, it must be either limited or overruled.

The Government replies that this Court has never held that a statute implementing a valid treaty exceeds Congress's enumerated powers. To do so here, the Government says, would contravene another deliberate choice of the Framers: to avoid placing subject matter limitations on the National Government's power to make treaties. And it might also undermine confidence in the United States as an international treaty partner.

Notwithstanding this debate, it is "a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia County v. McMillan, 466 U.S. 48, 51, 104 S. Ct. 1577, 80 L. Ed. 2d 36 (1984)* (*per curiam*); see also *Ashwander v. TVA, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936)* (Brandeis, J., concurring). Bond argues that *section 229* does not cover her conduct. So we consider that argument first.

III

*Section 229* exists to implement the Convention, so we begin with that international agreement. As explained, **[***20]** the Convention's drafters intended for it to be a comprehensive ban on chemical weapons. But even with its broadly worded definitions, we have doubts that a treaty about *chemical weapons* has anything to do with Bond's conduct. The Convention, a product of years of worldwide study, analysis, and multinational negotiation, arose in response to war crimes and acts of terrorism. See Kenyon & Feakes 6. There is no reason to think the sovereign nations that ratified the Convention were interested in anything like Bond's common law assault.

Even if the treaty does reach that far, nothing prevents Congress from implementing the Convention in the same manner it legislates with respect to innumerable other matters--observing the Constitution's division of responsibility between sovereigns and leaving the prosecution of purely local crimes to the States. The Convention, after all, is agnostic between enforcement at the state versus federal level: It provides that "[e]ach State Party shall, *in accordance with its constitutional processes*, adopt the necessary measures to implement its obligations under this Convention." Art. VII(1), 1974 U. N. T. S. 331 (emphasis added); see also Tabassi, National Implementation: Article VII, in Kenyon & Feakes **[***21]** 205, 207 ("Since the creation of **[*2088]** national law, the enforcement of it and the structure and administration of government are all sovereign acts reserved exclusively for [State Parties], it is not surprising that the Convention is so vague on the critical matter of national implementation.").

Fortunately, we have no need to interpret the scope of the Convention in this case. Bond was prosecuted under *section 229*, and the statute -- unlike the Convention -- must be read consistent with principles of federalism inherent in our constitutional structure.

A

In the Government's view, the conclusion that Bond "knowingly" "use[d]" a "chemical weapon" in violation of *section 229(a)* is simple: The **[**12]** chemicals that Bond placed on Haynes's home and car are "toxic chemical[s]" as defined by the statute, and Bond's attempt to assault Haynes was not a "peaceful purpose." *§§ 229F(1), (8), (7)*. The problem with this interpretation is that it would "dramatically intrude[] upon traditional state criminal jurisdiction," and we avoid reading statutes to have such reach in the absence of a clear indication that they do. *United States v. Bass, 404 U.S. 336, 350, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971)*.

Part of a fair reading of statutory text is recognizing **[***22]** that "Congress legislates against the backdrop" of certain unexpressed presumptions. *EEOC v. Arabian American Oil Co., 499 U.S. 244, 248, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991)*. As Justice Frankfurter put it in his famous essay on statutory interpretation, correctly reading a statute "demands awareness of certain presuppositions." Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947). For example, we presume that a criminal statute derived from the common law carries with it the requirement of a culpable mental state--even if no such limitation appears in the text--unless it is clear that the Legislature intended to impose strict liability. *United States v. United States Gypsum Co., 438 U.S. 422, 437, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978)*. To take another example, we presume, absent a clear statement from Congress, that federal statutes do not apply outside the United States. *Morrison v. National Australia Bank Ltd., 561 U.S. 247, 255, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010)*. So even though *section 229*, read on its face, would cover a chemical weapons crime if committed by a U.S. citizen in Australia, we would not apply the statute to such conduct absent a plain statement from Congress. [1] The notion that some things "go without saying" applies to legislation **[***23]** just as it does to everyday life.

1   Congress has in fact included just such a plain statement in *section 229(c)(2)*: "Conduct prohibited by *[section 229(a)]* is within the jurisdiction of the United States if the prohibited conduct . . . takes place outside of the United States and is committed by a national of the United States."

Among the background principles of construction that our cases have recognized are those grounded in the relationship between the Federal Government and the States under our Constitution. It has long been settled, for example, that we presume federal statutes do not abrogate state sovereign immunity, *Atascadero State Hospital v. Scanlon, 473 U.S. 234, 243, 105 S. Ct. 3142, 87 L. Ed. 2d 171 (1985)*, impose obligations on the States pursuant to *section 5 of the Fourteenth Amendment, Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 16-17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981)*, or preempt state law, *Rice v. Santa Fe Elevator Corp.,* **[*2089]** *331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947)*.

Closely related to these is the well-established principle that "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides'" the "usual constitutional balance of federal and state powers." *Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991)* **[***24]** (quoting *Atascadero, supra, at 243, 105 S. Ct. 3142, 87 L. Ed. 2d 171*). To quote Frankfurter again, if the Federal Government would "'radically readjust[ ] the balance of state and national authority, those charged with the duty of **[**13]** legislating [must be] reasonably explicit'" about it. *BFP v. Resolution Trust Corporation, 511 U.S. 531, 544, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994)* (quoting *Some Reflections, supra, at 539-540, 114 S. Ct. 1757, 128 L. Ed. 2d 556*; second alteration in original). Or as explained by Justice Marshall, when legislation "affect[s] the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Bass, supra, at 349, 92 S. Ct. 515, 30 L. Ed. 2d 488*.

We have applied this background principle when construing federal statutes that touched on several areas of traditional state responsibility. See *Gregory, supra, at 460, 111 S. Ct. 2395, 115 L. Ed. 2d 410* (qualifications for state officers); *BFP, supra, at 544, 114 S. Ct. 1757, 128 L. Ed. 2d 556* (titles to real estate); *Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U.S. 159, 174, 121 S. Ct. 675, 148 L. Ed. 2d 576 (2001)* (land and water use). Perhaps the clearest example of traditional state authority is the punishment of local criminal activity. *United States v. Morrison, 529 U.S. 598, 618, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000)*. Thus, **[***25]** "we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction." *Bass, 404 U.S., at 349, 92 S. Ct. 515, 30 L. Ed. 2d 488*.

In *Bass*, we interpreted a statute that prohibited any convicted felon from "'receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm.'" *Id., at 337, 92 S. Ct. 515, 30 L. Ed. 2d 488*. The Government argued that the statute barred felons from possessing *all* firearms and that it was not necessary to demonstrate a connection to interstate commerce. We rejected that reading, which would "render[ ] traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources." *Id., at 350, 92 S. Ct. 515, 30 L. Ed. 2d 488*. We instead read the statute more narrowly to require proof of a connection to interstate commerce in every case, thereby "preserv[ing] as an element of all the offenses a requirement suited to federal criminal jurisdiction alone." *Id., at 351, 92 S. Ct. 515, 30 L. Ed. 2d 488*.

Similarly, in *Jones v. United States, 529 U.S. 848, 850, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000)*, we confronted the question whether the federal arson statute, which prohibited burning "'any . . . property used in interstate or foreign commerce* **[***26]** or in any activity affecting interstate or foreign commerce,'" reached an owner-occupied private residence. Once again we rejected the Government's "expansive interpretation," under which "hardly a building in the land would fall outside the federal statute's domain." *Id., at 857, 120 S. Ct. 1904, 146 L. Ed. 2d 902*. We instead held that the statute was "most sensibly read" more narrowly to reach only buildings used in "active employment for commercial purposes." *Id., at 855, 120 S. Ct. 1904, 146 L. Ed. 2d 902*. We noted that "arson is a paradigmatic common-law state crime," *id., at 858, 120 S. Ct. 1904, 146 L. Ed. 2d 902*, and that the Government's proposed broad reading would "'significantly change[ ] the federal-state **[*2090]** balance,'" *ibid.* (quoting *Bass, 404 U.S., at 349, 92 S. Ct. 515, 30 L. Ed. 2d 488*), "mak[ing] virtually every arson **[**14]** in the country a federal offense," *529 U.S., at 859, 120 S. Ct. 1904, 146 L. Ed. 2d 902*.

These precedents make clear that it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute. In this case, the ambiguity derives from the improbably broad reach of the key statutory definition given the term -- "chemical weapon" -- being defined; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of **[***27]** the context from which the statute arose--a treaty about chemical warfare and terrorism. We conclude that, in this curious case, we can insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the

statute's expansive language in a way that intrudes on the police power of the States. See *Bass, supra, at 349, 92 S. Ct. 515, 30 L. Ed. 2d 488.* [2]

> 2   Justice Scalia contends that the relevance of *Bass* and *Jones* to this case is "entirely made up," *post*, at 3 (opinion concurring in judgment), but not because he disagrees with interpreting statutes in light of principles of federalism. Rather, he says that *Bass* was a case where the statute was unclear. We agree; we simply think the statute in this case is also subject to construction, for the reasons given. As for *Jones*, Justice Scalia argues that the discussion of federalism in that case was beside the point. *Post*, at 4. We do not read *Jones* that way; the Court adopted the "most sensibl[e] read[ing]" of the statute, *529 U.S., at 855, 120 S. Ct. 1904, 146 L. Ed. 2d 902*, which suggests that other sensible readings are possible. In arriving at its fair reading of the statute, the Court considered the dramatic extent to which the Government's broader interpretation would have **[***28]** expanded "the federal statute's domain." *Id., at 857, 120 S. Ct. 1904, 146 L. Ed. 2d 902*. We do the same here.

