RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CLIFFORD CHARLES TYLER,

*Plaintiff-Appellant,*

*v.*

No. 13-1876

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids
No. 1:12-cv-00523—Gordon J. Quist, District Judge.

Argued:  March 21, 2014

Decided and Filed:  December 18, 2014

Before:  BOGGS, SILER, and GIBBONS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Lucas J. McCarthy, HARTWELL, FAILEY & MCCARTHY, PLC, Grand Rapids, Michigan, for Appellant.  Anisha S. Dasgupta, UNITED STATED DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees.  **ON BRIEF:**  Lucas J. McCarthy, HARTWELL, FAILEY & MCCARTHY, PLC, Grand Rapids, Michigan, for Appellant.  Anisha S. Dasgupta, Michael S. Raab, UNITED STATED DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees.  James L. Dyer, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Lansing, Michigan, for County Appellees.

BOGGS, J., delivered the opinion of the court, in which SILER and GIBBONS, JJ., joined.  GIBBONS, J. (pp. 47–48), delivered a separate concurring opinion.

_____

**OPINION**

_____

BOGGS, Circuit Judge.  This case presents an important issue of first impression in the federal courts: whether a prohibition on the possession of firearms by a person "who has been committed to a mental institution," 18 U.S.C. § 922(g)(4), violates the Second Amendment. Twenty-eight years ago, Clifford Charles Tyler was involuntarily committed for less than one month after allegedly undergoing an emotionally devastating divorce.  Consequently, he can never possess a firearm.  Tyler filed suit in federal court, seeking a declaratory judgment that § 922(g)(4) is unconstitutional as applied to him.  The district court dismissed Tyler's suit for failure to state a claim.  Because Tyler's complaint validly states a violation of the Second Amendment, we reverse and remand.

I.  Background

A.  Statutory and Regulatory Background

Under federal law, an individual "who has been committed to a mental institution" may not possess a firearm.  18 U.S.C. § 922(g)(4).  Specifically, the statute provides:

> It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

*Ibid.*  Section 922(g) imposes the same firearm restrictions on numerous other groups of individuals, including convicted felons, § 922(g)(1); fugitives, § 922(g)(2); and domestic-violence misdemeanants, § 922(g)(9).[1]

Federal law also provides a relief-from-disabilities program whereby individuals prohibited from possessing firearms may "appl[y] to the Attorney General for relief from the

_____

[1]Other classes of people denied gun-possession rights are: unlawful users of controlled substances, § 922(g)(3); drug addicts, § 922(g)(3); illegal aliens, § 922(g)(5)(A); non-immigrant aliens, § 922(g)(5)(B); those dishonorably discharged from the Armed Forces, § 922(g)(6); renouncers of U.S. citizenship, § 922(g)(7); and persons subject to certain domestic-restraining orders, § 922(g)(8).

disabilities imposed by Federal laws." § 925(c). The Attorney General may grant this relief if, after reviewing the circumstances regarding the disability and the applicant's record and reputation, "it is established to his satisfaction . . . that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Ibid.* Judicial review is available to "[a]ny person whose application for relief from disabilities is denied by the Attorney General." *Ibid.* A United States district court "may in its discretion admit additional evidence where failure to do so would result in a miscarriage of justice." *Ibid.*

The Attorney General has delegated his authority to "[i]nvestigate, administer, and enforce the laws related to . . . firearms," including the relief-from-disabilities program of 18 U.S.C. § 925(c), to the director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 28 C.F.R. § 0.130(a)(1).

ATF regulations prescribe the form and contents of an application for relief from disabilities. *See* 27 C.F.R. § 478.144. All applications from individuals, for instance, must contain written statements from three references and written authorization for ATF to obtain pertinent background records. § 478.144(c)(1)–(2). Applications from individuals prohibited from firearm possession because of prior commitment to a mental institution must provide: the court order mandating commitment; medical records reflecting diagnosis; and records from any authority showing the applicant's discharge from commitment, restoration of medical competency, and restoration of rights. *See* § 478.144(c)(5). The ATF director may not grant relief to an applicant previously committed to a mental institution unless the applicant meets the requirements of 18 U.S.C. § 925(c) and unless "a court, board, commission, or other lawful authority" has subsequently determined the applicant "to have been restored to mental competency, to be no longer suffering from a mental disorder, and to have had all rights restored." 27 C.F.R. § 478.144(e).

In 1992, however, Congress defunded the relief-from-disabilities program. *See* Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732. Since that time, Congress has affirmatively retained the bar on funding the relief-from-disabilities program. *See* Consolidated Appropriations Act, 2014, Pub. L. No. 113-

76, 128 Stat. 5, 57; *United States v. Bean*, 537 U.S. 71, 75 n.3 (2002) (collecting appropriation riders from 1994–2002).

In 2008, Congress authorized federal grants to states to assist them in determining which individuals are eligible to purchase and possess firearms and to aid them in supplying accurate information to federal databases. *See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 103, 122 Stat. 2559, 2567. To be eligible for such grants, a state must certify to the Attorney General that it has implemented a relief-from-disabilities program under which an individual who "pursuant to state law" has been adjudicated mentally defective or has been "committed to a mental institution" may apply "for relief from the disabilities imposed" by 18 U.S.C. § 922(g)(4). §§ 103 & 105, 122 Stat. at 2568–69.

Similar to the federal relief-from-disabilities program, states "shall grant the relief" if "the circumstances regarding the disabilities . . . and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Ibid.* Such state relief satisfies the requirements of § 925(c) for restoration of gun rights. These state programs must permit an individual "whose application for the relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial."[2] § 105(a)(3), 122 Stat. at 2570. Roughly half the states have created grant-eligible relief-from-disabilities programs.[3] Michigan, Tyler's state of residence, has not implemented a relief-from-disabilities program.

---

[2]These state relief-from-disability programs appear to differ from the federal analogue in 18 U.S.C. § 925(c) in two significant ways. First, § 925(c)'s relief program applies to all persons subjected to "disabilities imposed by Federal laws," whereas the state programs afford potential relief *only* to individuals prohibited from firearm possession because of a mental defect or a prior commitment to a mental institution.

The second important difference concerns the scope of judicial review. Under the state programs, judicial review is de novo. In the federal program, section 925(c) does not specify the scope or nature of judicial review, but "in the absence of a statutorily defined standard of review for action under § 925(c), the [Administrative Procedure Act] supplies the applicable standard." *Bean*, 537 U.S. at 77. The Supreme Court has indicated that the APA standard provided in 5 U.S.C. § 706(2)(A), under which an agency action is set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," probably applies to judicial review under § 925(c). *See Bean*, 537 U.S. at 77.

[3]The exact number of states with certified programs is unclear. The government put the figure at twenty-four states at the time it filed its brief. Appellee Br. 8. The Department of Justice website, in contrast, indicates that fifteen states received grant funding in FY 2013 and seventeen states received grant funding in FY 2014, and that twenty-six states overall have received funding since 2009. Bureau of Justice Statistics, The NICS Improvement

## B.  Factual Background

### 1.  Tyler's Involuntary Commitment

Tyler is a seventy-three-year-old resident of Hillsdale County, Michigan.  On January 2, 1986, a state probate court committed Tyler to a mental institution.  Tyler alleges that he underwent an emotionally devastating divorce in 1985 and that he was involuntarily committed because of a risk that he might be suicidal.

Tyler submitted a 2012 substance-abuse evaluation containing additional information about his 1985 depression.  In 1985, when Tyler was forty-five years old, Tyler's wife of twenty-three years served him divorce papers.  Prior to filing for divorce, Tyler's ex-wife allegedly ran away with another man and depleted Tyler's finances.  Tyler felt "overwhelmed" and "sat in the middle of the floor at home pounding his head."  According to a mental-health evaluation submitted by Tyler, Tyler was crying non-stop, not sleeping, depressed, and suicidal at this time.  Tyler's daughters became scared and contacted the police.

The police transported Tyler to the sheriff's department, where they contacted Tyler's eighteen-year-old daughter to assist them with the necessary steps to have Tyler receive a psychological evaluation.  Probate-court documents indicate that a Dr. Tamara Marie Tyler filed a petition asserting that Tyler required treatment.[4]  Tyler was represented by counsel at his probate-court commitment hearing.  The probate court found by "clear and convincing evidence" that Tyler was "a person requiring treatment because [he was] mentally ill."[5]  The court further found that Tyler, as a result of his "mental illness," could be "reasonably expected within the near future to intentionally or unintentionally seriously physically injure [himself] or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation."  Additionally, the probate court found no "treatment program other than hospitalization adequate to meet [Tyler's] treatment needs."  The probate court ordered that

---

Amendments Act of 2007, http://www.bjs.gov/index.cfm?ty=tp&tid=491#promising (last visited December 12, 2014).

[4]There is no indication that this individual, though sharing the plaintiff's last name, has any relation to the plaintiff.

[5]In Michigan, "[a] judge or jury shall not find that an individual is a person requiring treatment unless that fact has been established by clear and convincing evidence."  Mich. Comp. Laws § 330.1465.

Tyler undergo a treatment program "for a period not to exceed 90 days" and committed Tyler to Ypsilanti Regional Center "for a period not to exceed 30 days."

Tyler's 2012 substance-abuse evaluation indicates that Tyler was transported to Ypsilanti Regional Center for a psychological evaluation. He purportedly had bruises on his head and face. He also purportedly had suicidal thoughts, was depressed, sobbing, shaking, and had not been sleeping. Tyler reported that he remained at the Center for two to four weeks. He declined prescribed medications for fear they would alter his "thinking."

Tyler subsequently returned home and remained in the workforce for another eighteen to nineteen years. Tyler's 2012 substance-abuse evaluation determined that Tyler has no substance-abuse problem. It also indicates that Tyler did not report any "past legal involvement." In 2012, Tyler underwent a psychological evaluation. Tyler informed the psychologist that he had never experienced a "depressive episode" other than his 1985 incident. The psychologist's report indicated that Tyler has no criminal history. The psychologist contacted Tyler's physician who also reported that she had not detected evidence of mental illness in Tyler. The psychologist determined that Tyler's prior involuntary commitment "appeared to be a brief reactive depressive episode in response to his wife divorcing him." The psychologist determined that there was no evidence of mental illness. In about 1999, Tyler remarried, and he maintains a close relationship with his two daughters from his first marriage.

2. Administrative Process

Tyler has been unable to purchase a firearm because of his prior involuntary commitment. He alleges that on February 7, 2011, he attempted to purchase a firearm. The Hillsdale County Sheriff's Office informed Tyler that he was ineligible to purchase a firearm because the FBI's National Instant Criminal Background Check System (NICS) indicated that Tyler had previously been committed to a mental institution. In August 2011, Tyler appealed this denial to the FBI's NICS section. On September 8, 2011, the NICS section informed Tyler that he was prohibited from purchasing a firearm under 18 U.S.C. § 922(g)(4) but that his appeal was pending. On September 30, 2011, Tyler's counsel wrote the NICS section to authorize release of private information and to provide additional information on Tyler's circumstances.

On January 6, 2012, the NICS section wrote Tyler's counsel to inform him that Tyler's appeal was denied. The NICS section's letter explained that the NICS Improvement Amendments Act of 2007 "provides states with the ability to pursue an ATF-approved relief of disability for individuals adjudicated as a mental defective or who have been committed to a mental institution." The letter further stated: "Until your state has an ATF approved relief from disabilities program in place your federal firearm rights may not be restored." The letter did not mention that federal law allows Tyler to apply directly to ATF for relief but that Congress denied funding for a federal relief-from-disabilities program.

### 3. Federal Litigation

On May 21, 2012, Tyler filed suit in federal court, alleging that the enforcement of § 922(g)(4), in light of the lack of any procedure in Michigan for relief from the disability, violates his rights protected by the Federal Constitution. In particular, Tyler alleged that the federal disability scheme constitutes an overbroad infringement on his right to keep and bear arms under the Second Amendment and Fourteenth Amendment and also that the scheme violates equal protection under the Due Process Clause of the Fifth Amendment and under the Fourteenth Amendment. Additionally, Tyler alleged that the government's failure to afford Tyler notice and opportunity to be heard on the matter, even in a post-deprivation proceeding, violates the Due Process Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.

Tyler named various county, state, and federal defendants. The state defendants moved to dismiss because Tyler did not allege that they interfered with his constitutional rights, and the district court granted the motion.