B

We do not find any such clear indication in *section 229*. "Chemical weapon" is the key term that defines the statute's reach, and it is defined extremely broadly. But that general definition does not constitute a clear statement that Congress meant the statute to reach local criminal conduct.

In fact, a fair reading of *section 229* suggests that it does not have as expansive a scope as might at first appear. To begin, as a matter of natural meaning, an educated user of English would not describe Bond's crime as involving a "chemical weapon." Saying that a person "used a chemical weapon" conveys a very different idea than saying the person "used a chemical in a way that caused some harm." The natural meaning of "chemical weapon" takes account of both the particular chemicals that the defendant used and the circumstances in which she used them.

When used in the manner here, the chemicals in this case are not of the sort that an ordinary person would associate with instruments of chemical warfare. The substances that Bond used bear little resemblance to the deadly toxins that are "of particular danger to the objectives **[***29]** of the Convention." Why We Need a Chemical Weapons Convention and an OPCW, in Kenyon & Feakes 17 (describing the Convention's Annex on Chemicals, a nonexhaustive list of covered substances that are subject to special regulation). More to the point, the use of something as a "weapon" typically connotes "[a]n instrument of offensive or defensive combat," Webster's Third New International Dictionary 2589 (2002), or "[a]n instrument of attack or defense in combat, as a gun, missile, or sword," American Heritage Dictionary 2022 (3d ed. **[**15]** 1992). But no speaker in natural parlance would describe Bond's feud-driven act of spreading irritating chemicals on Haynes's door knob and mailbox as "combat." Nor do the other circumstances **[*2091]** of Bond's offense--an act of revenge born of romantic jealousy, meant to cause discomfort, that produced nothing more than a minor thumb burn--suggest that a chemical weapon was deployed in Norristown, Pennsylvania. Potassium dichromate and 10-chloro-10H-phenoxarsine might be chemical weapons if used, say, to poison a city's water supply. But Bond's crime is worlds apart from such hypotheticals, and covering it would give the statute a reach exceeding the ordinary meaning **[***30]** of the words Congress wrote.

In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition. In *Johnson v. United States, 559 U.S. 133, 136, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010)*, for example, we considered the statutory term "'violent felony,'" which the Armed Career Criminal Act defined in relevant part as an offense that "'has as an element the use . . . of physical force against the person of another.'" Although "physical force against . . . another" might have meant *any* force, however slight, we thought it "clear that in the context of a statutory definition of '*violent* felony,' the phrase 'physical force' means *violent* force -- that is, force capable of causing physical pain or injury to another person." *Id., at 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1*. The ordinary meaning of "chemical weapon" plays a similar limiting role here.

The Government would have us brush aside the ordinary meaning and adopt a reading of *section 229* that would sweep in everything from the detergent under the kitchen sink to the stain remover in the laundry room. Yet no one would ordinarily describe those substances as "chemical **[***31]** weapons." The Government responds that because Bond used "specialized, highly toxic" (though legal) chemicals, "this case presents no occasion to address whether Congress intended [*section 229*] to apply to common household substances." Brief for United States 13, n. 3. That the statute *would* apply so broadly, however, is the inescapable conclusion of the Government's position: Any parent would be guilty of a serious federal offense--possession of a chemical weapon--when, exasperated by the children's repeated failure to clean the goldfish tank, he considers poisoning the fish with a few drops of vinegar. We are reluctant to ignore the ordinary meaning of "chemical weapon" when doing so would transform a statute passed to implement the

international Convention on Chemical Weapons into one that also makes it a federal offense to poison goldfish. That would not be a "realistic assessment[ ] of congressional intent." *Post*, at 6 (Scalia, J., concurring in judgment).

In light of all of this, it is fully appropriate to apply the background assumption that Congress normally preserves "the constitutional balance between the National Government and the States." *Bond I, 564 U.S., at ___, 131 S. Ct. 2355, 2364, 180 L. Ed. 2d 269, 280*. [***32] That assumption is grounded in the very structure of the Constitution. And as we explained when this case was first before us, maintaining that [**16] constitutional balance is not merely an end unto itself. Rather, "[b]y denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Ibid.*

The Government's reading of *section 229* would "'alter sensitive federal-state relationships,'" convert an astonishing amount of "traditionally local criminal conduct" into "a matter for federal enforcement," and "involve a substantial extension of federal police resources." *Bass, 404 U.S., at 349-350, 92 S. Ct. 515, 30 L. Ed. 2d 488*. It would transform the statute from one [*2092] whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults. As the Government reads *section 229*, "hardly" a poisoning "in the land will fall outside the federal statute's domain." *Jones, 529 U.S., at 857, 120 S. Ct. 1904, 146 L. Ed. 2d 902*. Of course Bond's conduct is serious and unacceptable--and against the laws of Pennsylvania. But the background principle that Congress does not normally intrude upon the police power [***33] of the States is critically important. In light of that principle, we are reluctant to conclude that Congress meant to punish Bond's crime with a federal prosecution for a chemical weapons attack.

In fact, with the exception of this unusual case, the Federal Government itself has not looked to *section 229* to reach purely local crimes. The Government has identified only a handful of prosecutions that have been brought under this section. Brief in Opposition 27, n. 5. Most of those involved either terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people. See *United States v. Ghane, 673 F.3d 771 (CA8 2012)* (defendant possessed enough potassium cyanide to kill 450 people); *United States v. Crocker, 260 Fed. Appx. 794 (CA6 2008)* (defendant attempted to acquire VX nerve gas and chlorine gas as part of a plot to attack a federal courthouse); *United States v. Krar, 134 Fed. Appx. 662 (CA5 2005)* (*per curiam*) (defendant possessed sodium cyanide); *United States v. Fries, 2012 U.S. Dist. LEXIS 25009, 2012 WL 689157 (D Ariz., Feb. 28, 2012)* (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood). [***34] The Federal Government undoubtedly has a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering. Those crimes have not traditionally been left predominantly to the States, and nothing we have said here will disrupt the Government's authority to prosecute such offenses.

It is also clear that the laws of the Commonwealth of Pennsylvania (and every other State) are sufficient to prosecute Bond. Pennsylvania has several statutes that would likely cover her assault. See *18 Pa. Cons. Stat. §§ 2701* (2012) (simple assault), *2705* (reckless endangerment), *2709* (harassment). [3] And state authorities regularly enforce these laws in poisoning cases. See, *e.g.*, Gamiz, Family [**17] Survives Poisoned Burritos, Allentown, Pa., Morning Call, May 18, 2013 (defendant charged with assault, reckless endangerment, and harassment for feeding burritos poisoned with prescription medication to her husband and daughter); Cops: Man Was Poisoned Over 3 Years, Harrisburg, Pa., Patriot News, Aug. 12, 2012, p. A11 (defendant charged with assault and reckless endangerment for poisoning a man with eye drops over three years so that "he would pay more [***35] attention to her").

> 3 Pennsylvania also prohibits using "a weapon of mass destruction," including a "chemical agent." *18 Pa. Cons. Stat. §§ 2716(a), (i)*. Just as we conclude that Bond's offense cannot be fairly described as the use of a chemical weapon, Pennsylvania authorities apparently determined that her crime did not involve a "weapon of mass destruction."

The Government objects that Pennsylvania authorities charged Bond with only a minor offense based on her "harassing telephone calls and letters," *Bond I, 564 U.S., at ___, 131 S. Ct. 2355, 180 L. Ed. 2d 269*, and declined to prosecute her for assault. But we have traditionally viewed the exercise of state officials' prosecutorial discretion as a valuable feature of our constitutional system. See *Bordenkircher v. Hayes, 434 U.S. 357, 364, [*2093] 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978)*. And nothing in the Convention shows a clear intent to abrogate that feature. Prosecutorial discretion involves carefully weighing the benefits of a prosecution against the evidence needed to convict, the resources of the public fisc, and the public policy of the State. Here, in its zeal to prosecute Bond, the Federal Government has "displaced" the "public policy of the Commonwealth of Pennsylvania, enacted [***36] in its capacity as sovereign," that Bond does not belong in prison for a chemical weapons offense. *Bond I, supra, at ___, 131 S. Ct. 2355, 2366, 180 L. Ed. 2d 269, 282*); see also *Jones, supra, at 859, 120 S. Ct. 1904, 146 L. Ed. 2d 902* (Stevens, J.,

concurring) (federal prosecution of a traditionally local crime "illustrates how a criminal law like this may effectively displace a policy choice made by the State").

As we have explained, "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *Bass, 404 U.S., at 349, 92 S. Ct. 515, 30 L. Ed. 2d 488.* There is no clear indication of a contrary approach here. *Section 229* implements the Convention, but Bond's crime could hardly be more unlike the uses of mustard gas on the Western Front or nerve agents in the Iran-Iraq war that form the core concerns of that treaty. See Kenyon & Feakes 6. There are no life-sized paintings of Bond's rival washing her thumb. And there are no apparent interests of the United States Congress or the community of nations in seeing Bond end up in federal prison, rather than dealt with (like virtually all other criminals in Pennsylvania) by the State. The Solicitor General acknowledged as much at oral argument. See Tr. of Oral Arg. 47 ("I don't **[***37]** think anybody would say [that] whether or not Ms. Bond is prosecuted would give rise to an international incident").

This case is unusual, and our analysis is appropriately limited. Our disagreement with our colleagues reduces to whether *section 229* is "utterly clear." *Post,* at 5 (Scalia, J., concurring in judgment). We think it is not, given that the definition of "chemical weapon" in a particular case can reach beyond any normal notion of such a weapon, that the context from which the statute arose demonstrates a much more limited prohibition was intended, and that the most sweeping reading of the statute would fundamentally upset the Constitution's balance between national and local power. This exceptional convergence **[**18]** of factors gives us serious reason to doubt the Government's expansive reading of *section 229,* and calls for us to interpret the statute more narrowly.