The district court also granted the federal defendants' motion to dismiss. The court held that the Second Amendment, as historically understood, did not extend to persons in Tyler's position. The court also determined that even if the Second Amendment did encompass individuals with Tyler's status, § 922(g)(4) would survive intermediate scrutiny because Congress's method of keeping firearms from those who have been previously institutionalized is "reasonably related to the government's stated interest" in preventing firearm violence. Additionally, the district court found that Tyler's Fifth Amendment claims failed because they

were coextensive with Tyler's Second Amendment claims. Tyler and the county defendants agreed that the district court's order as to the federal defendants was dispositive as to the remaining claims, and they stipulated to entry of a final order dismissing Tyler's complaint as to the county defendants. Only the county and federal defendants are parties on appeal.

## II. Standard of Review

We review de novo the district court's grant of a motion to dismiss for failure to state a claim. *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). We accept the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005).

## III. Analysis

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has determined that this text—with a structure "unique in our Constitution"—confers "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 577, 595 (2008). This right is "not unlimited, just as the First Amendment's right of free speech [is] not." *Id.* at 595; *accord id.* at 626; *see also Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 (1961) (Harlan, J.). For instance, the Second Amendment does not guarantee a right to bear arms for "*any sort* of confrontation." *Heller*, 554 U.S. at 595. Nor does it protect an individual's right to possess all kinds of weapons, *see id.* at 621–22; for example, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. The *Heller* Court also condoned "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626.

In short, *Heller* did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Ibid. Heller* determined only that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The Supreme Court has not fleshed out the extent of the right protected by the Second

Amendment. Thus, although several courts of appeals have opined on whether the Second Amendment encompasses the right to carry a gun outside the home, the full breadth of the Second Amendment has not been determined. *Compare Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1167 (9th Cir. 2014) (recognizing the right beyond the home), *and Moore v. Madigan*, 702 F.3d 933, 936–42 (7th Cir. 2012) (same), *with Drake v. Filko*, 724 F.3d 426, 431–35 (3d Cir. 2013) (declining to "definitively declare" that *Heller* extends beyond the home), *cert. denied sub nom. Drake v. Jerejian*, 134 S. Ct. 2134, No. 13-827 (May 5, 2014), *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("merely" assuming, without deciding, that the "*Heller* right exists outside the home," but upholding good-and-substantial-reason permit requirement), *and Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89, 96 (2d Cir. 2012) (assuming that the Second Amendment "must have *some* application" beyond the home, but upholding "proper cause" handgun-license requirement).

In this case of first impression, we consider not the *what*, *where*, *when*, or *why* of the Second Amendment's limitations—but the *who*.[6] Specifically, does the Second Amendment forbid Congress from prohibiting firearm possession by all individuals previously committed to a mental institution?

### A. Appropriate Constitutional Test

#### 1. *Heller*

We begin with the *Heller* Court's statements about whom the state may constitutionally restrict from possessing firearms. Most significant is the Court's statement that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. These restrictions, the Court said, amount to "presumptively lawful regulatory measures." *Id.* at 627 n.26. Moreover, the right recognized in *Heller* concerns only "the right of law-abiding, *responsible* citizens." *Id.* at 635 (emphasis added). Thus, the *Heller* Court presumed that certain individuals may be "*disqualified*

---

[6]*See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1146 (9th Cir. 2013) (Bea, J., concurring) ("[T]he 'who' [of the Second Amendment] remains a sticking point."); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012) ("The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.' . . . Our issue concerns the 'who.'"); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1493–1515 (2009) ("'Who' Bans: Bans on Possession by Certain Classes of People").

from the exercise of Second Amendment rights." *Ibid.* (emphasis added). These statements strongly indicate that the Second Amendment right to possess firearms does not extend to *all* individuals—or, at least, that the state may at times limit that right for certain groups of individuals consistent with the Constitution.

Although these statements are dicta and not holding, the Court in *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010), reiterated its view that the Second Amendment has its limits. According to the Court, *Heller* "made it clear" that the decision "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 786 (internal quotation marks omitted). The *McDonald* Court described that caveat as an "assuranc[e]" and "repeat[ed]" it in its decision. *Ibid.*

The Court's "assurance" that *Heller* does not cast doubt on prohibitions on the possession of firearms by the mentally ill does not resolve this case. For § 922(g)(4) prohibits firearm possession not just by the mentally ill but by anyone "who has been committed to a mental institution." That these two categories are not coextensive is made clear by the very fact that the language of § 922(g)(4) expressly refers to two separate groups. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113 (2001) (presumption against redundancy). Although it is plausible that the two groups overlap, the point is that we presume they are not identical. *Heller*'s assurance that the state may prohibit the "mentally ill" from possessing firearms may provide solid constitutional ground for § 922(g)(4)'s restriction as to an individual "adjudicated as a mental defective," but it is insufficient—by itself—to support the restriction as to individuals who have been involuntarily committed at some time in the past. Therefore, we cannot resolve this case by relying solely on *Heller*'s "assurances," as we did in rejecting a Second Amendment challenge to a denial of an expungement motion in a case involving § 922(g)(1)'s bar on possession of firearms by felons. *See United States v. Carey*, 602 F.3d 738, 740–41 (6th Cir. 2010).

## 2. Two-Step Approach

To resolve Second Amendment challenges, we have adopted a two-step approach. *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). The first step asks "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as

historically understood." *Ibid.* If the government "demonstrates that the challenged statute regulates activity falling outside the scope of the Second Amendment right as it was understood [in 1791, at the Bill of Rights' ratification, or in 1868, at the Fourteenth Amendment's ratification], then the analysis can stop there." *Ibid.* (internal quotation marks omitted). In that case, "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Ibid.* On the other hand, "[i]f the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Ibid.* The second step involves "appl[ying] the appropriate level of scrutiny. If the law satisfies the applicable standard, it is constitutional. If it does not, it is invalid." *Ibid.* (internal citations and quotation marks omitted); *see also United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (Under the second step, a court will "evaluate the law under some form of means-end scrutiny.").[7]

There may be a number of reasons to question the soundness of this two-step approach. It derives from the Third Circuit's decision in *United States v. Marzzarella*, which primarily rested on a view that because "*Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment," that fact "implies the structure of First Amendment doctrine should inform . . . analysis of the Second Amendment." 614 F.3d at 89 n.4. There is significant language in *Heller* itself, however, that would indicate that lower courts should not conduct interest balancing or apply levels of scrutiny. *See Heller*, 554 U.S. at 634–35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."). This view was reiterated by the Supreme Court's subsequent decision in *McDonald*. 561 U.S. at 790–91 (noting that the *Heller* Court "specifically rejected" "an interest-balancing test"). Although

---

[7]The Ninth Circuit has used a different two-step approach, which asks "first, whether" the relevant conduct "amount[s] to 'keeping and bearing Arms' within the meaning of the Second Amendment and, next, whether the challenged laws, if they indeed d[o] burden constitutionally protected conduct, 'infring[e]' the right." *Peruta*, 742 F.3d at 1150 (internal quotation and alteration marks omitted).

reams of analysis have been devoted to this question,[8] *Greeno* clearly gives us the law to apply in this circuit at this time.

### B.  Step One: Scope of the Second Amendment

*Greeno*'s first step asks "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." 679 F.3d at 518.  We look at whether the challenged law "will survive Second Amendment challenge because [it] regulate[s] activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified." *Ibid.*  *Greeno* appears to place the burden on the state to establish that the challenged statute regulates activity falling outside the scope of the Second Amendment as it was understood in 1791.  *See ibid.* ("If the [g]overnment demonstrates that the challenged statute 'regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment . . . then the analysis can stop there . . . .  If the government cannot establish this[,] . . . then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.'") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011)).

### 1.  Tyler's Evidence

Both Tyler and the government marshal historical sources and secondary historical scholarship to discuss whether the conduct proscribed by § 922(g)(4)—possession of a firearm by a person previously committed to a mental institution—fell within the historical scope of the Second Amendment.

Tyler relies on the English Bill of Rights, which provided: "That the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law." 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689); *see Heller*, 554 U.S. at 592–93.  *Heller* explains the purpose of this provision: "Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to

---

[8] *See, e.g., Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1282 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* didn't just reject interest balancing.  The Court went much further by expressly rejecting [the dissent's] intermediate scrutiny approach, disclaiming cost-benefit analysis, and denying the need for empirical inquiry.  By doing so, the Court made clear . . . that strict *and* intermediate scrutiny are inappropriate.") (emphasis added).

suppress political dissidents, in part by disarming their opponents." *Heller*, 554 U.S. at 592. As a result of these experiences, Englishmen "obtained an assurance from William and Mary, in the Declaration of Right (which was codified as the English Bill of Rights), that Protestants would never be disarmed." *Id.* at 593. It is unclear, however, whether the provision in the English Bill of Rights limiting the right to that "allowed by law" encompassed individuals previously committed to a mental institution.

Tyler also relies heavily on legal commentary by William Blackstone, "whose works . . . constituted the preeminent authority on English law for the founding generation." *Id.* at 593–94. Tyler quotes Blackstone as recognizing the right to arms as "a public allowance, under due restrictions, of the natural right of resistance and self-preservation." 1 William Blackstone, Commentaries *144. Blackstone recognized that restraints on this right, as well as other fundamental English rights, must be "so gentle and moderate . . . that no man of sense or probity would wish to see them slackened." *Ibid.* Under this scheme, individuals were "restrained from nothing, but what would be pernicious either to ourselves or our fellow-citizens." *Ibid.* Blackstone spoke approvingly on prohibitions on unlawful hunting or appearing armed in certain places "with the face blacked or with other disguise, and being armed with offensive weapons, to the breach of the public peace and the terror of his majesty's subjects." 4 William Blackstone, Commentaries *144 (discussing the statute 1 Hen. VII., c. 7 and the statute 9 Geo. I., c. 22). Similarly, Blackstone described how the "offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the statute of Northampton, 2 Edw. III, c. 3." *Id.* at *149. Blackstone does not resolve whether a mental-institution prohibition such as the one at issue here would have been considered a "due restriction."

Other historical sources cited by Tyler are no more helpful. Under the Militia Act of 1662, "any person or persons" who were judged "dangerous to the Peace of the Kingdome" could be disarmed. 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.). But we already know from *Heller* that the right to bear arms, both now and as understood in 1791, did not extend to certain classes of people. Tyler also cites ratification history, but *Heller* explained that the ratification debate

over the right to keep and bear arms was not over the nature of the right but "over whether it needed to be codified in the Constitution." *Heller*, 554 U.S. at 598.

## 2.  The Government's Evidence

*Greeno* places the burden on the government to establish that regulated conduct falls outside the scope of the Second Amendment as understood in 1791.  679 F.3d at 518.  The government relies on historical sources similar to those cited by Tyler, but they too are of limited helpfulness.

The government, also invoking ratification history, relies on "a proposal offered by the Pennsylvania anti-federalist faction at the Pennsylvania Convention."  Appellee Br. 17.  *Heller* described this proposal as "highly influential."  554 U.S. at 604.  Under this proposal:

> The people have a right to bear arms for the defense of themselves and their own State, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, *or real danger of public injury from individuals*[.]

The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Bernard Schwartz, *The Bill of Rights, A Documentary History* 665 (1971) (emphasis added).  This, too, simply raises the question of *which* individuals presented a "real danger of public injury."  The government also cites Samuel Adams's proposal at the Massachusetts ratifying convention, which was also discussed in *Heller*. *See Heller*, 554 U.S. at 604–05.  Adams recommended "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States *who are peaceable citizens*, from keeping their own arms."  2 Schwartz, *The Bill of Rights*, 675, 681 (emphasis added).  But *Heller* already established that the Second Amendment applies, at the very least, to "law-abiding, responsible citizens."  554 U.S. at 635.

The government's brief discussion of historical scholarship is no more helpful.  The government asserts that most "scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry."  Appellee Br. 18 (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam)).  Whether we label the class of citizens entitled to Second Amendment protection as "responsible," "peaceable," or "virtuous,"

we are no closer to determining whether individuals previously institutionalized were counted in that class.