In sum, the global need to prevent chemical warfare does not require the Federal Government to reach into the kitchen cupboard, or to treat a local assault with a chemical irritant as the deployment of a chemical weapon. There is no reason to suppose that Congress--in implementing the Convention on Chemical Weapons--thought **[***38]** otherwise.

* * *

The Convention provides for implementation by each ratifying nation "in accordance with its constitutional processes." Art. VII(1), 1974 U. N. T. S. 331. As James Madison explained, the constitutional process in our "compound republic" keeps power "divided between two distinct governments." The Federalist No. 51, p. 323 (C. Rossiter ed. 1961). If *section 229* reached Bond's conduct, it would mark a dramatic departure from that constitutional structure and a serious reallocation of criminal law enforcement authority between the Federal Government and the States. Absent a clear statement of that purpose, we will not presume Congress to **[*2094]** have authorized such a stark intrusion into traditional state authority.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**CONCUR BY:** Scalia; Thomas; Alito

**CONCUR**

Justice Scalia, with whom Justice Thomas joins, and with whom Justice Alito joins as to Part I, concurring in the judgment.

Somewhere in Norristown, Pennsylvania, a husband's paramour suffered a minor thumb burn at the hands of a betrayed wife. The United States Congress--"every where extending the sphere of its activity, and **[***39]** drawing all power into its impetuous vortex" [1]--has made a federal case out of it. What are we to do?

1 The Federalist No. 48, p. 333 (J. Cooke ed. 1961) (J. Madison) (hereinafter The Federalist).

It is the responsibility of "the legislature, not the Court, . . . to define a crime, and ordain its punishment." *United States v. Wiltberger, 18 U.S. 76, 5 Wheat. 76, 95, 5 L. Ed. 37 (1820)* (Marshall, C. J., for the Court). And it is "emphatically the province and duty of the judicial department to say what the law [including the Constitution] is." *Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 177, 2 L. Ed. 60 (1803)* (same). Today, the Court shirks its job and performs Congress's. As sweeping and unsettling as the Chemical Weapons Convention Implementation Act of 1998 may be, it is clear beyond doubt that it covers what Bond did; and we have no authority to amend it. So we are forced to decide--there is no way around it--whether the Act's application to what Bond did was constitutional.

I would hold that it was not, and for that reason would reverse the judgment of the Court of Appeals for the Third Circuit.

I. The Statutory Question

A. Unavoidable Meaning of the Text

The meaning of the Act is plain. No person may knowingly "develop, produce, **[**19]** otherwise **[***40]** acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." *18 U. S. C. § 229(a)(1)*. A "chemical weapon" is "[a] toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose." *§ 229F(1)(A)*. A "toxic chemical" is "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. The term includes all such chemicals, regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere." *§ 229F(8)(A)*. A "purpose not prohibited" is "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity." *§ 229F(7)(A)*.

Applying those provisions to this case is hardly complicated. Bond possessed and used "chemical[s] which through [their] chemical action on life processes can cause death, temporary incapacitation or permanent harm." Thus, she possessed "toxic chemicals." And, because they were not possessed **[***41]** or used only for a "purpose not prohibited," *§ 229F(1)(A)*, they were "chemical weapons." Ergo, Bond violated the Act. End of statutory analysis, I would have thought. [2]

> 2  Petitioner offers one textual argument that the Court does not consider. She argues that the exception for "peaceful purposes" is best understood as a term of art meaning roughly any purpose that is not "warlike." Brief for Petitioner 50-57. Though that reading is more defensible than the Court's, the Act will not bear it. If "peaceful" meant "nonwarlike," the statute's exception for "any individual self-defense device, including . . . pepper spray or chemical mace," *§ 229C*--the prosaic uses of which are surely nonwarlike -- would have been unnecessary.

**[*2095]** The Court does not think the interpretive exercise so simple. But that is only because its result-driven antitextualism befogs what is evident.

B. The Court's Interpretation

The Court's account of the clear-statement rule reads like a really good lawyer's brief for the wrong side, relying on cases that are *so close* to being on point that someone eager to reach the favored outcome might swallow them. The relevance to this case of *United States v. Bass, 404 U.S. 336, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971),* **[***42]** and *Jones v. United States, 529 U.S. 848, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000),* is, in truth, entirely made up. In *Bass*, we had to decide whether a statute forbidding "'receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm'" prohibited possessing a gun that lacked any connection to interstate commerce. *404 U.S., at 337-339, 92 S. Ct. 515, 30 L. Ed. 2d 488.* Though the Court relied in part on a federalism-inspired interpretive presumption, it did so only *after* it had found, in Part I of the opinion, applying traditional interpretive tools, that the text in question was ambiguous, *id., at 339-347, 92 S. Ct. 515, 30 L. Ed. 2d 488.* Adopting in Part II the narrower of the two possible readings, we said that "*unless Congress conveys its purpose clearly*, it will not be deemed to have significantly changed the federal-state balance." *Id., at 349, 92 S. Ct. 515, 30 L. Ed. 2d 488* (emphasis added). Had Congress "convey[ed] its purpose clearly" by enacting a clear and even sweeping statute, the presumption would not have applied.

**[**20]** *Jones* is also irrelevant. To determine whether an owner-occupied private residence counted as a "'property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce'" under the federal arson statute, *529 U.S., at 850-851, 120 S. Ct. 1904, 146 L. Ed. 2d 902,* **[***43]** our opinion examined *not* the federal-jurisdiction-expanding consequences of answering yes but rather the ordinary meaning of the words--and answered no, *id., at 855-857, 120 S. Ct. 1904, 146 L. Ed. 2d 902.* Then, in a separate part of the opinion, we observed that our reading was consistent with the principle that we should adopt a construction that avoids "grave and doubtful constitutional questions," *id., at 857, 120 S. Ct. 1904, 146 L. Ed. 2d 902,* and, quoting *Bass*, the principle that Congress must convey its purpose clearly before its laws will be "deemed to have significantly changed the federal-state balance,'" *529 U.S., at 858, 120 S. Ct. 1904, 146 L. Ed. 2d 902.* To say that the best reading of the text conformed to those principles is not to say that those principles can render clear text ambiguous. [3]

3 Other cases in the *Bass* line confirm that broad text "need only be plain to anyone reading [it]" in order to be given its obvious meaning. *Salinas v. United States, 522 U.S. 52, 60, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)* (internal quotation marks omitted); see also *Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 209, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998)*; cf. *United States v. Lopez, 514 U.S. 549, 562, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995)*.

The latter is what the Court says today. Inverting *Bass* and *Jones*, it *starts* **[\*\*\*44]** with the federalism-related consequences of the statute's meaning and reasons backwards, holding that, if the statute has what the Court considers a disruptive effect on the "federal-state balance" of criminal jurisdiction, *ante*, at 14, that effect causes the text, even if clear on its face, to be ambiguous. **[\*2096]** Just ponder what the Court says: "[The Act's] ambiguity *derives* from the improbably broad reach of the key statutory definition . . . the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so . . . ." *Ibid.* (emphasis added). Imagine what future courts can do with that judge-empowering principle: Whatever has improbably broad, deeply serious, and apparently unnecessary consequences . . . *is ambiguous*!

The same skillful use of oh-so-close-to-relevant cases characterizes the Court's *pro forma* attempt to find ambiguity in the text itself, specifically, in the term "[c]hemical weapon." The ordinary meaning of weapon, the Court says, is an instrument of combat, and "no speaker in natural parlance would describe Bond's feud-driven act of spreading irritating chemicals on Haynes's door knob and mailbox as 'combat.'" *Ante*, at 15-16. **[\*\*\*45]** Undoubtedly so, but undoubtedly beside the point, since the Act supplies its own definition of "chemical weapon," which unquestionably does bring Bond's action within the statutory prohibition. The Court retorts that "it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Ante*, at 16. *So close* to true! What is "not unusual" is using the ordinary meaning of the term being defined for the purpose of resolving *an ambiguity in the definition*. When, for example, "draft," a word of many meanings, is one of the words **[\*\*21]** used in a definition of "breeze," we know it has nothing to do with military conscription or beer. The point is illustrated by the almost-relevant case the Court cites for its novel principle, *Johnson v. United States, 559 U.S. 133, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010)*. There the defined term was "violent felony," which the Act defined as an offense that "'has as an element the use . . . of physical force against the person of another.'" *Id., at 135, 130 S. Ct. 1265, 176 L. Ed. 2d 1* (quoting *§ 924(e)(2)(B)(i)*). We had to figure out what "physical force" meant, since the statute "*d[id] not define*" it. *Id., at 138, 130 S. Ct. 1265, 176 L. Ed. 2d 1* (emphasis added). **[\*\*\*46]** So we consulted (among other things) the general meaning of the term being defined, "violent felony." *Id., at 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1*.