### 3. Analysis

Recourse to tradition is not much more helpful, for "legal limits on the possession of firearms by the mentally ill . . . are of 20th Century vintage." *United States v. Skoien* (*Skoien II*), 614 F.3d 638, 641 (7th Cir. 2010) (en banc). Section 922(g)(4) "was not enacted until 1968." *Ibid.*; *see* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220. This law does not appear to rest on much historical foundation. "One searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1376 (2009). Professor Larson has concluded that "[s]pecific eighteenth-century laws disarming the mentally ill . . . simply do not exist." *Id.* at 1378.[9] The only more modern precedent that Professor Larson uncovered was the Uniform Fire Arms Act of 1930, which "prohibited delivery of a pistol to any person of 'unsound mind.'" *Id.* at 1376 (quoting Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Fortieth Annual Conference 565 (1930)).

We are not aware of any other historical source that suggests that the right to possess a gun was denied to persons who had ever been committed to a mental institution, regardless of time, circumstance, or present condition.[10]

---

[9]The government argues otherwise. *See* Appellee Br. 18. ("Historical sources further show that the colonial public did not view persons with a history of mental disturbance as being among those who could bear arms . . . ."). For this claim, the government relies on *United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001). *Emerson*, in turn, relies on Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA L. REV. 65, 96 (1983). This article states: "Colonial and English societies of the eighteenth century . . . have excluded infants, idiots, lunatics, and felons [from possessing firearms]." The Dowlut article, for its part, relies on T. Cooley, *A Treatise on Constitutional Limitations* 57 (7th ed. 1903). But the Cooley treatise simply provides no support for the proposition that the government now advances—that eighteenth-century America excluded "lunatics" from possessing firearms. In this way, one incorrect citation has begotten another.

The portion of Cooley's 1903 treatise cited by Dowlut does not address firearms at all but refers only to "[c]ertain classes [that] have been almost universally excluded" from "the *elective franchise*." *Ibid.* (emphasis added). Other courts, like the government, have mistakenly relied on the Dowlut article for the proposition that eighteenth-century America excluded "lunatics" from possessing firearms. *See, e.g.*, *State v. Jorgenson*, 312 P.3d 960, 966 (Wash. 2013). This citation-chain error has also been identified by the Oregon Supreme Court. *See State v. Hirsch*, 114 P.3d 1104, 1132 n.47 (Or. 2005).

[10]Mental institutions did not even exist in colonial America until the late eighteenth century. According to one source, "[T]he first asylum for the exclusive reception of the insane was opened [in 1772,] two decades later"

We need not reinvent the wheel and justify with historical reasoning § 922(g)(4)'s prohibition on possession of firearms by the mentally ill. So much we may take for granted. *Heller* has already sanctioned the "longstanding prohibitio[n] on the possession of firearms by . . . the mentally ill" as permissible. 554 U.S. at 626. The Court did not directly support this statement with citations. Justice Breyer suggested that the Court's statement amounted to "judicial *ipse dixit.*" *Id.* at 722 (Breyer, J., dissenting). The Court, in turn, responded that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635 (majority opinion).

The problem, as noted, is that the class of individuals constituting those ever previously mentally institutionalized is not identical to the class of individuals presently mentally ill. Ultimately, the government cannot establish that § 922(g)(4) regulates conduct falling outside the scope of the Second Amendment as it was understood in 1791. We cannot conclude, then, that the regulated activity is "categorically unprotected." *Greeno*, 679 F.3d at 518. History, text, and tradition, considered alone, are inconclusive.[11] Because the government has not met its burden, we conclude that the Second Amendment as understood in 1791 extended to at least some individuals previously committed to mental institutions. We proceed, therefore, to *Greeno*'s second step.

## C. Step Two: Applying the Appropriate Level of Scrutiny

Under *Greeno*, if the government cannot meet its burden of establishing that the regulated conduct fell outside the scope of the Second Amendment as historically understood in 1791, then the court must proceed to a second step. 679 F.3d at 518. The second step analyzes "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Ibid.* Courts must "appl[y] the appropriate level of scrutiny." *Ibid.*

---

than when "the first general hospital [was] established." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 40 (2d ed. 1940).

Thus, asking whether firearm possession by persons previously committed to a mental institution fell within the historical scope of the Second Amendment may simply be a futile question. Mental institutions, for the most part, did not emerge in America until after the adoption of the Second Amendment.

[11]On this point, we agree with the district court: "The [c]ourt agrees that the historical evidence cited by *Heller* and Defendants does not directly support the proposition that persons who were once committed due to mental illness are forever ineligible to regain their Second Amendment rights." *Tyler v. Holder*, No. 1:12-CV-523, 2013 WL 356851, at *3 (W.D. Mich. Jan. 29, 2013).

1.  Intermediate Scrutiny or Strict Scrutiny?

Whether courts should apply intermediate scrutiny or strict scrutiny is an open question in this circuit. *Greeno* itself concerned a Second Amendment challenge to the dangerous-weapon enhancement in § 2D1.1(b)(1) of the U.S. Sentencing Guidelines. *See id.* at 516–21. The *Greeno* court concluded that the dangerous-weapon enhancement was consistent with the historical understanding of the Second Amendment because the right to bear arms did not extend to "individuals engaged in criminal activity," *id.* at 519, or to "possession of weapons for unlawful purposes," *id.* at 520. The court in *Greeno* decided only the question asked in the first step of its newly announced test. *See id.* at 520 n.2. The *Greeno* court expressly reserved the question of what is "the appropriate level of scrutiny to apply to post-*Heller* Second Amendment challenges under the second prong." *Ibid.*

a

Although we might prefer to avoid a scrutiny-based approach altogether, *see Heller*, 554 U.S. at 634–35, *Greeno* now compels us to wade "into the 'levels of scrutiny' quagmire." *Skoien II*, 614 F.3d at 642.

The traditional levels of scrutiny are rational basis, intermediate scrutiny, and strict scrutiny. *See Heller*, 554 U.S. at 634. The Supreme Court in *Heller* ruled out the possibility that rational-basis review applies to Second Amendment challenges: "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.* at 628 n.27. Our choice, then, is between intermediate scrutiny and strict scrutiny. Both tests are "quintessential balancing inquiries that focus ultimately on whether a particular government interest is sufficiently compelling or important to justify an infringement on the individual right in question." *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1281 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). Under intermediate scrutiny, a challenged law "must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Strict scrutiny, in apparent contrast, requires the government to show that a challenged law "furthers a compelling interest and is narrowly tailored to achieve that interest."

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (citation omitted).  Before determining which standard is most appropriate, a few caveats are in order.

First, we recognize that this decision—intermediate or strict?—is likely more important in theory than in practice.  We are skeptical of ascribing too much significance to the difference between an "important" or "significant" interest and a "compelling" interest.  Justice Blackmun, for example, was never "able fully to appreciate just what a 'compelling state interest' is." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188 (1979) (Blackmun, J., concurring).  He felt that if "compelling interest" meant "'incapable of being overcome' upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all." *Ibid.*  Both intermediate scrutiny and strict scrutiny involve similar balancing tests.

Second, intermediate and strict scrutiny are not binary poles in the area of heightened scrutiny.  These familiar tests can take on many names and versions.  "[I]t bears mention that strict scrutiny and intermediate scrutiny can take on different forms in different contexts that are sometimes colloquially referred to as, for example, strict-scrutiny-light or intermediate-scrutiny-plus or the like." *Heller II*, 670 F.3d at 1277 n.8 (Kavanaugh, J., dissenting).  For example, in a campaign-finance case, the Court said a contribution limit would survive review if the government showed that the regulation was "closely drawn to match a sufficiently important interest." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387–88 (2000).  In another case, the Court reviewed a gender-based classification under "skeptical scrutiny" and "heightened review." *United States v. Virginia*, 518 U.S. 515, 531, 533 (1996).  Whether courts apply heightened scrutiny or a lighter version of that scrutiny, the underlying approach remains the same: it entails assessing means and ends and costs and benefits.

With these cautions in mind, we proceed to determine the appropriate standard.

b

The government maintains that intermediate scrutiny is the appropriate level of scrutiny to apply.  It offers two reasons.  First, it argues that a "more demanding standard would be inconsistent with *Heller*'s recognition that 'longstanding prohibitions on the possession of

firearms by felons and the mentally ill' are 'presumptively lawful.'" Appellee Br. 19 (quoting *Heller*, 554 U.S. at 626, 627 n.26). Second, the government notes that other courts of appeals have generally applied intermediate scrutiny.

i

The government's first argument is that *Heller*'s exceptions are inconsistent with strict scrutiny. *Heller* describes the prohibition on firearm possession by the mentally ill as "presumptively lawful." *Heller*, 554 U.S. at 626, 627 n.26. The government at oral argument stated that this language must indicate that strict scrutiny is inappropriate because if a law is subject to strict scrutiny, the government reasons, then it is not presumptively lawful. There are several problems with this logic.

First, the government reads *Heller*'s language to mean that courts, when analyzing the constitutionality of *Heller*'s exceptions, must *begin their analysis* by presuming that such exceptions are lawful. This cannot be correct because if that were the case, then courts would apply something akin to rational basis—an option that *Heller* forecloses. *Heller*, 554 U.S. at 628 n.27. The government argues in favor of intermediate scrutiny, but intermediate scrutiny does not involve applying a presumption of constitutionality. *Heller*'s "presumptively lawful" language does not suggest that a presumption of constitutionality attaches to the *Heller* exceptions. An equally valid, if not better, reading of the language is that the Court presumed that it would find the *Heller* exceptions constitutional *after applying* some analytic framework.[12] We do not read *Heller*'s "presumptively lawful" language to suggest anything about the level of scrutiny, if any, that courts should apply when evaluating Second Amendment challenges.

ii

The strongest argument in favor of intermediate scrutiny is that other circuits have adopted it as their test of choice. The government correctly notes that circuits have generally

---

[12]Other courts have recognized that *Heller*'s "presumptively lawful" language is simply ambiguous. *See NRA v. ATF (NRA I)*, 700 F.3d 185, 196 (5th Cir. 2012) ("It is difficult to discern whether [*Heller*'s exceptions], by virtue of their presumptive validity, either (i) presumptively fail to burden conducted protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny."); *Marzzarella*, 614 F.3d at 91 ("We recognize the phrase 'presumptively lawful' could have different meanings under newly enunciated Second Amendment doctrine.").

applied intermediate scrutiny in Second Amendment challenges. A closer look, however, reveals that the circuits' actual approaches are less neat—and far less consistent—than that.

The First Circuit applied a form of intermediate scrutiny to a "categorical ban on gun ownership by a class of individuals," which required a "strong showing, necessitating a substantial relationship between the restriction and an important governmental object." *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (internal quotation marks omitted).

The Second Circuit adopted "some form of heightened scrutiny . . . less than strict scrutiny" to laws not burdening the "'core' protection of self-defense in the home." *Kachalsky*, 701 F.3d at 93–94.

The Third Circuit has applied intermediate scrutiny when the "burden imposed by the law does not severely limit the possession of firearms," but recognized that the "Second Amendment can trigger more than one particular standard of scrutiny." *Marzzarella*, 614 F.3d at 97.

The Fourth Circuit employs a hybrid approach, applying intermediate scrutiny to laws burdening the right to bear arms "outside of the home" but applying strict scrutiny to laws burdening the "core right of self-defense in the home." *United States v. Masciandaro*, 638 F.3d 458, 470–71 (4th Cir. 2011); *accord Woollard*, 712 F.3d at 876; *United States v. Chester* (*Chester II*), 628 F.3d 673, 683 (4th Cir. 2010) ("[W]e conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.").

The Fifth Circuit has also adopted a multi-tiered approach in which "the appropriate level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *NRA v. ATF* (*NRA I*), 700 F.3d 185, 195 (5th Cir. 2012) (internal quotation marks omitted).

The Seventh Circuit has followed a number of different approaches, depending on the panel. Recently, it applied "a more rigorous showing than [intermediate scrutiny], if not quite 'strict scrutiny.'" *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011). In general, the court said that a "severe burden on the core Second Amendment right" requires "an extremely strong public-interest justification and a close fit between the government's means and its end," whereas "laws restricting activity lying closer to the margins of the Second Amendment right,

laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." *Ibid.* Previously, the full court, sitting en banc, accepted the government's concession that the court should apply intermediate scrutiny rather than rational-basis review and asked whether the challenged law was "substantially related to an important governmental objective." *Skoien II*, 614 F.3d at 641. *But see id.* at 647 (Sykes, J., dissenting) (arguing that the court "sends doctrinal signals that confuse rather than clarify"). Judge Posner, taking a different approach still, analyzed a challenged law "not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states." *Moore*, 702 F.3d at 941.