In this case, by contrast, the ordinary meaning of the term being defined is irrelevant, because the statute's own definition -- however expansive -- is utterly clear: any "chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals," *§ 229F(8)(A)*, unless the chemical is possessed or used for a "peaceful purpose," *§ 229F(1)(A), (7)(A)*. The statute parses itself. There is no opinion of ours, and none written by any court or put forward by any commentator since Aristotle, which says, or even suggests, that "dissonance" between ordinary meaning and the unambiguous words of a definition is to be resolved in favor of ordinary meaning. If that were the case, there would hardly be any use in providing a definition. No, the true rule is entirely clear: "When a statute includes an explicit definition, we must follow that definition, *even if it varies from that term's ordinary meaning*." *Stenberg v. Carhart, 530 U.S. 914, 942, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000)* (emphasis added). Once again, contemplate the judge-empowering consequences **[\*\*\*47]** of the new interpretive rule the Court today announces: When there is "dissonance" between the statutory definition and the ordinary meaning of the defined word, the latter may prevail.

But even text clear on its face, the Court suggests, must be read against the backdrop of established interpretive presumptions. Thus, we presume "that a criminal **[\*2097]** statute derived from the common law carries with it the requirement of a culpable mental state -- even if no such limitation appears in the text." *Ante*, at 11. And we presume that "federal statutes do not apply outside the United States." *Ibid.* Both of those are, indeed, established interpretive presumptions that are (1) based upon realistic assessments of congressional intent, and (2) well known to Congress -- thus furthering rather than subverting genuine legislative intent. To apply these presumptions, then, is not to rewrite clear text; it is to interpret words fairly, in light of their statutory context. But there is nothing either (1) realistic or (2) well known about the presumption the Court shoves down the throat of a resisting statute today. Who in the world would have thought that a definition is inoperative if it contradicts ordinary **[\*\*\*48]** meaning? When this statute was enacted, there was not yet a "*Bond* presumption" to that effect -- though presumably Congress will have to take account of the *Bond* presumption in the future, perhaps by adding at the end of all its definitions that depart from ordinary connotation "and we really mean it."

**[\*\*22]** C. The Statute as Judicially Amended

I suspect the Act will not survive today's gruesome surgery. A criminal statute must clearly define the conduct it proscribes. If it does not "'give a person of ordinary intelligence fair notice'" of its scope, *United States v. Batchelder, 442 U.S. 114, 123, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979)*, it denies due process.

The *new § 229(a)(1)* fails that test. Henceforward, a person "shall be fined . . ., imprisoned for any term of years, or both," *§ 229A(a)(1)* -- or, if he kills someone, "shall be punished by death or imprisoned for life," *§ 229A(a)(2)*-- whenever he "develop[s], produce[s], otherwise acquire[s], transfer[s] directly or indirectly, receive[s], stockpile[s], retain[s], own[s], possess[es], or use[s], or threaten[s] to use," *§ 229(a)(1)*, any chemical "*of the sort that an ordinary person would associate with instruments of chemical warfare*," *ante*, at 15 (emphasis added). Whether **[***49]** that test is satisfied, the Court unhelpfully (and also illogically) explains, depends not only on the "particular chemicals that the defendant used" but also on "the circumstances in which she used them." *Ibid*. The "detergent under the kitchen sink" and "the stain remover in the laundry room" are apparently out, *ante*, at 16 -- but what if they are deployed to poison a neighborhood water fountain? Poisoning a goldfish tank is also apparently out, *ante*, at 17, but what if the fish belongs to a Congressman or Governor and the act is meant as a menacing message, a small-time equivalent of leaving a severed horse head in the bed? See *ibid*. (using the "concerns" driving the Convention -- "acts of war, assassination, and terrorism" -- as guideposts of statutory meaning). Moreover, the Court's illogical embellishment seems to apply only to the "use" of a chemical, *ante*, at 15, but "use" is only 1 of *11* kinds of activity that the statute prohibits. What, one wonders, makes something a "chemical weapon" when it is merely "stockpile[d]" or "possess[ed]?" To these questions and countless others, one guess is as bad as another.

No one should have to ponder the totality of the circumstances in order **[***50]** to determine whether his conduct is a felony. Yet that is what the Court will now require of all future handlers of harmful toxins -- that is to say, all of us. Thanks to the Court's revisions, the Act, which before was merely broad, is now broad and unintelligible. "[N]o standard of conduct is specified at all." *Coates v. Cincinnati, 402 U.S. 611, 614, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971)*. Before long, I suspect, courts will be required to say so.

**[*2098]** II. The Constitutional Question

Since the Act is clear, the *real* question this case presents is whether the Act is constitutional as applied to petitioner. An unreasoned and citation-less sentence from our opinion in *Missouri v. Holland, 252 U.S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 18 Ohio L. Rep. 61 (1920)*, purported to furnish the answer: "If the treaty is valid"--and no one argues that the Convention is not--"there can be no dispute about the validity of the statute under Article I, § 8, as a necessary and proper means to execute the powers of the Government." **[**23]** *Id., at 432, 40 S. Ct. 382, 64 L. Ed. 641*. [4] Petitioner and her *amici* press us to consider whether there is anything to this *ipse dixit*. The Constitution's text and structure show that there is not. [5]

    4 Nineteen years earlier, the Court embraced a similar view--also without reasoning. See *Neely v. Henkel, 180 U.S. 109, 121, 21 S. Ct. 302, 45 L. Ed. 448 (1901)* **[***51]** ("The power of Congress to make all laws necessary and proper for carrying into execution . . . all [powers] vested in the Government of the United States . . . includes the power to enact such legislation as is appropriate to give efficacy to any stipulations which it is competent for the President by and with the advice and consent of the Senate to insert in a treaty with a foreign power"). There is also dictum arguably favorable to *Holland in Prigg v. Pennsylvania, 41 U.S. 539, 16 Pet. 539, 619, 10 L. Ed. 1060 (1842)* ("[T]he power is nowhere in positive terms conferred upon Congress to make laws to carry the stipulations of treaties into effect. It has been supposed to result from the duty of the national government to fulfill all the obligations of treaties"). But see *Mayor of New Orleans v. United States, 35 U.S. 662, 10 Pet. 662, 736, 9 L. Ed. 573 (1836)* ("The government of the United States . . . is one of limited powers. It can exercise authority over no subjects, except those which have been delegated to it. Congress cannot, by legislation, enlarge the federal jurisdiction, nor can it be enlarged under the treaty-making power").

    5 I agree with the Court that the Government waived its defense of the Act as an exercise of the commerce **[***52]** power. *Ante*, at 8-9.

A. Text

Under Article I, § 8, cl. 18, Congress has the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." One such "other Powe[r]" appears in Article II, § 2, cl. 2: "[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of

the Senators present concur." Read together, the two Clauses empower Congress to pass laws "necessary and proper for carrying into Execution . . . [the] Power . . . to make Treaties."

It is obvious what the Clauses, read together, do *not* say. They do not authorize Congress to enact laws for carrying into execution "Treaties," even treaties that do not execute themselves, such as the Chemical Weapons Convention. [6] Surely it makes sense, the Government contends, that Congress would have the power to carry out the obligations to which the President and the Senate have committed the Nation. The power to "carry into Execution" the "Power . . . to make Treaties," it insists, *has to* mean the power to [***53] execute the treaties themselves.

> 6 Non-self-executing treaties are treaties whose commitments do not "automatically have effect as domestic law," *Medellin v. Texas, 552 U.S. 491, 504, 128 S. Ct. 1346, 170 L. Ed. 2d 190 (2008)*, and "can only be enforced pursuant to legislation to carry them into effect," *Whitney v. Robertson, 124 U.S. 190, 194, 8 S. Ct. 456, 31 L. Ed. 386 (1888)*.

That argument, which makes no pretense of resting on text, unsurprisingly misconstrues it. Start with the phrase "to make Treaties." A treaty is a contract with a foreign nation *made*, the Constitution states, by the President with the concurrence [*2099] of "two thirds of the Senators present." That is true of self-executing and non-self-executing treaties alike; the Constitution does not distinguish between the two. So, because the President and the Senate can enter into a non-self-executing compact with a foreign nation but can never by themselves (without the House) give that compact domestic effect through legislation, the power of the President and the [**24] Senate "to make" a Treaty cannot possibly mean to "enter into a compact with a foreign nation and then give that compact domestic legal effect." We have said in another context that a right "to make contracts" (a treaty, of course, [***54] is a contract) does not "extend . . . to conduct . . . *after* the contract relation has been established . . . . Such *postformation* conduct does not involve the right to make a contract, but rather implicates the *performance* of established contract obligations." *Patterson v. McLean Credit Union, 491 U.S. 164, 177, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989)* (emphasis added). Upon the President's agreement and the Senate's ratification, a treaty--no matter what kind--has been *made* and is not susceptible of any more making.

How might Congress have helped "carr[y]" the power to make the treaty -- here, the Chemical Weapons Convention -- "into Execution"? In any number of ways. It could have appropriated money for hiring treaty negotiators, empowered the Department of State to appoint those negotiators, formed a commission to study the benefits and risks of entering into the agreement, or paid for a bevy of spies to monitor the treaty-related deliberations of other potential signatories. See G. Lawson & G. Seidman, The Constitution of Empire: Territorial Expansion and American Legal History 63 (2004). The Necessary and Proper Clause interacts similarly with other Article II powers: "[W]ith respect to the executive branch, the Clause [***55] would allow Congress to institute an agency to help the President wisely employ his pardoning power . . . . Most important, the Clause allows Congress to establish officers to assist the President in exercising his 'executive Power.'" Calabresi & Prakash, The President's Power to Execute the Laws, *104 Yale L. J. 541, 591 (1994)*.

But a power to help the President *make* treaties is not a power to *implement* treaties already made. See generally Rosenkranz, Executing the Treaty Power, *118 Harv. L. Rev. 1867 (2005)*. Once a treaty has been made, Congress's power to do what is "necessary and proper" to assist the making of treaties drops out of the picture. To legislate compliance with the United States' treaty obligations, Congress must rely upon its independent (though quite robust) Article I, § 8, powers.