The Ninth Circuit has also followed various approaches. In a 2013 case, the court held that intermediate scrutiny applies to a Second Amendment challenge to a law burdening "conduct falling within the scope of the Second Amendment's guarantee." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). Three months later, the court clarified that intermediate scrutiny applied only because the conduct fell within the scope of the Second Amendment but "outside [its] core." *Peruta*, 742 F.3d at 1168 n.15. The court also clarified that "[i]ntermediate scrutiny is not appropriate, however, for cases involving the destruction of a right at the core of the Second Amendment." *Ibid.* Several Ninth Circuit judges would adopt an approach that expressly considers "the extent of the regulation's burden on Second Amendment rights." *Nordyke v. King*, 681 F.3d 1041, 1045 (9th Cir. 2012) (en banc) (O'Scannlain, J., concurring in the judgment, joined by Tallman, Callahan, & Ikuta, JJ.). In a 2014 opinion, the Ninth Circuit applied intermediate scrutiny because the challenged law did "not impose a substantial burden on conduct protected by the Second Amendment." *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 965 (9th Cir. 2014). Judge Bea has forcibly argued that strict scrutiny is more appropriate because using "intermediate scrutiny as the correct level at which to review a categorical, status-based disqualification from the core right of the Second Amendment . . . does not make sense." *Chovan*, 735 F.3d at 1145 (Bea, J., concurring).

The Tenth Circuit applied intermediate scrutiny to a federal firearm restriction that applied "only to a narrow class of persons, rather than to the public at large." *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010).

The District of Columbia Circuit applied intermediate scrutiny to gun-registration laws, but held that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify." *Heller II*, 670 F.3d at 1257.

This tour of the circuits confirms several points. The appropriate level of scrutiny that courts should apply in Second Amendment cases (assuming a scrutiny-based approach is appropriate at all) remains a difficult, highly contested question. "[O]ur sister circuits have grappled with varying sliding-scale and tiered-scrutiny approaches." *Peruta*, 742 F.3d at 1167. "*Heller* has left in its wake a morass of conflicting lower court opinions regarding the proper analysis to apply to challenged firearms regulations." *Chester II*, 628 F.3d at 688–89 (Davis, J., concurring in the judgment). "Since . . . *Heller*, courts have wrestled with its text to develop a sound approach to resolving Second Amendment challenges." *Greeno*, 679 F.3d at 518. The general trend, however, has been in favor of some form of intermediate scrutiny.

What this also reveals is that our circuit is one of the few that has not entered this debate. Although we must "appl[y] the appropriate level of scrutiny," *ibid.*, we also must decide whether that is intermediate scrutiny or strict scrutiny. "A choice must be made." *Ezell*, 651 F.3d at 706.[13]

c

There are strong reasons for preferring strict scrutiny over intermediate scrutiny. First, the Supreme Court has by now been clear and emphatic that the "right to keep and bear arms" is a "fundamental righ[t] necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. In our view, that strong language suggests that restrictions on that right trigger strict scrutiny. It is true that strict scrutiny is not *always* "called for whenever a fundamental right is at stake." *Heller II*, 670 F.3d at 1256 (majority opinion). The majority in *Heller II* forcibly argued this point. *See id.* at 1256–57. It is true, for instance, that in the First Amendment context, content-neutral regulations that restrict speech's time, place, or manner are permissible if they survive a

---

[13]*Accord Chester II*, 628 F.3d at 682 ("Our task . . . is to select between strict scrutiny and intermediate scrutiny.").

form of intermediate scrutiny—i.e., if the regulation promotes a significant interest unrelated to the suppression of a message and allows for ample alternative channels of communication. *United States v. Grace*, 461 U.S. 171, 177 (1983); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). For commercial speech, as well, courts apply a form of intermediate scrutiny. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). In those two contexts, courts "impose similarly demanding levels of intermediate scrutiny." *Hucul Adver. v. Charter Twp. of Gaines*, 748 F.3d 273, 276 (6th Cir. 2014). Those two tests are "close cousin[s], if not fraternal twin[s]" of one another. *Id.* at 276 n.1 (citation omitted).

Although it is true that strict scrutiny is not *always* implicated when a fundamental right is at stake, the Supreme Court has suggested that there is a *presumption* in favor of strict scrutiny when a fundamental right is involved. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (strict scrutiny applies to "fundamental" liberty interests); *id.* at 762 (Souter, J., concurring in the judgment) (discussing "fundamental" rights and "the corresponding standard of 'strict scrutiny'"); *see also Poe v. Ullman*, 367 U.S. 497, 548 (1961) (Harlan, J., dissenting) ("[E]nactment[s] involv[ing] . . . fundamental aspect[s] of 'liberty' . . . [are] subjec[t] to 'strict scrutiny.'").

Second, another way of thinking about the above point—and another reason for preferring strict scrutiny—is that the courts of appeals originally adapted the levels of scrutiny of Second Amendment jurisprudence by looking to First Amendment doctrine but that First Amendment doctrine reflects a preference for strict scrutiny more often than for intermediate scrutiny.[14] In the First Amendment context, the Court has applied strict scrutiny when reviewing an infringement on "political speech," *Citizens United*, 558 U.S. at 340, on the freedom of association, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000), and on a content-based speech regulation, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Beyond the First Amendment context, the Court's substantive due-process doctrine also employs a form of strict scrutiny. *See Glucksberg*, 521 U.S. at 720–21, 728. As explained above, although strict

---

[14]The now prominent practice of looking to First Amendment doctrine "for guidance in evaluating Second Amendment challenges" appears to have originated in footnote 4 of the Third Circuit's recent, post-*Heller* decision in *Marzzarella*, 614 F.3d at 89.

scrutiny is not ubiquitous in constitutional law, it predominates in numerous constitutional areas. *See generally* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267 (2007).

In those areas of constitutional law where the Supreme Court favors intermediate scrutiny, the Court has expressly indicated a reason for downgrading from strict scrutiny. With commercial speech, the Court applies intermediate scrutiny because it has decided that "[t]he Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson*, 447 U.S. at 562–63; *see also id.* at 562 (recognizing "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech") (citation omitted). Similarly, the Court has long indicated that content-neutral regulation receives a form of intermediate scrutiny because it imposes a lesser burden on First Amendment values. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983); *Carey v. Brown*, 447 U.S. 455, 459-62 (1980); *Cox v. State of N.H.*, 312 U.S. 569, 574–76 (1941). One strikingly clear First Amendment example of the Court expressly "downgrading" from strict scrutiny is *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984), concerning governmental regulation of broadcasts over the public airwaves. The Court recognized that "[a]t first glance," strict scrutiny—"the most exacting degree of First Amendment protection"—should apply. *Id.* at 375–76. But the Court's express, reasoned determination that "broadcast regulation involves unique considerations" not present with "newspapers and magazines" is what "required some adjustment in First Amendment analysis." *Id.* at 376–77. Absent this kind of express indication from the Court that a lower version of scrutiny is sometimes applicable in Second Amendment cases, we prefer strict scrutiny.

Third, strict scrutiny is preferable because this is a doctrinal area in which the Court has not simply *refrained* from suggesting that lesser review is called for but one in which it has strongly indicated that intermediate scrutiny should *not* be employed. Justice Breyer's dissent in *Heller* explicitly advocated a form of interest-balancing intermediate scrutiny based in part on *Turner Broadcasting System, Inc. v. FCC* (*Turner II*), 520 U.S. 180, 195–96 (1997). *See Heller*, 554 U.S. at 690 (Breyer, J., dissenting). The *Heller* majority, however, flatly rejected Justice Breyer's *Turner Broadcasting*-based approach. *See id.* at 634–35 (majority opinion). Even so,

many of the courts now favoring intermediate scrutiny over strict scrutiny have relied expressly on *Turner Broadcasting* to develop Second Amendment doctrine. *See, e.g.*, *Marzzarella*, 614 F.3d at 97–98 (relying on *Turner Broad. Sys., Inc. v. FCC* (*Turner I*), 512 U.S. 662 (1994)); *Heller II*, 670 F.3d at 1257, 1259–60.

Fourth, and perhaps most importantly, we reject intermediate scrutiny here because it has no basis in the Constitution. Both the Court and the academy have said as much. The *Heller* Court's reasons for explicitly rejecting rational-basis scrutiny apply equally to intermediate scrutiny. The Court rejected rational-basis scrutiny for Second Amendment challenges because it "is a mode of analysis we have used when evaluating laws under constitutional commands that are *themselves* prohibitions on irrational laws," citing *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), an employment-discrimination case under the Equal Protection Clause. *Heller*, 554 U.S. at 628 n.27 (emphasis added). "In *those* cases," the Court said, "'rational basis' is not just the standard of scrutiny, but the very substance of the constitutional guarantee." *Ibid.* (emphasis added). "Obviously, the same test"—i.e., a scrutiny test imported from Equal Protection Clause jurisprudence—"could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or *the right to keep and bear arms*." *Ibid.* (emphasis added). The Court continued: "There may be narrower scope for operation of the presumption of constitutionality [*i.e.*, narrower than that provided by rational-basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . . ." *Ibid.* (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)) (bracketed material from *Heller*). *Heller*'s footnote 27—even aside from the Court's flat rejection of Justice Breyer's interest-balancing inquiry—strongly suggests that intermediate scrutiny "could not be used to evaluate" Second Amendment challenges. *Ibid.*

Given the above, we prefer strict scrutiny over intermediate scrutiny. In choosing strict scrutiny, we join a significant, increasingly emergent though, as yet, minority view that concludes that as between intermediate scrutiny and strict scrutiny—the choice that *Greeno* requires—the latter is more appropriate for assessing a challenge to an enumerated constitutional

right, especially in light of *Heller*'s rejection of judicial interest-balancing.  *See Chovan*, 735 F.3d at 1145–46, 1149–52 (Bea, J., concurring) ("Categorical curtailment of constitutional rights based on an individual's status requires more rigorous analysis than intermediate scrutiny."); *NRA v. ATF* (*NRA II*), 714 F.3d 334, 336 (5th Cir. 2013) (Jones, J., dissental,[15] joined by Jolly, Smith, Clement, Owen, & Elrod, JJ.) ("[T]he level of scrutiny required [for the case] must be higher than [intermediate scrutiny]."); *Heller II*, 670 F.3d at 1284 (Kavanaugh, J., dissenting) ("Even if it were appropriate to apply one of the levels of scrutiny after *Heller*, surely it would be strict scrutiny rather than . . . intermediate scrutiny . . . .").

d

Because applying strict scrutiny puts us on a different course than that taken by other circuits, we offer one final precautionary note.  The courts of appeals' post-*Heller* jurisprudence does not suggest that the decision to apply intermediate scrutiny over strict scrutiny was generally the crucial keystone that won the government's case.  *See, e.g.*, *Reese*, 627 F.3d at 804 n.4 (reaching the same result "[e]ven if we were to apply a strict scrutiny test"); *Marzzarella*, 614 F.3d at 99–101 (reaching the same result "even if strict scrutiny were to apply").  We predict that the application of strict scrutiny over intermediate scrutiny will not generally affect how other circuits decide various challenges to federal firearm regulations.  This is so for a few reasons.

First, as discussed above, there is not just one model of strict scrutiny; there are different forms, such as strict-scrutiny-light.  *See Heller II*, 670 F.3d at 1277 n.8 (Kavanaugh, J., dissenting).  And it is not the case that a particular form necessarily corresponds to a particular doctrinal domain.  The evidence bears out that jurists "tend to vary the version of strict scrutiny to reflect their personal views concerning the nature and significance of the rights involved in particular cases."  Fallon, *Strict Judicial Scrutiny*, *supra*, at 1312.

Second, even when using the same *form* of strict scrutiny, "individual Justices"—and judges, it is fair to say—also "tend to vary their *applications* of strict scrutiny based on their personal assessments of the importance of the right in question."  Fallon, *supra*, at 1271

---

[15]The term dissental has been adopted as shorthand for "dissenting from the denial of rehearing en banc."  *See* Alex Kozinski & James Burnham, *I Say Dissental, You Say Concurral*, 121 YALE L.J. ONLINE 601 (2012).

(emphasis added). Strict scrutiny is not a plaster mold that consistently produces identical results. For instance, the Court applied "the most rigid scrutiny"—using language later "cited to support the modern form of strict scrutiny review," *id.* at 1277—in upholding a military order excluding all persons of Japanese descent from areas of the West Coast. *Korematsu v. United States*, 323 U.S. 214, 216 (1944). That is not an outcome that most would expect from strict scrutiny today.