## B. Structure

"[T]he Constitutio[n] confer[s] upon Congress . . . not all governmental powers, but only discrete, enumerated ones." *Printz v. United States, 521 U.S. 898, 919, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997)*. And, of course, "enumeration presupposes something not enumerated." *Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 195, 6 L. Ed. 23 (1824)*. But in *Holland*, the proponents of unlimited congressional power found a loophole: "By negotiating a [***56] treaty and obtaining the requisite consent of the Senate, the President . . . may endow Congress with a source of legislative authority independent of the powers enumerated in Article I." L. Tribe, American Constitutional Law § 4-4, pp. 645-646 (3d ed. 2000). Though *Holland*'s change to the Constitution's text appears minor (the power to carry into execution the *power to make treaties* becomes the power to carry into execution *treaties*), the change to its structure is seismic.

[*2100] To see why vast expansion of congressional power is not just a remote possibility, consider two features of [**25] the modern practice of treaty making. In our Nation's early history, and extending through the time when *Holland* was written, treaties were typically bilateral, and addressed only a small range of topics relating to the

obligations of each state to the other, and to citizens of the other -- military neutrality, for example, or military alliance, or guarantee of most-favored-nation trade treatment. See Bradley, The Treaty Power and American Federalism, *97 Mich. L. Rev. 390, 396 (1998)*. But beginning in the last half of the last century, many treaties were "detailed multilateral instruments negotiated and drafted **[***57]** at international conferences," *ibid.*, and they sought to regulate states' treatment of their own citizens, or even "the activities of individuals and private entities," A. Chayes & A. Chayes, The New Sovereignty: Compliance with International Regulatory Agreements 14 (1995). "[O]ften vague and open-ended," such treaties "touch on almost every aspect of domestic civil, political, and cultural life." Bradley & Goldsmith, Treaties, Human Rights, and Condi-tional Consent, *149 U. Pa. L. Rev. 399, 400 (2000)*.

Consider also that, at least according to some scholars, the Treaty Clause comes with no implied subject-matter limitations. See, *e.g.*, L. Henkin, Foreign Affairs and the United States Constitution 191, 197 (2d ed. 1996); but see Bradley, *supra*, at 433-439. On this view, "[t]he *Tenth Amendment* . . . does not limit the power to make treaties or other agreements," *Restatement (Third) of Foreign Relations Law of the United States § 302, Comment d*, p. 154 (1986), and the treaty power can be used to regulate matters of strictly domestic concern, see *id.*, at Comment *c*, p. 153; but see *post*, at 3-16 (Thomas, J., concurring in judgment).

If that is true, then the possibilities of what the Federal **[***58]** Government may accomplish, with the right treaty in hand, are endless and hardly farfetched. It could begin, as some scholars have suggested, with abrogation of this Court's constitutional rulings. For example, the holding that a statute prohibiting the carrying of firearms near schools went beyond Congress's enumerated powers, *United States v. Lopez, 514 U.S. 549, 551, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995)*, could be reversed by negotiating a treaty with Latvia providing that neither sovereign would permit the carrying of guns near schools. Similarly, Congress could reenact the invalidated part of the Violence Against Women Act of 1994 that provided a civil remedy for victims of gender-motivated violence, just so long as there were a treaty on point -- and some authors think there already is, see MacKinnon, The Supreme Court, 1999 Term, Comment, *114 Harv. L. Rev. 135, 167 (2000)*.

But reversing some of this Court's decisions is the least of the problem. Imagine the United States' entry into an Antipolygamy Convention, which called for--and Congress enacted -- legislation providing that, when a spouse of a man with more than one wife dies intestate, the surviving husband may inherit no part of the estate. Constitutional? **[***59]** The Federalist answers with a rhetorical question: "Suppose by some forced constructions of its authority (which indeed cannot easily be imagined) the Federal Legislature should attempt to vary the law of descent in any State; would it not be evident that . . . it had exceeded its jurisdiction and infringed **[**26]** upon that of the State?" The Federalist No. 33, at 206 (A. Hamilton). Yet given the Antipolygamy Convention, *Holland* would uphold it. Or imagine that, to execute a treaty, Congress enacted a statute prohibiting state inheritance taxes on real property. Constitutional? Of course not. **[*2101]** Again, The Federalist: "Suppose . . . [Congress] should undertake to abrogate a land tax imposed by the authority of a State, would it not be equally evident that this was an invasion of that concurrent jurisdiction in respect to this species of tax which its constitution plainly supposes to exist in the State governments?" No. 33, at 206. *Holland* would uphold it. As these examples show, *Holland* places Congress only one treaty away from acquiring a general police power.

The Necessary and Proper Clause cannot bear such weight. As Chief Justice Marshall said regarding it, no "great substantive and independent **[***60]** power" can be "implied as incidental to other powers, or used as a means of executing them." *McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 411, 4 L. Ed. 579 (1819)*; see Baude, Rethinking the Federal Eminent Domain Power, *122 Yale L. J. 1738, 1749-1755 (2013)*. No law that flattens the principle of state sovereignty, whether or not "necessary," can be said to be "proper." As an old, well-known treatise put it, "it would not be a proper or constitutional exercise of the treaty-making power to provide that Congress should have a general legislative authority over a subject which has not been given it by the Constitution." 1 W. Willoughby, The Constitutional Law of the United States § 216, p. 504 (1910).

We would not give the Government's support of the *Holland* principle the time of day were we confronted with "treaty-implementing" legislation that abrogated the freedom of speech or some other constitutionally protected individual right. We proved just that in *Reid v. Covert, 354 U.S. 1, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957)*, which held that commitments made in treaties with Great Britain and Japan would not permit civilian wives of American servicemen stationed in those countries to be tried for murder by court-martial. The plurality opinion **[***61]** said that "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Id., at 16, 77 S. Ct. 1222, 1 L. Ed. 2d 1148*.

To be sure, the *Reid* plurality purported to distinguish the *ipse dixit* of *Holland* with its own unsupported *ipse dixit*. "[T]he people and the States," it said, "have delegated [the treaty] power to the National Government [so] the *Tenth Amendment* is no barrier." *354 U.S., at 18, 77 S. Ct. 1222, 1 L. Ed. 2d 1148*. The opinion does not say why (and there is

no reason why) only the *Tenth Amendment*, and not the other nine, has been "delegated" away by the treaty power. The distinction between provisions protecting individual liberty, on the one hand, and "structural" provisions, on the other, cannot be the explanation, since structure in general--and especially the structure of limited federal powers -- is *designed* to protect individual liberty. "The federal structure . . . secures the freedom of the individual. . . . By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." **[**27]** *Bond v. United States, 564 U.S. ___, ___, 131 S. Ct. 2355, 2364, 180 L. Ed. 2d 269, 280 (2011).*

The **[***62]** Government raises a functionalist objection: If the Constitution does not limit a *self-executing treaty* to the subject matter delineated in Article I, § 8, then it makes no sense to impose that limitation upon a statute implementing a *non-self-executing treaty*. See Tr. of Oral Arg. 32-33. The premise of the objection (that the power to make self-executing treaties is limitless) is, to say the least, arguable. But even if it is correct, refusing to extend that proposition to non-self-executing treaties makes a great deal of sense. Suppose, for example, that the self-aggrandizing **[*2102]** Federal Government wishes to take over the law of intestacy. If the President and the Senate find in some foreign state a ready accomplice, they have two options. First, they can enter into a treaty with "stipulations" specific enough that they "require no legislation to make them operative," *Whitney v. Robertson, 124 U.S. 190, 194, 8 S. Ct. 456, 31 L. Ed. 386 (1888)*, which would mean in this example something like a comprehensive probate code. But for that to succeed, the President and a supermajority of the Senate would need to reach agreement on all the details--which, when once embodied in the treaty, could not be altered or superseded **[***63]** by ordinary legislation. The second option--far the better one--is for Congress to gain lasting and flexible control over the law of intestacy by means of a non-self-executing treaty. "[Implementing] legislation is as much subject to modification and repeal by Congress as legislation upon any other subject." *Ibid.* And to make such a treaty, the President and Senate would need to agree only that they desire power over the law of intestacy.

The famous scholar and jurist Henry St. George Tucker saw clearly the danger of *Holland*'s *ipse dixit* five years before it was written:

"[The statement is made that] if the treaty-making power, composed of the President and Senate, in discharging its functions under the government, finds that it needs certain legislative powers which Congress does not possess to carry out its desires, it may . . . infuse into Congress such powers, although the Framers of the Constitution omitted to grant them to Congress. . . . Every reputable commentator upon the Constitution from Story down to the present day, has held that the legislative powers of Congress lie in grant and are limited by such grant. . . . [S]hould such a construction as that asserted in the above statement **[***64]** obtain through judicial endorsement, our system of government would soon topple and fall." Limitations on the Treaty-Making Power Under the Constitution of the United States § 113, pp. 129-130 (1915).

* * *

We have here a supposedly "narrow" opinion which, in order to be "narrow," sets forth interpretive principles never before imagined that will bedevil our jurisprudence (and proliferate litigation) for years to come. The immediate product of these interpretive novelties is a statute that should be the envy of every lawmaker bent on trapping the unwary with vague and uncertain criminal prohibitions. All this to leave in place an ill-considered *ipse dixit* that enables the fundamental constitutional principle **[**28]** of limited federal powers to be set aside by the President and Senate's exercise of the treaty power. We should not have shirked our duty and distorted the law to preserve that assertion; we should have welcomed and eagerly grasped the opportunity -- nay, the obligation -- to consider and repudiate it.