Third, strict scrutiny, although having the benefit of greater fidelity to *Heller* and *McDonald*, is not so different a construct than intermediate scrutiny. Strict scrutiny demands government interests that are "compelling" and not "merely" "important." "That's unlikely to be relevant to gun controls, since virtually every gun control law is aimed at serving interests that would usually be seen as compelling—preventing violent crime, injury, and death." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1470 (2009). The other way in which strict scrutiny differs from intermediate scrutiny is that it demands that government regulations be "narrowly tailored" to the interests and not "merely" "substantially related" to those interests. But both "tailoring requirement[s] . . . likely yield the same problems" and benefits. *Ibid.*

We conclude our explanation of choosing strict scrutiny with a reminder of intermediate scrutiny's shaky foundation in Second Amendment law. The Seventh Circuit was the first court of appeals to apply intermediate scrutiny to a Second Amendment challenge in *United States v. Skoien* (*Skoien I*), 587 F.3d 803 (7th Cir. 2009). That opinion was vacated, *United States v. Skoien*, No. 08-3770, 2010 WL 1267262 (7th Cir. Feb. 22, 2010), and on rehearing, the en banc court expressly declined to wade "more deeply into the 'levels of scrutiny' quagmire" and simply accepted the government's "concession" to apply intermediate scrutiny for the case at hand, *Skoien II*, 614 F.3d at 641–42 (July 13, 2010).[16] Then, the Third Circuit in *Marzzarella* applied intermediate scrutiny, acknowledging that the matter was "not free from doubt" and even offering a robust alternative strict-scrutiny analysis. 614 F.3d at 97, 99–101 (July 29, 2010). The *Skoien II* court's refusal to decide the scrutiny issue and the *Marzzarella* court's frank

---

[16]*Skoien II* refers to the government's position as a "concession" in the context of a choice between rational-basis review and "some form of strong showing," like intermediate scrutiny. 614 F.3d at 641–42.

uncertainty about its choice are hardly solid foundation for what has proven to be the analytic bedrock of the circuits' Second Amendment jurisprudence.[17]  But those two opinions—refusal to decide and uncertainty, no matter—were enough to trigger the cascade.  *See, e.g.*, *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. Aug. 5, 2010) (citing *Skoien II*); *Reese*, 627 F.3d at 800–02 (10th Cir. Dec. 10, 2010) (citing *Skoien II*, *Marzzarella*, & *Williams*, decisions from "recent months"); *Chester II*, 628 F.3d at 677–78, 682–83 (4th Cir. Dec. 30, 2010) (citing *Skoien I*, *Skoien II*, & *Marzzarella*).  Other circuits have followed suit.[18]

## 2.  Applying Strict Scrutiny

With our analytic structure in place, we turn finally to the law at issue here.  A challenged law satisfies strict scrutiny if it "furthers a compelling interest and is narrowly tailored to achieve that interest."  *Citizens United*, 558 U.S. at 340.

### a

We have no trouble concluding that § 922(g)(4), which prohibits possession of firearms by individuals "adjudicated as a mental defective" or who have "been committed to a mental institution," furthers compelling interests.  Tyler concedes that § 922(g)(4), facially, serves at least "important" interests.  The government advances two interests: "protecting the community from crime" and "preventing suicide."  Although the government suggests applying intermediate scrutiny, it asserts that these interests are not just important but in fact "compelling."  Indeed they are.  *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (internal quotation marks omitted); *Glucksberg*, 521 U.S. at 735 (recognizing suicide prevention as an "unquestionably important and legitimate" interest); *see also Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115,

---

[17]It bears noting that prior to *Skoien II* and *Marzzarella*'s planting the tiers-of-scrutiny seed, the courts of appeals had no trouble reviewing Second Amendment challenges without relying on the tiers of scrutiny.  *See e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1116–17 (9th Cir. 2010) (employing a common-law approach by relying on past cases and also examining "cases from other circuits" and "historical gun restrictions"); *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010) (reasoning based not on a level of scrutiny but by analogy to *Heller*); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) ("rest[ing] our conclusion" not on a level of scrutiny but by examining "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns," and by employing an historical approach "as the *Heller* Court did"); *see also Houston v. City of New Orleans*, 675 F.3d 441, 451–52 (5th Cir. 2012) (Elrod, J., dissenting) (rejecting the premise that the choice is one between intermediate and strict scrutiny and advocating for a test rooted in text, history, and tradition).

[18]As noted above, *supra* pp. 25–26, a sizable minority of jurists disagree.

126 (1989) ("recogniz[ing] . . . a compelling interest in protecting the physical and psychological well-being of minors").  Section 922(g)(4) serves compelling interests.

b

For § 922(g)(4) to withstand strict scrutiny, however, the government must also establish that the law is narrowly tailored to achieve its interests.  That is, "[r]eal scrutiny is different from parroting the government's legislative intentions."  *NRA II*, 714 F.3d at 346 (Jones, J., dissental).  Narrow tailoring is essentially a means-end calculation.  It does not demand a perfect fit.  The government can carry its burden even under strict scrutiny (or at least a lenient version of it) "based solely on history, consensus, and simple common sense."  *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks omitted).[19]  "[W]hile the government must carry its burden to establish the fit between a regulation and a governmental interest, it may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require."  *United States v. Carter* (*Carter I*), 669 F.3d 411, 418 (4th Cir. 2012); *accord United States v. Carter* (*Carter II*), 750 F.3d 462, 465–66 (4th Cir. 2014).

Central to narrow tailoring is the fit between the government's objective and its means.  A regulation flunks narrow tailoring by being "overbroad" if "[the proffered] interests could be achieved by narrower ordinances that burde[n] [the right] to a far lesser degree."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  Similarly, a regulation flunks the narrow-tailoring requirement by being "underinclusive" if "[t]he proffered objectives are not pursued with respect to analogous . . . conduct."  *Ibid.*  The Fourth Circuit noted last year that "no circuit has accepted an overbreadth challenge in the Second Amendment context," *United States v. Chester* (*Chester III*), 514 F. App'x 393, 395 (4th Cir. 2013), but what it meant, in context, was that "[a] person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."  *Skoien II*, 614 F.3d at 645 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[20]  Overbreadth, however, can and must be

---

[19]*But see Playboy Entm't*, 529 U.S. at 822 ("[T]he Government must present more than anecdote and supposition" to meets its burden under strict scrutiny.).

[20]*But see Williams*, 616 F.3d at 693 ("recogniz[ing] that" the felon-in-possession prohibition "may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who

considered *as part of* strict scrutiny's narrow-tailoring requirement.  *See Lukumi Babalu Aye*, 508 U.S. at 546.

We use *Heller*'s and *McDonald*'s "assurances" as a reference point to consider how narrow tailoring is applied in the Second Amendment context.  *See* Jamal Greene, Heller *High Water? The Future of Originalism*, 3 HARV. L. & POL'Y REV. 325, 336 (2009) ("[T]he dozens of lower court opinions . . . have reasoned largely by analogy to Justice Scalia's list of permissible regulations [in *Heller*].").  Congress probably can regulate firearms at schools, *see Heller*, 554 U.S. at 626; § 922(q), but it probably cannot ban all teachers from owning firearms.  Such a prohibition would no doubt implicate the government's interest in preventing violent crime at schools, *see* § 922(q)(1)(F), but it would also cover a substantial amount of conduct not implicating the interest.  Similarly, Congress can probably regulate firearms in government buildings, *see Heller*, 554 U.S. at 626; 39 C.F.R. § 232.1, but it probably cannot ban firearms in the District of Columbia, even though a disproportionately large number of government buildings are located there.

Based on *Heller*, a law forbidding possession of firearms by "the mentally ill" is most likely constitutional and satisfies narrow tailoring.  *See McDonald*, 561 U.S. at 786; *Heller*, 554 U.S. at 626.  A law that captures only a small subset of that group, or a law that captures the entire group but also a significant number of non-mentally ill persons, would fail narrow tailoring.  Section 922(g)(4)'s prohibition on gun possession by persons who have "been adjudicated as a mental defective" is so close to a prohibition on possession by "the mentally ill" that we suppose that it, too, satisfies narrow tailoring.  It might be objected that § 922(g)(4)'s adjudicated-as-a-mental-defective prohibition could be underinclusive because it does not encompass *all* mentally ill persons.  But the match is a very close one.[21]  Strict scrutiny does not call for perfect tailoring.

---

are non-violent"); *Binderup v. Holder*, 13-CV-06750, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014) (permitting to proceed an as-applied challenge to § 922(g)(1)'s ban on the possession of firearms by felons brought by a non-violent felon with a sixteen-year-old conviction).

[21] *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012), also recognizes this subtle difference—the difference between *Heller*'s assurance about the "mentally ill" and the classifications actually made in § 922(g)(4). "[S]ection 922(g)(4) does not bar firearms possession for those who are or were mentally ill and dangerous, but (pertinently) only for any person 'who has been *adjudicated* as a mental defective' or 'has been *committed* to a mental institution.'"  *Ibid.* (emphasis added).

At issue here is only § 922(g)(4)'s prohibition on possession by persons previously committed to a mental institution. Not all previously institutionalized persons are mentally ill at a later time, so the law is, at least somewhat, overbroad. But is it *impermissibly* so? Congress, in its efforts to keep firearms away from the mentally ill, may cast a wider net than is necessary to perfectly remove the harm. A "prophylactic approach thus obviate[s] the necessity for large numbers of individualized determinations." *Weinberger v. Salfi*, 422 U.S. 749, 782 (1975).[22] But is § 922(g)(4)'s net too wide? Are previously institutionalized persons sufficiently dangerous, as a class, that it is permissible to deprive permanently all such persons of the Second Amendment right to bear arms?

It is a difficult question but one that we need not answer in the first instance. Congress has *already* determined that the class of individuals previously committed to a mental institution is *not* so dangerous that all members must be permanently deprived of firearms. Congress created a relief-from-disabilities program in which individuals subject to a § 922 prohibition can regain their firearm rights by showing that they are unlikely to present a threat. *See* § 925(c). Because this program extends eligibility to *all* persons subject to any § 922 prohibition, it alone might be insufficient evidence of Congress's determination that the previously institutionalized are not per se dangerous; at any rate, Congress has chosen not to fund the program since 1992.

In 2008, following a campus shooting at the Virginia Polytechnic Institute and State University that killed and wounded dozens of students and faculty members, the president signed the NICS Improvement Amendments Act. *See* Pub. L. No. 110-180, § 2(9) (Findings), 122 Stat. 2559, 2560. The gunman had "a proven history of mental illness" but was able "to purchase the two firearms used in the shooting," *ibid.*, apparently notwithstanding § 922(g)(4)'s adjudicated-as-a-mental-defective prohibition. According to Congress's findings in the 2008 law, the tragedy "renewed the need to improve information-sharing that would enable Federal and State [authorities]" to screen "potential firearms purchasers." *Ibid.* Congress found that "[i]mproved

---

[22]This case involved rational-basis review of a Social Security regulation that denied benefits to widows married to the deceased wage earner for less than nine months prior to the wage earner's death. *See Weinberger*, 422 U.S. at 753–54. Although that case involved rational-basis review, there is no reason to think that strict scrutiny requires a "ban [on] all prophylactic provisions." *Id.* at 777. Such an approach is tantamount to perfect tailoring, *see ibid.*, which is not what strict scrutiny requires.

coordination between State and Federal authorities could have ensured that the shooter's disqualifying mental health information was available to [the FBI]." *Ibid.*

Unable to mandate the states' cooperation in matters of gun control,[23] Congress instead adopted a carrot-and-stick approach to encourage states to share their information identifying individuals ineligible to own firearms under federal standards. With one hand, Congress offered grants to those states that cooperated in "upgrad[ing] information and identification technologies for firearms eligibility determinations." § 103(a)(1), 122 Stat. at 2567. And with the other, Congress withheld anti-crime funding to those states that did not cooperate. *See* § 104(b), 122 Stat. at 2569. To be eligible for any grant money, however, Congress required states to implement a relief-from-disabilities-program for individuals subject to § 922(g)(4)'s prohibition. *See* § 103(c), 122 Stat. at 2568. States "shall grant the relief" and restore the individual's firearm rights if the person is unlikely to be dangerous. *See* § 105(a)(2), 122 Stat. at 2569–70. Unlike the federal analogue in § 925(c), though, these optional state programs apply to individuals burdened *only by a § 922(g)(4) disability*. Congress has not just conceded that the previously institutionalized are not sufficiently dangerous, as a class, that it is necessary to deprive all class members of firearms; it has gone further and has actively encouraged a system in which dangerous class members are treated differently from non-dangerous members and in which non-dangerous members may regain their constitutional right. The existence of this program treats the formerly institutionalized more favorably than most other persons prohibited from possessing firearms. Roughly half the states have accepted Congress's carrot and created a relief-from-disabilities program that meets the Act's criteria.[24]

In this case, the regulatory scheme that Congress has created has placed Tyler in a catch-22. Tyler may not possess a firearm because he was previously committed to a mental institution. *See* § 922(g)(4). Tyler applied to the federal government for relief, but this was unavailing because the federal program is unfunded. Congress's failure to fund the federal program precludes the judicial review under § 925(c) that would otherwise be available if the

---

[23] *See Printz v. United States*, 521 US. 898, 935 (1997) ("Congress cannot . . . conscrip[t] the State's officers directly" to enforce provisions of the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536).