Justice Thomas, with whom Justice Scalia joins, and with whom Justice Alito joins as to Parts I, II, and III, concurring in the judgment.

By its clear terms, the statute at issue in this **[***65]** case regulates local criminal conduct that is subject to the powers reserved to the States. See *ante*, at 1-2 (Scalia, J., concurring in judgment). That aggrandizement of federal power cannot be justified as a "necessary and proper" means of implementing a treaty addressing similar subject matter. See *ante*, at 8-9. To the contrary, reading the Necessary and Proper Clause to expand Congress' power upon the ratification of every new treaty defies an indisputable first principle **[*2103]** of our constitutional order: "'[T]he Constitution created a Federal Government of limited powers.'" *New York v. United States, 505 U.S. 144, 155, 112 S. Ct.*

*2408, 120 L. Ed. 2d 120 (1992)* (quoting *Gregory v. Ashcroft, 501 U.S. 452, 457, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991)*). I accordingly join Justice Scalia's opinion in full.

I write separately to suggest that the Treaty Power is itself a limited federal power. Cf. *United States v. Lopez, 514 U.S. 549, 584, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995)* (Thomas, J., concurring) ("[W]e *always* have rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power"). The Constitution empowers the President, "by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." **[***66]** Art. II, § 2. The Constitution does not, however, comprehensively define the proper bounds of the Treaty Power, and this Court has not yet had occasion to do so. As a result, some have suggested that the Treaty Power is boundless -- that it can reach any subject matter, even those that are of strictly domestic concern. See, *e.g.*, *Restatement (Third) of Foreign Relations Law of the United States, § 302, Comment c* (1986). A number of recent treaties reflect that suggestion by regulating what appear to be purely domestic affairs. See, *e.g.*, Bradley, The Treaty Power and American Federalism, *97 Mich. L. Rev. 390, 402-409 (1998)* (hereinafter Bradley) (citing examples).

Yet to interpret the Treaty Power as extending to every conceivable domestic subject matter -- even matters without any nexus to foreign relations -- would destroy the basic constitutional distinction between domestic and foreign powers. See *United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 57 S. Ct. 216, 81 L. Ed. 255 (1936)* ("[T]he federal power over external affairs [is] in origin and essential character different from that over internal affairs . . ."). It would also lodge in the Federal Government the potential for "a 'police power' over **[***67]** all aspects of American life." *Lopez, supra, at 584, 115 S. Ct. 1624, 131 L. Ed. 2d 626* (Thomas, J., concurring). A treaty-based power of that magnitude--no less than a plenary power of legislation--would threaten "' "the liberties that derive from the diffusion of sovereign power." '" *Bond v.* **[**29]** *United States, 564 U.S. ___, ___, 131 S. Ct. 2355, 2364, 180 L. Ed. 2d 269, 280 (2011)*. And a treaty-based police power would pose an even greater threat when exercised through a self-executing treaty because it would circumvent the role of the House of Representatives in the legislative process. See The Federalist No. 52, p. 355 (J. Cooke ed. 1961) (J. Madison) (noting that the House has a more "immediate dependence on, & an intimate sympathy with the people").

I doubt the Treaty Power creates such a gaping loophole in our constitutional structure. Although the parties have not challenged the constitutionality of the particular treaty at issue here, in an appropriate case I believe the Court should address the scope of the Treaty Power as it was originally understood. Today, it is enough to highlight some of the structural and historical evidence suggesting that the Treaty Power can be used to arrange intercourse with other nations, but not to regulate purely **[***68]** domestic affairs.

I

The Treaty Power was not drafted on a blank slate. To the contrary, centuries of experience -- reflected in treaties, dictionaries, and actual practice -- shaped the contours of that power.

Early treatises discussed a wide variety of treaties that nevertheless shared a common **[*2104]** thread: All of them governed genuinely international matters such as war, peace, and trade between nations. See, *e.g.*, 2 H. Grotius, De Jure Belli Ac Pacis 394-396 (1646 ed., F. Kelsey transl. 1925) (treaties are made "for the sake either of peace or of some alliance," including "for the restoration of captives and of captured property, and for safety"; "that neither signatory shall have fortresses in the territory of the other, or defend the subjects of the other, or furnish a passage to the enemy of the other"; and for "commercial relations" and agreements on "import duties" (footnote omitted)); 2 S. Pufendorf, De Jure Naturae et Gentium 1331 (1688 ed., C. Oldfather & W. Oldfather transls. 1934) (treaties are made "to form some union or society, the end of which is either commercial relations, or a united front in war"); 3 E. Vattel, The Law of Nations 165 (1758 ed., C. Fenwick transl. 1916) **[***69]** (treaties, which "can be subdivided into as many classes as there are varieties in the character of national relations," "deal with conditions of commerce, with mutual defense, with belligerent relations, with rights of passage, . . . stipulations not to fortify certain places, etc.").

Founding-era dictionaries reflect a similar understanding. To be sure, some early dictionaries briefly defined "treaty" simply as a "compact of accommodation relating to public affairs." See, *e.g.*, 2 S. Johnson, A Dictionary of the English Language 2056 (rev. 4th ed. 1773). More detailed definitions, however, recognized the particular character of treaties as addressing matters of intercourse between nations rather than domestic regulation. See, *e.g.*, J. Buchanan, A New English Dictionary (1769) (defining "treaty" as "[a] covenant or agreement between several nations for peace, commerce, navigation, &c."); N. Bailey, An Universal Etymological English Dictionary (26th ed. 1789) (same); J. Montefiore, A Commercial Dictionary (1803) (noting "treaties of alliance" for military aid; "treaties of subsidy" for the provision of soldiers; treaties of navigation and commerce; **[**30]** treaties governing fishing and timber **[***70]** rights; and treaties on import duties); 2 N. Webster, An American Dictionary of the English Language 97 (1828) (noting

"treaties for regulating commercial intercourse, treaties of alliance, offensive and defensive, treaties for hiring troops, [and] treaties of peace").

Treaty practice under the Articles of Confederation was also consistent with the understanding that treaties govern matters of international intercourse. The Articles provided: "The United States in Congress assembled, shall have the sole and exclusive right and power of . . . entering into treaties and alliances . . . ." Art. IX. The Congress of the Confederation exercised that power by making treaties that fell squarely within the traditional scope of the power. See, *e.g.*, Treaty with the Cherokee, Art. IV, Nov. 28, 1785, 7 Stat. 19, 2 C. Kappler, Indian Affairs: Laws and Treaties 9 (1904) (territorial borders); Definitive Treaty of Peace, U.S.-Gr. Brit., Art. VII, Sept. 3, 1783, 8 Stat. 83, T. S. No. 104 (peace); Contract for the Payment of Loans, U.S.-Fr., Arts. I-IV, July 16, 1782, 8 Stat. 614-615, T. S. No. 831[#x2044]4 (repayment of sovereign debt); Definitive Treaty of Peace, U. S.-Gr. Brit., Art. III, Sept. 3, 1783, 8 Stat. 82, T. S. No. 104 (fishery rights in disputed waters); Treaty of Amity and Commerce, U. S.- Prussia, Arts. IV-IX, Sept. 10, 1785, 8 Stat. 86-88, T. S. No. 292 (treatment of vessels in a treaty partners' waters); Convention Defining and Establishing the Functions and Privileges of Consuls and Vice-Consuls, U.S.-Fr., Arts. I-III, Nov. 14, 1788, 8 Stat. 106-108, T. S. No. 84 (privileges and immunities of diplomatic officials); Treaty of Amity and Commerce, U. S.-Swed., Arts. III-IV, Apr. 3, 1783, 8 Stat. 60, T. S. No.  [*2105]  346 (rights of citizens of one treaty partner residing in the territory of the other).

These treaties entered into under the Articles of Confederation would not have suggested to the Framers that granting a power to "make Treaties" included authorization to regulate purely domestic matters. Whenever these treaties affected legal rights within United States territory, they addressed only rights that related to foreign subjects or foreign property. See, e.g., Treaty of Amity and Commerce, U. S.-Neth., Art. IV, Oct. 8, 1782, 8 Stat. 34 (affording burial rights "when any subjects or inhabitants of either party shall die in the territory of the other"); Treaty with the Cherokee, Art. VII, 7 Stat. 19, 2 Kappler, supra, at 10 ("If any citizen of the United States . . . shall commit a robbery or murder, or other capital crime, on any Indian, such offender or offenders shall be punished in the same manner as if [the crime] had been committed on a citizen of the United States . . ."); Convention Relative to Recaptured Vessels, U. S.-Neth., Oct. 8, 1782, 8 Stat. 50,  T. S. No. 250 ("The vessells of either of the two nations recaptured by the privateers of the other, shall be restored to the first proprietor . . ."). Preconstitutional practice therefore reflects the use of the treaty-making power only for matters of international intercourse; that practice provides no support for using treaties to regulate purely domestic affairs.

II

A

Debates preceding the ratification of the proposed Constitution confirm the limited scope of the powers possessed by the Federal Government generally; the Treaty Power was no exception. The Framers understood that most regulatory matters were to be left to the States. See The Federalist No. 45, at 313 (J. Madison) ("The powers delegated by the proposed Constitution to the Federal Government, are few and defined"); see also *Lopez, 514 U. S., at 590-592, 115 S. Ct. 1624, 131 L. Ed. 2d 626* (THOMAS, J., concurring) (citing sources). Consistent with that general understanding of limited federal power, evidence from the ratification campaign suggests that the Treaty Power was limited and, in particular, confined to matters of intercourse with other nations.