[24] As indicated above, *supra* note 3, the exact number of states that the government has certified that meet the criteria for funding is unclear.

government denied his application on the merits. *Bean*, 537 U.S. at 78. Tyler could apply for relief from a federally-certified state program, but he cannot obtain relief from his state program because Michigan has not created one. If Michigan had a program, Tyler could potentially obtain relief and regain his Second Amendment right because he is not dangerous.[25]

Under this scheme, whether Tyler may exercise his right to bear arms depends on whether his state of residence has chosen to accept the carrot of federal grant money and has implemented a relief program. His right thus would turn on whether his state has taken Congress's inducement to cooperate with federal authorities in order to avoid losing anti-crime funding. An individual's ability to exercise a "fundamental righ[t] necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778, cannot turn on such a distinction. Thus, § 922(g)(4) lacks narrow tailoring as the law is applied to Tyler. The following review of the circuits' post-*Heller* jurisprudence confirms this. We hold that the complaint, as alleged, states a violation of the Second Amendment.

## IV.  Post-*Heller* Jurisprudential Landscape

It may be true that no other appeals court has sustained a Second Amendment challenge to a federal firearms regulation since *Heller* was decided. *See, e.g.*, *United States v. Mahin*, 668 F.3d 119, 123 (4th Cir. 2012) (recognizing "mounting case law declining to overturn on Second Amendment grounds criminal convictions under 18 U.S.C. § 922(g)" and noting that "appellant has not pointed us to a single court of appeals decision in the aftermath of *Heller* that has reversed any § 922(g) conviction on Second Amendment grounds"); *United States v. Seay*, 620 F.3d 919, 924 (8th Cir. 2010) ("To date, [no defendants] have succeeded" in "argu[ing] that 18 U.S.C. § 922(g), or some subsection thereof, violates the Second Amendment."). We have examined the judicial landscape and our decision, in fact, fits comfortably within it.

Only a few opinions have touched on § 922(g)(4) since *Heller* was decided, and none in any depth relevant here. For example, two courts, in unpublished opinions, summarily rejected § 922(g)(4) challenges, only one involving the mental-commitment provision. *See Petramala v. U.S. Dep't of Justice*, 481 F. App'x 395 (9th Cir. 2012) (unpublished memorandum); *United*

---

[25]We accept the facts as alleged in the complaint as true.

*States v. McRobie*, No. 08-4632, 2009 WL 82715 (4th Cir. Jan. 14, 2009). In addition, the First Circuit held in *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012), that an emergency hospitalization imposed without any adversarial proceeding did not qualify as a mental "commitment" for § 922(g)(4) purposes. More recently, in *United States v. McIlwain*, No. 14-10735, 2014 WL 6657013 (11th Cir. Nov. 25, 2014), the Eleventh Circuit affirmed the denial of a motion to dismiss a § 922(g)(4) indictment. The court found that the defendant's involuntary commitment, which was ordered by a state probate court after a formal process, "fell within § 922(g)(4)." *Id.* at *1, *8–9. The court also rejected the defendant's attempt, citing *Heller*, to attack collaterally the commitment order in federal court. *Id.* at *9.

We have reviewed scores of opinions presenting post-*Heller* Second Amendment challenges, and we do not believe that any other court of appeals in a reasoned opinion has reviewed a firearm restriction as severe as this one—one that forever deprives a law-abiding, non-violent, non-felon of his Second Amendment rights.

## A. Other § 922 "Who" Prohibitions

At any rate, a close reading of the case law indicates both that the cases are not as contrary to our position as it might initially appear and, moreover, that the cases in fact affirmatively support the result we now reach. The case law supports several principles about the many federal firearms restrictions in § 922. First, in light of *Heller*'s statement about "longstanding prohibitions on the possession of firearms by felons," 554 U.S. at 626, almost every circuit has held that § 922(g)(1)'s prohibition on possession of firearms by felons is constitutional. *See United States v. Stuckey*, 317 F. App'x 48 (2d Cir. 2009) (unpublished summary order); *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011); *United States v. Brunson*, 292 F. App'x 259 (4th Cir. 2008) (unpublished per curiam); *United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) (on plain-error review); *United States v. Anderson*, 559 F.3d 348 (5th Cir. 2009) (without significant discussion); *United States v. Whisnant*, 391 F. App'x 426 (6th Cir. 2010) (unpublished); *United States v. Khami*, 362 F. App'x 501 (6th Cir. 2010) (unpublished); *United States v. Frazier*, 314 F. App'x 801 (6th Cir. 2008) (unpublished); *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); *United States v. Irish*, 285 F. App'x 326 (8th Cir. 2008) (unpublished per curiam); *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010); *United*

*States v. Smith*, 329 F. App'x 109 (9th Cir. 2009) (unpublished); *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) (per curiam); *United States v. Battle*, 347 F. App'x 478 (11th Cir. 2009) (unpublished per curiam); *see also United States v. Huet*, 665 F.3d 588 (3d Cir. 2012) (upholding conviction, under § 922(g)(1) and § 2, of aiding and abetting a felon to possess a firearm when government's only evidence was that defendant possessed rifle in the home while living with a convicted felon, because "a properly-brought aiding and abetting charge does not burden conduct protected by the Second Amendment"); *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010) (upholding 18 U.S.C. § 921(a)(20), containing "the burdens associated with the congressionally-created expungement exception").[26]

There is also significant post-*Heller* case law addressing several other § 922 firearm regulations: § 922(g)(5)(A), forbidding possession of firearms by illegal aliens; § 922(g)(9), forbidding possession by domestic-violence misdemeanants; §§ 922(b)(1), (c)(1), & (x)(2)(a), restricting possession of firearms based on age; § 922(g)(8), forbidding possession of firearms by individuals subject to certain domestic-protection orders; and § 922(g)(3), forbidding possession of firearms by "an unlawful user of or addic[t] to any controlled substance."[27]   Section 922(g)(4)'s committed-to-a-mental-institution provision differs from each of these provisions in at least one of four crucial respects: its prohibition is permanent; it applies potentially to non-

---

[26]In a recent decision, the Eastern District of Pennsylvania permitted to proceed an as-applied challenge to § 922(g)(1) . . . to the possession of firearms by felons raised by an individual with a prior state conviction sixteen years in the past for corruption of a minor stemming from an illicit, though consensual, relationship with a seventeen-year-old. *Binderup v. Holder*, 13-CV-06750, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014). First, the court determined that the plaintiff's conviction, though labeled a first-degree misdemeanor under Pennsylvania law, constituted a felony for purposes of § 922(g)(1) because it was punishable by up to five years of imprisonment. *Id.* at *9. The court then determined that the Third Circuit's decision in *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011), and not the two-step approach of *Marzzarella*, 614 F.3d 85, set out the relevant framework for an as-applied Second Amendment challenge to § 922(g)(1).

Applying *Barton*, the district court "placed the burden on . . . the party challenging the constitutionality of § 922(g)(1) . . . to present facts demonstrating the unconstitutionality of § 922(g)(1) as applied to him." *Binderup*, 2014 WL 4764424, at *21. In that particular case, the "undisputed material facts" demonstrated that the plaintiff was "no more dangerous than a typical lawabiding citizen, and poses no continuing threat to society." *Ibid.* (internal quotation marks omitted). "Therefore, application of § 922(g)(1) to him violates the Second Amendment to the United States Constitution." *Id.* at *31. In reaching this conclusion, the *Binderup* court rejected the general evidence introduced by the government "pertaining to recidivism risk and the efficacy of denial of handgun purchases for certain persons as a method of reducing the risk of firearm violence," *id.* at *26, because it did not demonstrate that the particular individual at issue, who had no history of violence and was only convicted of one non-violent crime sixteen years in the past, presented a "greater risk of future violent conduct than the average law-abiding citizen." *Id.* at *31.

[27]Courts have also addressed other § 922 prohibitions, but these provisions have received the most extensive treatment.

violent individuals; it applies potentially to law-abiding individuals; and it punishes potentially non-volitional conduct.   No court has upheld a similar firearm regulation under these circumstances.   And a number of courts have suggested they would have trouble doing so.   A review of the case law illustrates the boundaries of permissible firearm regulations—that is, of the constraints on the Second Amendment right.   We begin with the provisions that are perhaps easier to justify and proceed to those that are more problematic and also more similar to the one at issue here.

### 1. § 922(g)(5)(A): Illegal Aliens

Several courts of appeals have upheld § 922(g)(5)(A), forbidding possession of firearms by illegal aliens.   In light of *Heller*'s characterization of the right at issue as one of "law-abiding, responsible citizens" and case law permitting Congress to distinguish among citizens, aliens, and illegal aliens, these holdings are not difficult.[28]   *See United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011) (per curiam and without significant discussion); *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011).   It is significant that, even in reviewing firearm restrictions on illegal aliens, these panels have not spoken with a single voice.   Recognizing that "the question seems large and complicated," the Tenth Circuit declined to "infer from *Heller* a rule that the right to bear arms is categorically inapplicable to non-citizens."   *Huitron-Guizar*, 678 F.3d at 1168–70 (emphasizing the narrowness of its holding "[o]n this record"); *see also Portillo-Munoz*, 643 F.3d at 442 (Dennis, J., dissenting in part, to argue for remanding for district court to consider in the first instance whether provision survives an applicable level of scrutiny).   The "mounting case law declining to overturn" provisions of § 922, *Mahin*, 668 F.3d at 123, becomes more fractured with respect to other § 922(g) provisions.

### 2. § 922(g)(9): Domestic-Violence Misdemeanants

Domestic-violence misdemeanants, banned from firearm possession by § 922(g)(9), present a tougher case.   The four criteria offered above as potential limiting principles suggest this prohibition is permissible.   Domestic-violence misdemeanants, by definition, are violent and

---

[28]We review the case law addressing other § 922 prohibitions strictly for illustrative purposes.   We make no determination as to any provision other than § 922(g)(4).   Nothing here should be construed otherwise.

non-law-abiding, and the prohibition targets volitional conduct. And the ban is not necessarily permanent because of the possibility of pardon or expungement.

At least six circuits have upheld § 922(g)(9) against challenges. *See United States v. Booker*, 644 F.3d 12 (1st Cir. 2011); *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011); *United States v. Skoien* (*Skoien II*), 614 F.3d 638 (7th Cir. 2010) (en banc); *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013); *In re United States*, 578 F.3d 1195 (10th Cir. 2009) (unpublished order but appended to published dissent) (granting a petition for a writ of mandamus directing the district court not to instruct jury that § 922(g)(9) is inapplicable for persons who do not pose a risk of violence); *United States v. White*, 593 F.3d 1199 (11th Cir. 2010). But some of these cases offer dissenting voices, reflect a strong emphasis on limiting principles, and include remands to the district court because of the government's failure initially to meet its burden to justify the regulation.