In essays during the ratification campaign in New York, James Madison took the view that the Treaty Power was inherently limited. The Federal Government's powers, Madison wrote, "will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce"--the traditional subjects of treaty-making. The Federalist No. 45, at 313. If the "external" Treaty Power contained a capacious domestic regulatory authority, that would plainly conflict with Madison's firm understanding that "[t]he powers delegated by the proposed Constitution to the Federal Government, are few and defined." Ibid. Madison evidently saw no conflict, however, because the Treaty Power included authority to "regulate  [***71]  the intercourse with foreign nations" rather than all domestic affairs. Id., No. 42, at 279.

Madison reiterated that understanding at the 1788 Virginia ratifying convention, where the most extensive discussion of the proposed Treaty Power occurred, see Bradley 410; Golove, Treaty-Making and the Nation, 98 Mich. L. Rev. 1075, 1141-1142 (2000) (hereinafter Golove). There, Anti-Federalists leveled the charge that the Treaty Power gave the Federal Government excessive power. See, e.g., 3 Debates on the Federal Constitution 509 (J. Elliot 2d ed. 1876) (hereinafter Elliot's Debates) (G. Mason) ("The President and Senate can make any treaty whatsoever"); id., at 513 (P. Henry) ("To me this power  [*2106]  appears still destructive; for they can make any treaty"). But Madison insisted that just "because this power is given to Congress," it did not follow that the Treaty Power was "absolute and unlimited." Id., at 514. The President and the Senate lacked the power "to dismember the empire," for example, because

"[t]he exercise of the power must be consistent with the object of the delegation." *Ibid.* "The object of treaties," in Madison's oft-repeated formulation, "is the regulation of intercourse with **[***72]** foreign nations, and is external." *Ibid.*

Although Alexander Hamilton undoubtedly believed that the Treaty Power was broad within its proper sphere, see *infra*, at 8, the view he expressed in essays during the New York ratification campaign is entirely consistent with Madison's. After noting that the Treaty Power was one of the "most unexceptionable parts" of the proposed Constitution, Hamilton distinguished the Treaty Power from the legislative power "to prescribe rules for the regulation of the society" and from the executive power to "execut[e] . . . the laws." The Federalist No. 75, at 503-504. "The power of making treaties," he concluded, "is plainly neither the one nor the other." *Id.*, at 504. Rather, Hamilton explained that treaties "are not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign." *Id.*, at 504-505. That description is difficult to square with a view of the Treaty Power that would **[**31]** allow the Federal Government to prescribe rules over all aspects of domestic life.

B

It did not escape the attention of the Framers that the Treaty Power was drafted without explicitly enumerated limits on what sorts of treaties are permissible. See, **[***73]** *e.g.*, Hamilton, The Defence No. XXXVI, in 20 Papers of Alexander Hamilton 6 (H. Syrett ed. 1974) ("A power 'to make treaties,' granted in these indefinite terms, extends to all kinds of treaties and with all the latitude which such a power under any form of Government can possess"). The Articles of Confederation had, for example, explicitly restricted certain categories of treaties. See Art. IX ("[N]o treaty of commerce shall be made whereby the legislative power of the respective States shall be restrained from imposing such imposts and duties on foreigners, as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever"). The Constitution omitted those restrictions.

That decision was not a grant of unlimited power, but rather a grant of flexibility; the Federal Government needed the ability to respond to unforeseeable varieties of intercourse with other nations. James Madison, for example, did "not think it possible to enumerate all the cases in which such external regulations would be necessary." 3 Elliot's Debates 514; see also *id.*, at 363 (E. Randolph) ("The various contingencies which may form the object **[***74]** of treaties, are, in the nature of things, incapable of definition"). But Madison nevertheless recognized that any exercise of the Treaty Power "must be consistent with the object of the delegation," which is "the regulation of intercourse with foreign nations." *Id.*, at 514; see also Hamilton, The Defence, *supra*, at 6 ("[W]hatever is a *proper subject of compact between Nation & Nation* may be embraced by a Treaty" (emphasis added)). That understanding of the Treaty Power did not permit the President and the Senate to exercise domestic authority commensurate with their substantial power over external affairs.

C

The understanding that treaties are limited to, in Madison's words, "the regulation **[*2107]** of intercourse with foreign nations," endured in the years after the Constitution was ratified.

In 1796, an extended debate regarding the proper scope of the Treaty Power arose in the aftermath of a controversial treaty with Great Britain that addressed the validity of prerevolutionary debts and the property rights of British subjects. Treaty of Amity, Commerce and Navigation, Nov. 19, 1794, 8 Stat. 116, T. S. No. 105. When President Washington requested appropriations to implement that so-called "Jay **[***75]** Treaty" (after its chief negotiator, John Jay), the House of Representatives engaged in a month-long floor debate over its own role in the process of implementing treaties. See 5 Annals of Cong. 426 (1796); see generally D. Currie, The Constitution in Congress: The Federalist Period 1789-1801, pp. 211-217 (1997). Some Congressmen argued that the House had a right to independently review the merits of the treaty. See, *e.g.*, 5 Annals of Cong. 427-428 (remarks of Rep. Livingston) ("[T]he House w[as] vested with a discretionary power of carrying the Treaty into effect, or refusing it their sanction"). **[**32]** Others insisted that "if the Treaty was the supreme law of the land, then there was no discretionary power in the House, except on the question of its constitutionality." *Id.*, at 436-437 (Rep. Murray).

That latter group relied in part on the observation that the Treaty Power was limited by its nature, and thus the Constitution's failure to specify a role for the House did not pose a mortal threat to that Chamber's legislative prerogatives. Representative James Hillhouse of Connecticut expounded that position in the floor debate. Hillhouse recognized that the House had an "indispensable duty **[***76]** to look into every Treaty" to ensure that it is constitutional, *i.e.*, "whether it related to objects within the province of the Treaty-making power, a power which is not unlimited." *Id.*, at 660. He further explained that "[t]he objects upon which it can operate are understood and well defined, and if the Treaty-making power were to embrace other objects, their doings would have no more binding force than if the Legislature were to assume and exercise judicial powers under the name of legislation." *Ibid.*

Hillhouse "advert[ed] to the general definition of the Treaty-making power" to explain why the Treaty Power was not a threat to the House's legislative prerogatives:

> "[I]f we look into our code of laws, we shall find few of them that can be affected, to any great degree, by the Treaty-making power. All laws regulating our own internal police, so far as the citizens of the United States alone are concerned, are wholly beyond its reach; no foreign nation having any interest or concern in that business, every attempt to interfere would be a mere nullity, as much as if two individuals were to enter into a contract to regulate the conduct or actions of a third person, who was no party to such [***77] contract." *Id.*, at 662.

He accordingly denied that "the President and Senate hav[e] it in their power, by forming Treaties with an Indian tribe or a foreign nation, to legislate over the United States," concluding instead that the Treaty Power "cannot affect the Legislative power of Congress but in a very small and limited degree." *Id.*, at 663.

Other Representatives who participated in the Jay Treaty debates agreed with Hillhouse that the Treaty Power had a limited scope. See, *e.g.*, *id.*, at 516 (Rep. Sedgwick) (classifying the uses of the power as "1. To compose and adjust differences, whether to terminate or to prevent war. 2. To form contracts for mutual security or defence; or to make Treaties, offensive or defensive. 3. To regulate an **[*2108]** intercourse for mutual benefit, or to form Treaties of commerce"). James Madison, who opposed the Jay Treaty as a Representative from Virginia, also took the opportunity to reiterate his view that "the Treaty-making power was a limited power." *Id.*, at 777.

Other historical evidence from the postratification period is in accord. For example, Thomas Jefferson's Senate Manual of Parliamentary Procedure, drafted while he was Vice President and therefore **[***78]** president of the Senate, Bradley 415, noted the need for a treaty to have a nexus to international intercourse. If a treaty did not "concern the foreign nation, party to the contract," then "it would be a mere nullity *res inter alias acta*." Thomas Jefferson's Senate Manual (1801), in 9 The Writings of Thomas **[**33]** Jefferson 80-81 (H. Washington ed. 1861). Later, Justice Story likewise anchored the Treaty Power in intercourse between nations. J. Story, Commentaries on the Constitution of the United States 552-553 (abr. ed. 1833). ("The power 'to make treaties' is by the constitution general; and of course it embraces all sorts of treaties, for peace or war; for commerce or territory; for alliance or succours; for indemnity for injuries or payment of debts; for the recognition or enforcement of principles of public law; and for any other purposes, which the policy or interests of independent sovereigns may dictate in their intercourse with each other").

The touchstone of all of these views was that the Treaty Power is limited to matters of international intercourse. Even if a treaty *may* reach some local matters, [1] it still *must* relate to intercourse with other nations. The Jay Treaty, for **[***79]** example, altered state property law, but only with respect to British subjects, who could hold and devise real property in the United States "in like manner as if they were natives." Art. IX, 8 Stat. 122. An 1815 treaty with Great Britain was held to pre-empt a state law authorizing the seizure of "'free negroes or persons of color'" at ports in part because the state law applied to British sailors. See *Elkison v. Deliesseline, 8 F. Cas. 493, 495, F. Cas. No. 4366, 2 Wheeler Cr. 56 (No. 4, 366)* (CC SC 1823) (Johnson, Circuit Justice). And treaties with China and Japan, which afforded subjects of those countries the same rights and privileges as citizens of other nations, were understood to pre-empt state laws that discriminated against Chinese and Japanese subjects. See, *e.g.*, *Baker v. Portland, 2 F. Cas. 472, 474, F. Cas. No. 777 (No. 777)* (CC Ore. 1879). Cf. Brief for United States 29, 33-38.