The first panel to consider a § 922(g)(9) challenge concluded that the government failed to meet its burden to defend the law's constitutionality, even when applying intermediate scrutiny's lesser substantially-related requirement. *See Skoien I*, 587 F.3d at 815–16. The panel remanded to the district court to allow the government to do more than "rel[y] almost entirely on conclusory reasoning by analogy from *Heller*'s reference to . . . felon-dispossession laws." *Id.* at 815. The panel "note[d] that § 922(g)(9) is overinclusive on several fronts" but emphasized that "*only* those who have already used or attempted to use force or have threatened the use of a deadly weapon against a domestic victim are banned from possessing firearms." *Id.* at 815–16. The en banc court vacated the panel's decision, No. 08-3770, 2010 WL 1267262 (7th Cir. Feb. 22, 2010), and although the en banc court affirmed the defendant's § 922(g)(9) conviction, it, too, emphasized the same limiting principles that lead to a different outcome in our case. The en banc court stressed that § 922(g)(9)'s prohibition is not permanent: "[The] opportunity to seek pardon or expungement" means that "[the law] in its normal application does not create a perpetual and unjustified disqualification for a person who no longer is apt to attack other members of the household." *Skoien II*, 614 F.3d at 645. The court also limited its holding to violent, non-law-abiding persons and expressly reserved judgment on whether "a misdemeanant who has been law abiding for an extended period must be allowed to carry guns again, even if he

cannot [obtain pardon or expungement]." *Ibid*. Judge Sykes, who authored the panel opinion, dissented, arguing that the government still did not carry its relatively low burden and that the majority "develop[ed] its own record to support the government's application of § 922(g)(9) to th[e] defendant." *Id.* at 647 (Sykes, J., dissenting).

Similarly, when the government did not meet its burden of justifying § 922(g)(9) in a Fourth Circuit case, that court, in two separate opinions, remanded to demand a greater showing. Even when remanding for essentially de novo consideration of the entire Second Amendment claim because of a complete lack of a record, the court did concede one point: the defendant "was not law-abiding, and is therefore at least one step removed from the core constitutional right." *United States v. Chester* (*Chester I*), 367 F. App'x 392, 398 (4th Cir. 2010) (internal quotation marks omitted), *vacated on panel reh'g*, *Chester II*, 628 F.3d 673 (4th Cir. 2010). In a second opinion, the same panel reiterated that the defendant's claim was "not within the core right identified in *Heller*" because he was not "*law-abiding . . .* by virtue of [his] criminal history as a domestic violence misdemeanant." *Chester II*, 628 F.3d at 683 (emphasis in original). Judge Davis, concurring in the judgment, disagreed with much of the majority's analytic structure but agreed on the importance of the fact that the defendant was "not law abiding" and "had been convicted of a serious crime in which violence is an element." *Id.* at 690 (Davis, J., concurring in the judgment). A subsequent Fourth Circuit panel, in denying an as-applied challenge to the same statute, "consider[ed] important the fact" that Congress "*limit*[*ed*] *its application*" to only violent persons, "those persons who have used or attempted to use force capable of causing physical pain or injury in a domestic disturbance or those persons who have threatened the use of a deadly weapon in a domestic disturbance." *Staten*, 666 F.3d at 167 (emphasis added).[29]

Other courts, in upholding § 922(g)(9), have also emphasized the same limiting principle: that it applies only to persons who are, by definition, violent. *See White*, 593 F.3d at 1206 ("[A] person convicted under § 922(g)(9) must have first acted violently toward a family member or domestic partner."); *In re United States*, 578 F.3d at 1200 (noting that § 922(g)(9) "involve[es]

---

[29]On the second appeal, the *Chester* panel determined that *Staten* was controlling precedent. *See Chester III*, 514 F. App'x at 395; *see also United States v. Tooley*, 468 F. App'x 357, 359 (4th Cir. 2012) (unpublished) ("*Staten* controls the outcome" in a challenge to § 922(g)(9).).

those convicted of misdemeanor domestic *violence*" (emphasis in original)).  Judge Murphy, dissenting in *In re United States*, went even further, stating: "[I]t is not at all clear [Congress's] finding regarding the dangerousness of domestic violence misdemeanants is constitutionally sufficient to warrant a blanket ban on firearm possession." *In re United States*, 578 F.3d at 1196 (Murphy, J., dissenting).

The Ninth Circuit has focused on the lack of permanence of the ban in upholding § 922(g)(9).  It identified as a "provision limiting [§ 922(g)(9)'s] applicability" the fact that it "exempts those with expunged, pardoned, or set-aside convictions, or those who have had their civil rights restored." *Chovan*, 735 F.3d at 1138.[30]  Judge Bea, concurring, found it "important to note" that the law "applies only to those domestic violence convicts who remain convicted. Misdemeanants hold in their own hands the power to remove the taint of conviction and rejoin the protected class of those who may possess firearms.  They can seek pardon, expungement, set-aside of their conviction, or restoration of civil rights." *Id.* at 1151 (Bea, J., concurring).[31]  He further emphasized: "Section 922 . . . ceases to apply if convicts have satisfied the state procedures for expungement. . . .  It allows those who no longer pose a threat to society to demonstrate their rehabilitation and reclaim their Second Amendment rights." *Ibid.*  Not so for Clifford Tyler, who cannot seek expungement or pardon, as he never committed a crime, and who cannot seek relief from authorized programs that his state and nation refuse to fund.

### 3.  § 922's Age-Based Restrictions

Section 922's age-based restrictions, though temporary in nature, are perhaps a more challenging case because they target conduct by law-abiding individuals who are not per se violent as a class.  *See NRA I*, 700 F.3d at 206, *cert. denied*, 134 S. Ct. 1364 (2014) ("Granted, 18-to-20-year-olds may have a stronger claim to the Second Amendment guarantee than convicted felons and domestic-violence misdemeanants have.").  The First Circuit upheld a

---

[30]Also relevant in *Chovan* was that the government affirmatively provided "evidence that the rate of domestic violence recidivism is high." 735 F.3d at 1142.  In contrast, in the case at hand, aside from discussing two past incidents of a mentally ill (but not previously institutionalized) person committing gun violence, the government offered no evidence about the likelihood of the previously institutionalized committing violence after release from commitment.

[31]Interestingly, Judge Bea also noted that "[t]he frequency of such expungements . . . seem[s] to have risen in many states since the enactment of § 922(g)(9)." *Chovan*, 735 F.3d at 1151 (Bea, J., concurring) (citing Robert A. Mikos, *Enforcing State Law in Congress's Shadow*, 90 CORNELL L. REV. 1411, 1463–64 & nn. 187–88 (2005)).

seventeen-year-old's conviction under § 922(x)(2)(A), which forbids possession of handguns by juveniles, subject to several statutory exceptions for uses such as hunting, firearm-safety classes, and ranch-hand work. *See United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009). The decision did not turn on the limiting principles identified here, but the court did "emphasize the circumscribed nature of [its] decision" because the law was "narrowly drawn" and "contain[ed] exceptions." *Id.* at 16. Even more restrictive are § 922(b)(1) and (c)(1), forbidding licensed dealers to sell handguns to persons under the age of twenty-one. The Fifth Circuit upheld these laws, in part, based on the "temporary nature of the burden."[32] *NRA I*, 700 F.3d at 207.[33] The en banc court denied rehearing by a one-vote margin.[34] *See NRA II*, 714 F.3d 334. In a published dissent, Judge Jones argued that even the temporary disability for 18-to-20-year-olds was impermissible, as the majority's willingness to emphasize the short duration of the burden was "no different than saying they may be disabled from exercising constitutionally protected speech until they've attained a 'responsible' age." *Id.* at 345 (Jones, J., dissental, joined by Jolly, Smith, Clement, Owen, & Elrod, JJ.) ("Never in the modern era has the Supreme Court held that a fundamental constitutional right could be abridged for a law-abiding adult class of citizens.").

### 4. § 922(g)(8): Persons Subject to Domestic-Restraining Orders

The prohibition in § 922(g)(8) targets presumptively violent, albeit law-abiding, individuals. But it is temporary, only applying so long as a person is "subject to a court order." At least three circuits have upheld the law on this basis. *See United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011); *Reese*, 627 F.3d 792; *see also Mahin*, 668 F.3d 119 (relying on *Chapman* as controlling precedent). "Of critical importance" to the Fourth Circuit was that § 922(g)(8)'s "exceedingly narrow prohibitory

---

[32] Indeed, the burden was so temporary that the claims of two of the challengers became moot before oral argument because they had turned twenty-one. *NRA I*, 700 F.3d at 191. The Fifth Circuit did not consider whether a burden placed distinctively on 18-to-20-year-olds is one that is "capable of repetition, yet evading review." *Roe v. Wade*, 410 U.S. 113, 125 (1973).

[33] The court also highlighted that the laws at issue did not present a "total prohibition" on firearm possession and use by 18-to-20-year-olds, as the laws allowed such individuals to "possess and use handguns for self-defense, hunting, or any other lawful purpose; . . . acquire handguns from responsible parents or guardians; and . . . possess, use, and purchase long-guns." *NRA I*, 700 F.3d at 206–07, 209.

[34] The Fifth Circuit's per curiam order denying the petition for rehearing indicates the vote of each judge of the en banc court. *See NRA II*, 714 F.3d at 335.

sweep" only affected "persons under a [domestic-restraining order] then currently in force." *Chapman*, 666 F.3d at 228–29. The court said it was "significant" to its holding that the firearm ban was "temporally definite" and "limit[ed] the application to the exact duration of the [restraining order] at issue, which in [the defendant's] case was only 180 days." *Id.* at 230. The court further drove home the point: "Congress tailored [the law] to cover *only* the time period during which it deemed the persons subject to it to be dangerous." *Id.* at 231 (emphasis added).

The Eighth and Fifth Circuit cases bear out the same point: § 922(g)(8) is permissible in part because it is a temporary restriction on a constitutional right. The Eighth Circuit, emphasizing that it was considering "only a facial challenge" to § 922(g)(8), which fails if even one application of the statute is lawful, upheld the law on the ground that "[t]he prohibition . . . need not apply in perpetuity, but only so long as a person is 'subject to' a qualifying court order." *Bena*, 664 F.3d at 1184. The court reserved the question "whether § 922(g)(8) would be constitutional as applied to a person who is subject to an order that was entered without evidence of dangerousness." *Id.* at 1185. For the Fourth Circuit, § 922(g)(8) satisfied the tailoring requirement because the law contains two limiting principles. *See Mahin*, 668 F.3d at 125–26. The court first stressed that the law is "temporally limited and therefore exceedingly narrow." *Id.* at 125 (internal quotation marks omitted). The law did not "impos[e] a lifelong prohibition" but only a "temporary burden during a period when the subject of the order is *adjudged to pose a particular risk of further abuse*." *Ibid.* (emphasis added). Second, the Fourth Circuit stressed that the law "applies only to persons individually adjudged to pose a future threat" of violence. *Ibid.* The same cannot be said of § 922(g)(4).

### 5. § 922(g)(3): Unlawful Drug Users and Drug Addicts

Section 922(g)(3)'s prohibition is most similar to the one at issue here. Like § 922(g)(4), it encompasses two distinct prohibitions: possession of firearms by "unlawful" users of controlled substances and by drug addicts. As with § 922(g)(4), a person subject to a § 922(g)(3) prohibition might be an entirely non-violent, law-abiding citizen. On the one hand, both § 922(g)(3) prohibitions apply to potentially non-violent persons. The first prohibition targets, by definition, only non-law-abiding individuals—"unlawful" drug users—but it does target volitional conduct. The second prohibition applies to a class—drug addicts—some members of

which might be non-law-abiding[35] and does not necessarily target volitional conduct.[36] Yet both bans are not permanent prohibitions.

These limiting principles have led at least five circuits to uphold § 922(g)(3), one of which after initially remanding to require the government to produce more substantial evidence to justify the law. *See United States v. Carter* (*Carter II*), 750 F.3d 462 (4th Cir. 2014); *United States v. Carter* (*Carter I*), 669 F.3d 411 (4th Cir. 2012) (remanding to district court); *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011) (upholding § 922(g)(3) without significant discussion); *United States v. Seay*, 620 F.3d 919 (8th Cir. 2010); *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per curiam); *United States v. Richard*, 350 F. App'x 252 (10th Cir. 2009) (unpublished) (upholding § 922(g)(3) without significant discussion).

The Seventh and Ninth Circuits, in affirming § 922(g)(3) convictions, heavily stressed the temporary nature of the ban. As the Seventh Circuit said: "[U]nlike those who have been . . . committed to a mental institution and *so face a lifetime ban*, an unlawful drug user . . . [may] regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686 (emphasis added); *accord Dugan*, 657 F.3d at 999. For the prohibition to apply, "the habitual abuse [must] be contemporaneous with the gun possession." *Yancey*, 621 F.3d at 687. Applying that rule to the defendant's case, the Seventh Circuit held "the gun ban [would] exten[d] only so long as [the defendant] abuses drugs." *Ibid.* Thus, § 922(g)(3), both courts concluded, "is far less onerous than those affecting . . . the mentally ill." *Yancey*, 621 F.3d at 686–87; *accord Dugan* 657 F.3d at 999. We agree.