> 1 This point remains disputed. Compare Bradley 456 (contending that treaties should be subject "to the same federalism restrictions that apply to Congress's legislative powers"), with Golove 1077 (arguing treaties can address "subjects that are otherwise beyond Congress's legislative powers").

The postratification theory and practice of treaty-making **[***80]** accordingly confirms the understanding that treaties by their nature relate to intercourse with other nations (including their people and property), rather than to purely domestic affairs.

III

The original understanding that the Treaty Power was limited to international intercourse has been well represented in this Court's precedents. Although we have not had occasion to define the limits of the power in much detail, we have described treaties as dealing in some manner with intercourse between nations. See, *e.g.*, *Holmes v. Jennison, 39 U.S. 540, 14 Pet. 540, 569, 10 L. Ed. 579 (1840)* ("The power to make treaties . . . was designed to include all those subjects, which in the ordinary intercourse of nations had usually been made subjects of negotiation and treaty"); *Holden* **[*2109]**

*v. Joy, 84 U.S. 211, 17 Wall. 211, 242-243, 21 L. Ed. 523 (1872)* ("[T]he framers of the Constitution intended that [the Treaty Power] should extend to all those objects which in the intercourse of nations had usually been regarded as the proper subjects of negotiation and treaty, if not inconsistent with the nature of our government and the relation between the States and the United States"). Cf. *Power Auth. of N. Y. v. Federal Power Comm'n, 247 F.2d 538, 542-543 (CADC 1957)* **[***81]** (Bazelon, J.) ("No court has ever said . . . that the treaty power can be exercised **[**34]** without limit to affect matters which are of purely domestic concern and do not pertain to our relations with other nations"), vacated as moot, *355 U.S. 64, 78 S. Ct. 141, 78 S. Ct. 142, 2 L. Ed. 2d 107 (1957) (per curiam)*.

A common refrain in these cases is that the Treaty Power "extends to all proper subjects of negotiation with foreign governments." *In re Ross, 140 U.S. 453, 463, 11 S. Ct. 897, 35 L. Ed. 581 (1891)*; see also *Geofroy v. Riggs, 133 U.S. 258, 266, 10 S. Ct. 295, 33 L. Ed. 642 (1890)* (same); *Asakura v. Seattle, 265 U.S. 332, 341, 44 S. Ct. 515, 68 L. Ed. 1041 (1924)* (same). Those cases identified certain paradigmatic instances of "intercourse" that were "proper negotiating subjects" fit for treaty. See, *e.g.*, *Holmes, supra, at 569, 14 Pet. 540, 569, 10 L. Ed. 579* ("[T]he treaty-making power must have authority to decide how far the right of a foreign nation . . . will be recognised and enforced, when it demands the surrender of any [fugitive] charged with offences against it"); *Geofroy, supra, at 266, 266, 10 S. Ct. 295, 33 L. Ed. 642* ("It is also clear that the protection which should be afforded to the citizens of one country owning property in another, and the manner in which that property may be transferred, devised or inherited, are fitting subjects for such negotiation and of **[***82]** regulation by mutual stipulations between the two countries"); *Asakura, supra, at 341, 44 S. Ct. 515, 68 L. Ed. 1041* ("Treaties for the protection of citizens of one country residing in the territory of another are numerous, and make for good understanding between nations" (footnote omitted)). Nothing in our cases, on the other hand, suggests that the Treaty Power conceals a police power over domestic affairs.

Whatever its other defects, *Missouri v. Holland, 252 U.S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 18 Ohio L. Rep. 61 (1920)*, is consistent with that view. There, the Court addressed the constitutionality of a treaty that regulated the capture of birds that migrated between Canada and the United States. Convention with Great Britain for the Protection of Migratory Birds, Aug. 16, 1916, 39 Stat. 1702, T. S. No. 628. Although the Court upheld a statute implementing that treaty based on an improperly broad view of the Necessary and Proper Clause, see *ante*, at 12-14 (Scalia, J., concurring in judgment), *Holland* did not conclude that the Treaty Power itself was unlimited. See *252 U.S., at 433, 40 S. Ct. 382, 64 L. Ed. 641* ("We do not mean to imply that there are no qualifications to the treaty-making power . . ."). To the contrary, the holding in *Holland* is consistent with the understanding that **[***83]** treaties are limited to matters of international intercourse. The Court observed that the treaty at issue addressed *migratory* birds that were "only transitorily within the State and ha[d] no permanent habitat therein." *Id., at 435, 40 S. Ct. 382, 64 L. Ed. 641*; see also *id., at 434, 40 S. Ct. 382, 64 L. Ed. 641* ("[T]he treaty deals with creatures that [only] for the moment are within the state borders"). As such, the birds were naturally a matter of international intercourse because they were creatures in international transit. [2]

> 2  The Solicitor General also defended the treaty in *Holland* on a basis that recognized the limited scope of the Treaty Power. Acknowledging that the Treaty Power addressed "matters in which a foreign government may have an interest, and which may properly be the subject of negotiations with that Government," Brief for Appellee in *Missouri* v. *Holland*, O. T. 1919, No. 609, p. 41, the Solicitor General expressly reserved the question "[w]hether a treaty . . . for the protection of game which remains permanently within the United States would be a valid exercise of the treaty-making power." *Id.*, at 42. Because the treaty at issue focused on creatures in international transit--it was "limited to regulations for the protection **[***84]** of birds which regularly migrate between the United States and Canada" -- the Solicitor General concluded that the treaty concerned "a proper subject of negotiations." *Ibid.*

**[*2110]** **[**35]**  At least until recently, the original understanding that the Treaty Power is limited was widely shared outside the Court as well. See Golove 1288 ("[V]irtually every authority, including the Supreme Court, has on countless occasions from the earliest days recognized general subject matter limitations on treaties"). The Second Restatement on the Foreign Relations Law of the United States, for example, opined that the Treaty Power is available only if the subject matter of the treaty "is of international concern." § 117(1)(a) (1964-1965). The Second Restatement explained that a treaty "must relate to the external concerns of the nation as distinguished from matters of a purely internal nature." *Id.*, *Comment b*; see also Treaties and Executive Agreements: Hearings on S. J. Res. 1 before a Subcommittee of the Senate Committee on the Judiciary, 84th Cong., 1st Sess., 183 (1955) (Secretary of State Dulles) (Treaties cannot regulate matters "which do not essentially affect the actions of nations in relation to international **[***85]** affairs, but are purely internal"); Proceedings of the American Society of International Law 194-196 (1929) (C. Hughes) ("[The Treaty Power] is not a power intended to be exercised . . . with respect to matters that have no relation to international concerns"). But see *Restatement (Third) of Foreign Relations Law of the United States § 302, Comment*

*c* ("Contrary to what was once suggested, the Constitution does not require that an international agreement deal only with 'matters of international concern'"). At a minimum, the Second Restatement firmly reflects the understanding shared by the Framers that the Treaty Power has substantive limits. Only in the latter part of the past century have treaties challenged that prevailing conception by addressing "matters that in the past countries would have addressed wholly domestically" and "purport[ing] to regulate the relationship between nations and their own citizens," Bradley 396; see also *ante*, at 12 (opinion of Scalia, J.). But even the Solicitor General in this case would not go that far; he acknowledges that "there may well be a line to be drawn" regarding "whether the subject matter of [a] treaty is a proper subject for a treaty." Tr. **[***86]** of Oral Arg. 43:10-15.

* * *

In an appropriate case, I would draw a line that respects the original understanding of the Treaty Power. I acknowledge that the distinction between matters of international intercourse and matters of purely domestic regulation may not be obvious in all cases. But this Court has long recognized that the Treaty Power is limited, and hypothetical difficulties in line-drawing are no reason to ignore a constitutional limit on federal power.

The parties in this case have not addressed the proper scope of the Treaty Power or the validity of the treaty here. The preservation of limits on the Treaty Power is nevertheless a matter of fundamental constitutional importance, and the Court ought to address the scope of the Treaty Power **[**36]** when that issue is presented. **[*2111]** Given the increasing frequency with which treaties have begun to test the limits of the Treaty Power, see Bradley 402-409, that chance will come soon enough.

Justice Alito, concurring in the judgment.

As explained in Part I of Justice Scalia's concurring opinion, which I join, petitioner's conduct violated *18 U. S. C. § 229*, the federal criminal statute under which she was convicted. I therefore find it necessary **[***87]** to reach the question whether this statute represents a constitutional exercise of federal power, and as the case comes to us, the only possible source of federal power to be considered is the treaty power.

For the reasons set out in Parts I-III of Justice Thomas' concurring opinion, which I join, I believe that the treaty power is limited to agreements that address matters of legitimate international concern. The treaty pursuant to which *§ 229* was enacted, the Chemical Weapons Convention, is not self-executing, and thus the Convention itself does not have domestic effect without congressional action. The control of true chemical weapons, as that term is customarily understood, is a matter of great international concern, and therefore the heart of the Convention clearly represents a valid exercise of the treaty power. But insofar as the Convention may be read to obligate the United States to enact domestic legislation criminalizing conduct of the sort at issue in this case, which typically is the sort of conduct regulated by the States, the Convention exceeds the scope of the treaty power. *Section 229* cannot be regarded as necessary and proper to carry into execution the treaty power, **[***88]** and accordingly it lies outside Congress' reach unless supported by some other power enumerated in the Constitution. The Government has presented no such justification for this statute.

For these reasons, I would reverse petitioner's conviction on constitutional grounds.