In *Carter I*, 669 F.3d 411, a case involving an as-applied challenge to § 922(g)(3)'s unlawful-drug-user prohibition, the Fourth Circuit both agreed with this limiting principle and also determined that the government did not meet its burden of justifying the law. Central to the court's analysis was that § 922(g)(3) "contain[ed] an important limiting principle that is absent from [other § 922] provisions." *Id.* at 418. Unlike provisions that "permanently disarm"

---

[35] Being a drug addict is not a crime. *Robinson v. California*, 370 U.S. 660, 667 (1962) (criminalizing drug addiction violates the Eighth Amendment, as incorporated by the Fourteenth Amendment).

[36] "[N]arcotic addiction is an illness . . . which may be contracted innocently or involuntarily." *Robinson*, 370 U.S. at 667 & n.9 (explaining that addiction may result from medically prescribed narcotics and that a person may "even be a narcotics addict from the moment of his birth").

individuals, the drug-user prohibition did "not permanently disarm all persons who, *at any point in their lives*, were unlawful drug users or addicts." *Id.* at 419 (emphasis added). This "feature" of the law satisfied the tailoring requirement for two reasons. *Ibid.* The court first discussed the law's "limited temporal reach" in contrast to "other statutes that impose a permanent prohibition on the possession of firearms." *Ibid.* "Congress tailored the prohibition to cover *only the time period* during which it deemed such persons to be dangerous." *Ibid.* (emphasis added). Second, the court discussed how the law "tracks the ongoing choices of individuals either to remain drug users or to quit drug abuse." *Ibid.* The court acknowledged that breaking addiction could be "extraordinarily difficult" but that, nonetheless, the law allowed a person "who places a high value on the right to bear arms to regain that right by parting ways with illicit drug use." *Ibid.* Even so, the court did not outright deny the as-applied challenge. Though recognizing that the government would probably meet its burden on remand, the court remanded for the government to do more than defend its position with just "common sense." *Ibid.* Following remand, the same panel found that the government did, in fact, meet its burden and held § 922(g)(3) constitutional. *See Carter II*, 750 F.3d at 470. In doing so, the court once again emphasized the law's "limited temporal reach." *Id.* at 466.

### B. § 922(g)(4)

Section 922(g)(4) goes further than any of the prohibitions discussed above. The statutory prohibition is permanent. It targets a class that is potentially non-violent and law-abiding. The prohibition, by definition, targets the non-volitional act of being committed.[37] The underlying behavior that prompted the commitment may also be non-volitional.[38] Post-*Heller* case law is not contrary to the result we reach today, though a cursory review of the cases might

---

[37] The prohibition excludes persons voluntarily committed. *See* 27 C.F.R. § 478.11 (ATF Regulations) (The term "*Committed to a mental institution* . . . does not include a voluntary admission to a mental institution."); *cf. McIlwain*, 2014 WL 6657013, at *6 ("While this Court is not bound or required to defer to the ATF's regulations [in 27 C.F.R. § 478.11] . . . , we find these regulations helpful and persuasive.").

[38] *See Robinson*, 370 U.S. at 666 (Because mental illness may be involuntary, "a law which made a criminal offense of [mental illness] would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.").

suggest otherwise. Decisions from the other circuits are not only consistent with concluding that Tyler's complaint states a constitutional violation but affirmatively support that result.[39]

It is certain that there is a non-zero chance that a previously institutionalized person will commit gun violence in the future, but that is true of all classes of persons. Although the government presents two examples of persons adjudicated as mentally ill who committed gun violence and cites one study in support of the claim that a prior suicide attempt is a "risk facto[r]" for suicide,[40] Appellee Br. 26, it has offered not an iota of evidence that prohibiting the previously institutionalized from possessing guns serves its compelling interests. In addition to recognizing that many previously institutionalized persons now are not dangerous and thus that a total ban was not justified, Congress went further. For an entire class of persons, Congress effectively conditioned the ability to exercise a right "necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778, on whether they reside in a state that has chosen to participate in a joint federal-state administrative scheme. It is true that it is not uncommon for Congress to incorporate state law into a federal scheme or to have the applicability of a federal regulation turn on the outcome of a state proceeding. *See generally* Robert A. Mikos, *Enforcing State Law in Congress's Shadow*, 90 CORNELL L. REV. 1411 (2005). Section 922 itself contains several examples. The felon-in-possession prohibition, for instance, may attach based on state convictions. *See* § 922(g)(1). So too, whether the domestic-violence-misdemeanant prohibition may be lifted turns on whether a state decides to afford expungement, a pardon, or a restoration of civil rights. *See* § 921(a)(33)(B)(ii). It is certainly possible—but by no means certain[41]—that states may vary in how difficult it is to obtain this kind of discretionary relief from past convictions. But Congress is not responsible for simple variance, not of its own design, among state procedures.

---

[39]As noted above, *see supra* note 26, the Eastern District of Pennsylvania recently permitted to proceed an as-applied challenge to § 922(g)(1)'s felon-in-possession ban because the ban unconstitutionally prevented an individual with no violent history or tendencies, only a sixteen-year-old conviction for a non-violent crime, from purchasing a firearm. *Binderup*, 2014 WL 4764424.

[40]There is also no evidence in the record that Tyler attempted suicide.

[41]*Compare Skoien II*, 614 F.3d at 645 ("Some of the largest states make expungement available as of right to misdemeanants who have a clean record for a specified time."), *with Skoien II*, 614 F.3d at 652–53 (Sykes, J., dissenting) (discussing the difficulty of obtaining an expungement, pardon, or restoration of civil rights in Wisconsin).

The joint federal-state regulatory scheme that Congress created to administer § 922(g)(4) goes beyond merely leaving decisions of state law to the state. Congress established criteria that state programs must meet, *see* Pub. L. No. 110-180, § 105, 122 Stat. 2559, 2569–60, and the government must "certify, to the satisfaction of the Attorney General," that the state programs meet the federal criteria, § 103(c), 122 Stat. at 2568. That is in itself fine. Congress may certainly incentivize state action through carrots and sticks, but Congress cannot condition individual constitutionally protected rights on states' participation. A state "shall grant . . . relief" to a person "who will not be likely to act" dangerously.[42] § 105, 122 Stat. at 2569–70. Tyler alleges that he will not present a danger, and he presents evidence to support that claim. If he lived in a state with a government-certified program, he could potentially regain his Second Amendment right. Because he resides in Michigan, he can never possess a gun, unless Michigan chooses to join the federal program. What is at stake is more than just "influencing a State's policy choices." *New York v. United States*, 505 U.S. 144, 166 (1992). It is the protection of the Second Amendment. For these reasons, § 922(g)(4)'s mental-commitment prohibition's application to Tyler does not satisfy narrow tailoring.

## V. Conclusion

It may be true that "[n]o Second Amendment challenge since *Heller* to any of [§ 922's 'who'] provisions has succeeded" in the courts of appeals. *Huitron-Guizar*, 678 F.3d at 1166. But no court has grappled with the provision at issue here under such circumstances. We do not tread lightly into this "unchartered realm of Second Amendment jurisprudence," *Chester I*, 367 F. App'x at 397, but do so "only upon necessity and only then by small degree," *Masciandaro*, 638 F.3d at 475. This previously unexplored area of our Constitution "has been opened to judicial exploration by *Heller* and *McDonald*." *Moore*, 702 F.3d at 942. And "[i]t should be unsurprising" that the question presented by this case remains "judicially unresolved," *Heller*, 554 U.S. at 625, as *Heller* was decided only six years ago. Yet provisions of our Constitution do not lose their force even with the passage of decades. *See United States v. Lopez*, 514 U.S. 549, 567–68 (1995). "It has now fallen to the lower courts to delineate the

---

[42]This process is subject to state law and due-process principles. § 105, 122 Stat. at 2569.

boundaries of the Second Amendment right," *Mahin*, 668 F.3d at 123, and "[t]here is no turning back," *Moore*, 702 F.3d at 942.

The Second Amendment's individual right to bear arms, identified in *Heller*, has "boundaries [that] are defined by the Constitution. They are not defined by Congress." *Chovan*, 735 F.3d at 1148 (Bea, J., concurring). Section 922(g)(4)'s prohibition is not necessarily improper as a matter of policy, "[b]ut the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. It is not our place to say whether permanently depriving the previously institutionalized of firearms is a good or bad idea. "[O]ur task is to apply the Constitution and the precedents of the Supreme Court, regardless of whether the result is one we agree with as a matter of first principles or policy." *Heller II*, 670 F.3d at 1296 (Kavanaugh, J., dissenting).

Nineteenth-century constitutional-law scholar Thomas M. Cooley—like Tyler, a Michigander—could not say "how far it may be in the power of the legislature to regulate the right [to bear arms]." Thomas M. Cooley, *A Treatise on Constitutional Limitations* 429 (5th ed. 1883). "Happily," Cooley said, "there neither has been, nor, we may hope is likely to be, much occasion for an examination of that question by the courts." *Ibid.* But the occasion has now arrived.

Tyler's complaint validly states a claim for a violation of the Second Amendment. The government's interest in keeping firearms out of the hands of the mentally ill is not sufficiently related to depriving the mentally healthy, who had a distant episode of commitment, of their constitutional rights.[43] The government at oral argument stated that it currently has no reason to dispute that Tyler is a non-dangerous individual. On remand, the government may, if it chooses, file an answer to Tyler's complaint to contest his factual allegations. If it declines to do so, the district court should enter a declaration of unconstitutionality as to § 922(g)(4)'s application to Tyler.[44] We REVERSE and REMAND for further proceedings consistent with this opinion.

---

[43]*Cf. Binderup*, 2014 WL 4764424, at *31 (Barring dangerous felons from gun ownership "might be effective at reducing firearm-related violent crime," but that does not justify barring an individual with only one sixteen-year-old conviction for a non-violent crime from purchasing a firearm.).

[44]*See Moore*, 702 F.3d at 942 (finding Illinois gun law unconstitutional under the Second Amendment and remanding to district court for the entry of declaration of unconstitutionality).

---

## CONCURRENCE

---

JULIA SMITH GIBBONS, Circuit Judge, concurring.  I concur in the result in this case and agree with much of the majority opinion's analysis.  I write separately to express my view that we should avoid extensive discussion of the degree of scrutiny to be applied and the ultimate application of strict scrutiny.  While I have substantial doubts as to whether strict scrutiny applies in this particular context—especially considering the general trend of our sister circuits[1]—it is unnecessary to reach the issue.  For one thing, both parties agree that intermediate scrutiny is the appropriate standard.  For another, Tyler has a viable Second Amendment claim under either degree of scrutiny; thus it seems most appropriate to assume, without deciding, that intermediate scrutiny applies here.

Under intermediate scrutiny, the government must demonstrate that there is a "'reasonable fit' between the challenged regulation and a 'substantial' government objective." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)).  This fit must employ means "narrowly tailored to achieve the desired objective."  *Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) (quoting *Fox*, 492 U.S at 480).  Thus, in this as-applied challenge to § 922(g)(4), the government must show a reasonable fit between its important objectives of public safety and suicide prevention and its ban on the possession of firearms by persons long ago adjudicated to be mentally unstable.  Based upon the record as it stands, the government has failed to do so.

There is no indication in this record of the continued risk presented by people who were involuntarily committed twenty-eight years ago and who have no history of mental illness, criminal activity, or substance abuse.  Indeed, Congress seems to have focused on the risk presented by those who are mentally ill, rather than the continued risk of those who were long ago found to be mentally ill.  Moreover, as the majority opinion notes, Congress explicitly

---

[1]The majority concedes that most of the other circuits have applied intermediate scrutiny in Second Amendment challenges.  (Op. 23, 26.)

recognized that there were instances in which the ban of § 922(g) should not continue to apply through creation of the now unfunded relief-from-disabilities mechanism.

The record is therefore inadequate for this court to confidently hold that § 922(g)(4) mental-commitment prohibition's application is narrowly tailored to the government's interests in public safety and suicide prevention. Accordingly, the majority opinion's ultimate conclusion—to reverse and remand to the district court—is correct.